**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| | ) | **Case No. 1:26-CR-21 (BAH)** |
| | ) | |
| | ) | |
| **-v-** | ) | |
| | ) | |
| **ANGEL RIOS** | ) | |

**Defendant.**

**<u>DEFENDANT'S MEMORANDUM IN AID OF SENTENCING</u>**

Angel Rios, through undersigned counsel, respectfully submits this memorandum requesting that the Court consider his entire life and the various legal arguments made in this sentencing memorandum in determining a fair and just sentence. Given the extreme challenges that Mr. Rios has faced in his upbringing, his lack of a significant criminal record, the relative limited scope of his conduct and the likelihood that he will successfully turn around his life, counsel respectfully submits that a sentence of thirty-six months of incarceration along with a significant period of supervised release is appropriate. This sentence would also reflect the particularly difficult five-month period that Mr. Rios has been subject to while in DOC custody as he has been relegated to involuntary segregated housing – essentially solitary confinement – for the past 5 months. Along with a 5-year period of supervised release, such a sentence would be sufficient but no greater than necessary to punish Mr. Rios and protect the interests of the community.

Mr. Rios is a 30-year-old man with one prior misdemeanor theft offense in his record from nine years ago. He was born in a rural, impoverished Latino community in California to a mother who appears to have been a young teenager at the time of conception and a father who was three years older than her. The pair did not have a relationship and between their youth, limited means and substance abuse problems, Angel Rios, the infant and child had essentially no support from and little to no contact with his parents.

Angel was thus raised by his grandmother, Graciela. Graciela, however had substance abuse issues of her own, suffered from rheumatoid arthritis and lived in dire poverty. She had only her disability check to support them and at a shockingly young age, Angel began to go to strangers' houses door to door to find jobs cleaning to help his grandmother make ends meet. Angel appreciated that his grandmother took him in when no one else would but also recalled significant physical and emotional abuse at a young age. Her health issues caught up with her though and she had a severe debilitating fall when he was nine. She was essentially bed-ridden from that point forward, transforming Angel into the caregiver. She passed when he was 14.

Angel then went to live with extended family, as his parents remained unavailable to him because of their issues with drugs and the criminal justice system. Mrs. Arrata, married to his cousin on his mother's side, recalled Angel's childhood when he moved in to live with them. She remembered that his grandmother kept an extremely dirty home with a hundred wandering cats and

that Angel himself was always filthy. She recalled that they relied upon food pantries at churches for food. But when Angel had nowhere else to go, Mrs. Arrata and her husband reluctantly took him in until he became an adult.

Mr. Rios' family life as an adult hasn't been much more fulfilling. Somewhere around the time he lived with Mrs. Arrata, it became clear to those around him that he was gay, news that was taken poorly by his relatives. Already an outcast, he became actually estranged from his parents and has had no contact with his mother since. He and his father have made attempts to build a father and son bond but that has not yet meaningfully developed. He ultimately moved to Mississippi in hopes of finding a fresh start and then to Washington D.C. with a desire to become involved in politics.

Mr. Rios' family situation has not improved. His sexuality remains a barrier between him and most of his family. It is telling that Probation relied upon a distant in-law to verify Mr. Rios' information – he has no close familial relationships in his life. Mrs. Arrata made that clear when she reiterated that he was not welcome to come live with him. He also lost many of his friends from his early adult life when he broke up with his long term partner.

Through all this, Mr. Rios has still made progress in his personal development. He has graduated high school and received a certification as a pharmacy technician, a field in which he worked for a couple of years. He has also attended some college. He has been employed steadily throughout his life, attempting entrepreneurial ventures like a graphic design company in Mississippi

and a political consulting business in D.C. but always sustaining himself through catering jobs, a job at McDonald's or Amazon, or as a cook at a bar and grill. Mr. Rios lived in the D.C. area for about 18 months before he was arrested for this offense. He most recently worked for Aramark at the Capital One Area and ascended to shift supervisor but was laid off due to construction a few months before his arrest. As a result of his unemployment, at the time of his arrest, Mr. Rios was at a particularly dark place in his life.

## ARGUMENT

### I. <u>A 36-Month Sentence Followed by a Period of 5 Years of Supervised Release is Sufficient, But Not Greater Than Necessary, to Comply with 18.U.S.C. §3553(a).</u>

#### a. Mr. Rios' Personal History and Characteristics

Mr. Rios' life story bears many of the same hallmarks of many indigent defendants in D.C., even as a gay man who grew up exclusively in California. But throughout the years, he did not have a strong network of family support to ultimately fall back upon. He was born to a teenaged mother who was unprepared for parenthood. He does not know if she was addicted to drugs before he was born but he knows that she was utterly unprepared to care for him. His grandmother made efforts but her physical disabilities meant that she lived in squalor and her addiction issues also came with abusive behavior. Mr. Rios' community lived outside of the kind of law enforcement that one sees in the cities and for a young child, it meant that there were no interventions by Child Protective Services when he was working as a small child or when he had a knife thrown at him or was

beaten with a tap dancing shoe. His extended family remembered how dirty he would appear in his childhood.

Dr. Erickson observes a direct link between the deficiencies in his childhood and his conduct in this case:

> Growing up without strong, stable, or nurturing parental figures deprived Mr. Rios of critical emotional foundations, healthy interpersonal boundaries, and constructive developmental guidance. This profound early neglect and exposure to poverty initiated a cascading pattern of personal instability throughout his adult life, characterized by chronic residential transience and an inability to maintain steady employment. Within this chaotic trajectory, Mr. Rios experienced recurrent episodes of depression and emotional distress. Lacking adaptive self-regulation techniques typically instilled during childhood, he developed maladaptive coping mechanisms, resorting to sexual behaviors and impulsive decision-making as a temporary, albeit highly problematic, means of managing emotional pain, emptiness, and negative affective states.

Exh. 2, Dr. Erickson's Report at 11.

As a result, Dr. Erickson is comfortable predicting that Mr. Rios will respond well to treatment and successfully rehabilitate. "In this context, his sexual behavior appears to have become a dysfunctional means of managing internal distress, particularly during periods of depressed mood. Addressing the underlying emotional deficits through appropriate psychological treatment will likely support the development of more appropriate sexual behaviors and reduce his broader impulsivity." *Id.*

Mr. Rios' sentence should also reflect the recent trauma that he has experienced at the D.C. Jail. In April, he was sexually assaulted twice.[1] Then, in

[1] Out of fear of repercussions, Mr. Rios did not report these assaults but another individual in his unit reported them.

May, he overheard his cellmate and other individuals plotting, in Spanish, to have him removed from the cell because the cellmate was uncomfortable being housed with a gay man. Sure enough, he was soon falsely accused of sexual assault by that cellmate.

When Mr. Rios explained to the PREA coordinator at the Jail what was happening, he was nevertheless placed in administrative restrictive housing in South One. As the Court has learned, the conditions there mirror those in solitary confinement. As the president's "surge" filled the D.C. Jail and created staff shortages, conditions at South One grew progressively worse.

Even after the complainant left the jail in the summer, Mr. Rios remained in South One. After MPD referred its investigation to the U.S. Attorney's Office and the USAO decided not to pursue charges, Mr. Rios remained in South One. Counsel appealed the decision to place Mr. Rios and still, nothing happened. Mr. Rios remained in South One until October 21, 2026, only after he filed a lawsuit against the District of Columbia and the Warden of the Jail and moved for a Preliminary Injunction and only after the case appeared in front of a Superior Court judge on October 20th and she expressed skepticism of the DOC's position.

Throughout that period, Mr. Rios was forced to be shackled in all of his legal visits and in all of his movements throughout the jail. He had limited medical and mental health visits. He had no access to his tablet and limitations placed on his recreation and shower time. He had limitations on his legal calls and his social

calls. He fell into depression, suffered from insomnia and began to take mental health medication for the first time in his life.[2]

b. **Nature and Circumstances of the Offense**

Mr. Rios' conduct is undoubtedly serious. However, it is important to note that in the spectrum of offenders that are sentenced for child sexual abuse material, Mr. Rios is on the far end of the spectrum.

First, Mr. Rios is not an individual that showed interest in watching child pornography. He had access to a video that he knew was extremely taboo and used it to push boundaries with an individual that he met online. This was of course an exceptional failure in judgment. But it was not the kind of behavior or impulse that drives someone to reoffend in this manner. Mr. Rios will never possess this sort of material again because he did not possess this material to gratify himself.

Second, his distribution of the video is materially different than the distribution that is contemplated by the enhancement in the guidelines. Mr. Rios did not share the video in an attempt to profit, circulate it into the marketplace or offer a quid pro quo. It was instead a terrible choice made after a gross misinterpretation of what he understood about a potentially romantic interaction. He had never distributed this material before and has never possessed any similar material prior to this particular video.

---

[2] When the Superior Court judge, the Honorable Julie Becker observed that the District of Columbia appeared to have a difficult argument regarding the irreparable harm suffered by Mr. Rios, the Office of the Attorney General attorney agreed.

Finally, he was always willing to be forthcoming about information that he had about the individual who produced the video. Although the government did not need any assistance from Mr. Rios, he would have been and remains willing to help. Mr. Rios understands that the individual is facing charges in Pennsylvania.

While grave, this offense arose in a context that distinguishes it from the type of sexual preferences that are often associated with offenses of this category. The incident occurred during a moment of impulsive and profoundly misguided judgment. In no way and at no time is Mr. Rios a threat to minor children.

This was an isolated incident and there is no evidence of any prior misconduct of any kind, no pattern of inappropriate behavior toward minors, and no use of force, threats, coercion, or manipulation. As the risk assessment notes, Mr. Rios is suitable for rehabilitation and is not at an elevated risk of recidivism.

By recognizing these distinctions, the Court can impose a sentence that is firm and accountable, but also proportionate to the specific nature of this offense and the evidence showing that Mr. Rios is capable of change. He is particularly predisposed for rehabilitation, and presents a low risk of similar conduct when supported by structured supervision and ongoing therapy.

### c. The Need to Promote Respect for the Law, Provide Just Punishment, Protect the Community and Provide Adequate Deterrence, and the Need to Avoid Unwanted Sentencing Disparities

The recommended sentence will promote respect for the law and provide just deterrence. Firstly, Mr. Rios' current incarceration of approximately ten months, five in solitary confinement, has already deterred him from any future misconduct.

He has never been incarcerated and so this has been a naturally jarring and terrifying experience for him. In addition, there are brutal collateral consequences that Mr. Rios will face that serve as significant specific and general deterrence. Being branded a sex-offender and having to register will follow him around for the rest of his life. This conviction will also undoubtedly prevent many future job opportunities. These severe collateral consequences are a form of punishment that will plague him for the rest of his life. Judges have recognized that there are several forms of punishment, other than incarceration, that should be taken into account when imposing a sentence:

> People are all very quick to suggest that the only real punishment is a jail sentence, and it's just not true. People can suffer in many different ways and do suffer in many different ways a result of their conduct and that is something every judge, at least on this court, I believe, understands, and takes into account when they're fashioning the appropriate sentence.

*United States v. Andrew Cavanaugh*, 21-cr-362 (APM), Sentencing Transcript at 29.

Furthermore, the recommended sentence would not create unwanted sentencing disparities. In fact, according to JSIN, the average and median sentences for offenses in the same guideline is 60 months – no doubt because they typically come with a 60 month mandatory minimum. Mr. Rios' guideline range is exceptionally low and a similar reduction from the guideline range would be warranted in this case.

Because possession cases are uncommon, it is helpful to look at the variances given by judges in more serious cases. In far more serious CSAM cases, significant variances are the norm, for reasons discussed below. Even in Distribution cases

which undoubtedly create significantly greater harm to the victims, many other judges in this district, have imposed sentences well below the calculated guideline range for similar and more aggravating conduct. *See United States v. Steve Sollera*, 14-cr-225 (TSC) (sentence of 60 months imposed despite guideline range of 135-168 months); *United States v. Douglas Payne*, 11-cr-317 (ABJ) (sentence of 60 months imposed for conduct involving travel and possession); *United States v. Gange*, 13-cr-038 (JEB) (defendant who distributed large quantities of photos sentenced to 46 months); *United States v. Dietterle*, 13-cr-080 (ABJ) (defendant who distributed pornography and discussed meeting to engage in sexual contact with minor sentenced to 40 months); and *United States v. Matthew Scanlon*, 14-cr-007 (RC) (sentenced to 51 months imposed despite guideline range of 87-108 months – defendant doing well on supervision).

As discussed in more detail below, the guideline calculation gives excessive weight to factors based on assumptions that are unfounded in general and particularly about this case. Given the acknowledged issues with the 2G2.2 guidelines, Courts have granted significant downward variances in similar cases. This Court has been no exception, especially in cases with guidelines far higher than Mr. Rios'. *See United States v. Godoc*, 12-cr-29 (BAH) (a sentence of 81 months imposed despite a guideline range of 210-262 months); *United States v. DeGrange*, 13-cr-297 (BAH) (a sentence of 57 months imposed for conduct that involved travel and possession); and *United States v. Cunningham*, 13-cr-288 (BAH) (a sentence of 51 months imposed).

Lastly, the interests in rehabilitation outweigh a lengthy period of incarceration. Mr. Rios is motivated and willing to engage in the rehabilitation that Dr. Erickson and Probation emphasizes and recommends. This rehabilitation is important not only for his life and future productivity, it is also important to protect the community in the future.

## II. <u>The Sentencing Guideline Enhancements set forth in U.S.S.G. §2G2.2 Result in a Guideline Range that is Incompatible with the 3553(a) Factors.</u>

The defense submits that in the present case the Sentencing Guidelines should be rejected on policy grounds. A sentencing judge "may vary from Guideline ranges based solely on policy considerations, including disagreements with the Guidelines." *Kimbrough v. United States*, 552 U.S. at 101 (2007). Such a policy disagreement is appropriate because several of the enhancements that apply have been widely criticized on policy grounds. Many circuit courts have expressed concern over the high guideline range that child pornography cases produce. *See United States v. Grober*, 624 F.3d 592, 597 (3d. Cir. 2010) (discussing articles that show the flawed nature of the child pornography guidelines).[3] The Court also

[3] <u>*See Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of the Child Pornography Guidelines*</u>, attached as Exhibit 3. In this article, the progression of the guidelines are dissected and show that the base offense level for child pornography offenses evolved from a based offense of 13 to 17 in 1996 and then to 18 (for possession only) in order to account for various circumstances typically associated with modern day child pornography offenses. Unfortunately, the additional enhancements that were also added over the years contradict this intention to modify the base offense level to reflect the seriousness of the offense. Now, we are in a situation where the base offense level is supposed to account for the egregiousness of most offenses but is oddly doubled in severity for defendants because of the extra enhancements resulting in adjusted offenses levels of 26 and beyond for most cases.

reviewed many district court opinions and one circuit opinion that expressed concern over the child pornography guidelines and found that they were not based on empirical data. *See United States v. Dorvee*, 616 F.3d 174 (2d. Cir. 2010); *United States v. Baird*, 580 F.Supp.2d 889 (D. Neb. 2008); *United States v. Shipley*, 560 F.Supp.2d 739 (S.D. Iowa 2008). In fact, *Grober* explained why the district court found the guidelines to be so flawed and it is because it found that most of the enhancements are essentially inherent in the crime and applied in almost every case. *Grober*, 624 F.3d at 597.[4]

Applying these flaws to the instant matter, it is clear that most of the enhancements applied to Mr. Rios are inherent in the crime itself. Sentencing Commission statistics bear out what appears obvious – the enhancements are outdated. First, Mr. Rios received the two-level enhancement for use of a computer or interactive device. *See* PSR at ¶ 27. It is hard to imagine in this day and age how someone would access child pornography but not for the internet and 96.3% of Possession convictions apply that enhancement. *See* Exhibit 4, *Federal Sentencing of Child Pornography, Non-Production* at 19. Second, he received an additional *two-level* enhancement for the number of images he possessed. 95.4% of Possession offenses apply that enhancement. *Id. See* PSR at ¶ 28. Mr. Rios receives that enhancement even though he had **one** video (the equivalent of 75 images) and the

[4] The Second Circuit also agreed with this analysis in *United States v. Tutty*, 612 F.3d 128 (2d Cir. 2010) and *United States v. Volpe*, 224 F.3d 72 (2d Cir. 2000). These cases explain in detail why certain enhancements would apply in virtually almost every case. For example, the computer enhancement allows "double-counting" because effectively increases a defendant's sentence to reflect the kind of harm that has already been accounted for the modern day offense levels.

median number of images of 2350 in Possession offenses when the data was last collected in 2019. *Id.* at 30.

Even the two-level age-of-the-victim enhancement (96.3%) and the sadomasochistic conduct or abuse of toddler enhancement (78.6%) are applied at very high rates. *Id.* at 19. *See* PSR at ¶¶ 24, 26. This suggests that such characteristics are now the norm in a crime where files are more likely to be received and distributed *en masse*, rather than inspected individually. *Id.* The *four-level* sadomasochistic image enhancement is applied in 89.6% of distribution cases and 78.6% of possession cases. The two-level prepubescent (under 12) minor enhancement applies in 96.3% of possession cases. The Sentencing Commission thus concluded: "Thus, across all non-production child pornography offense types, §2G2.2 fails to distinguish adequately between more and less severe offenders." *Id.*

Just eliminating the use of computer and number of images enhancements that are inherent in Mr. Rios' crime would bring his offense level to 23. With a Criminal History Category of I, his guideline range would be 46-57 months rather than the excessively high range of 70-87 months. Eliminating the prepubescent victim enhancement would place him in the 37-46 month range.

Courts nationwide have responded to the outdated Guidelines. Courts varied downward in 53.2% of non-production child pornography offenses in 2024. *See* Exhibit 5, *Child Pornography Offenses QuickFacts*, at 2. In fact, for someone in Mr. Rios' guideline cell, a variance is the norm. The average sentence is 60 months and the median sentence is 60 months, prompting Probation's acknowledgement that a

substantial variance may be necessary to avoid an unwarranted sentencing disparity. PSR at ¶ 104.

Even still, removing those enhancements does not fix the flawed nature of 2G2.2. The Sentencing Commission has acknowledged that U.S.S.G. §2G2.2 is not the product of "empirical data and national experience" but rather a reaction to Congress's push for mandatory minimum sentences. *United States Sentencing Commission, Fifteen Years of Guideline Sentencing*, at 73 (Nov. 2004) ("frequent mandatory minimum legislation and specific directives to the Commission to amend the Guidelines make it difficult to gauge the effectiveness of any particular policy change, or to disentangle the influences of the Commission from those of Congress"); *United States v. Hanson*, 561 F. Supp. 2d 1004 (E.D. Wisc. 2008); *United States v. Baird*, 580 F.Supp. 2d 889, 892 (D. Neb. 2008) ("when Guidelines are not the result of 'the Commission's exercise of its characteristic institutional role,' such as when they are not based on an empirical approach, but instead keyed to or guided by statutory directives, a court is not presented with an 'ordinary case,' in which 'the Commission's recommendation of a sentencing range will reflect a rough approximation of the sentences that might achieve 3553(a)'s objectives'"); *United States v. Johnson*, 588 F.Supp 2d 997, 1004 (S.D. Iowa) ("because [2G2.2.] does not reflect the unique institutional strengths of the Sentencing Commission in that they are not based on study, empirical research, and data, the Court affords them less deference").

## CONCLUSION

Mr. Rios has struggled throughout his life. He has lived through life mired with various challenges. But what happened when he committed this crime was a result of his depression and the lack of regulation that was a direct result of an exceptionally difficult upbringing. Mr. Rios is eager to begin his rehabilitation and will ultimately be successful. Because of his likelihood of rehabilitation and his early and sincere acceptance of responsibility and any other reasons that appear to the Court, Mr. Rios respectfully submits that a sentence of thirty-six months of incarceration is sufficient but no greater than necessary to punish him.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

By: s/_______________

Eugene Ohm
Assistant Federal Public Defender
Office of the Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C. 20004