# EXHIBIT 4

United States Sentencing Commission
June 2021

# FEDERAL SENTENCING OF CHILD PORNOGRAPHY NON-PRODUCTION OFFENSES



# FEDERAL SENTENCING OF CHILD PORNOGRAPHY: NON-PRODUCTION OFFENSES

CHARLES R. BREYER

Acting Chair

PATRICIA K. CUSHWA

*Ex Officio*

JONATHAN WROBLEWSKI

*Ex Officio*

KENNETH P. COHEN

Staff Director

**JUNE 2021**



# Table of Contents



1 Introduction & Key Findings

11 Chapter One: Overview of Sentencing Framework

15 Chapter Two: Data Overview

27 Chapter Three: Content, Community, and Conduct

47 Chapter Four: Sentencing Disparities

61 Chapter Five: Recidivism

67 Conclusion

71 Appendices

80 Endnotes




> **This report focuses on offenders sentenced under the non-production child pornography guideline. A subsequent report will analyze offenders sentenced under the production of child pornography guideline.**

# Introduction

## This publication updates and expands upon the United States Sentencing Commission's 2012 *Child Pornography Report to the Congress: Federal Child Pornography Offenses* (the "2012 *Child Pornography Report*").[1]

In the 2012 *Child Pornography Report*, the Commission analyzed offenders sentenced under the federal child pornography sentencing guidelines and their corresponding statutes to assess how these offenders were prosecuted, sentenced, and supervised following their reentry into the community. This report focuses on offenders sentenced under the guideline for non-production offenses such as the possession, receipt, and distribution of child pornography (USSG §2G2.2).[2] A subsequent report will analyze offenders sentenced under the guideline for child pornography production offenses (USSG §2G2.1).[3]

Several factors prompted the Commission to examine child pornography offenses in 2012. First, while only a small percentage of the overall federal criminal caseload, child pornography offenses had grown substantially both in total numbers and as a percentage of the total caseload.[4] Second, there had been a steady increase in the percentage of sentences imposed below the applicable guideline range in non-production child pornography cases, which indicated that courts increasingly believed the sentencing scheme for such offenders was overly severe.[5] Third, the volume and accessibility of child pornography images had increased dramatically due to the rising use of computers, digital cameras, and internet-based technology like peer-to-peer ("P2P") file sharing programs.[6] The changes in computer and internet technology typically used by non-production child pornography offenders rendered the sentencing scheme insufficient to distinguish between offenders with different degrees of culpability.[7]

The 2012 *Child Pornography Report* sought to contribute to the ongoing assessment by Congress and other stakeholders in the federal criminal justice system regarding the efficacy of sentences for federal child pornography offenses, particularly for non-production cases. Specifically, the 2012 *Child Pornography Report* evaluated the severity of offender behavior to provide a more complete understanding of non-production child pornography offenses and offenders. The Commission emphasized the seriousness of non-production offenses, noting that child pornography offenses normalize the sexual abuse of children and may promote existing tendencies towards sex offending and the production of new images.[8] Indeed, the 2012 *Child Pornography Report* showed that approximately one in three non-production child pornography offenders had engaged in one or more types of criminal sexually dangerous behavior in addition to the instant child pornography offense.[9] The Commission also found that the rise of the internet facilitated the growth of online child pornography "communities" in chat rooms and other online platforms.

The 2012 *Child Pornography Report* also examined sentencing outcomes and resulting disparities. The Commission explained that guideline ranges and average sentences had increased substantially since Congress passed the Prosecutorial Remedies and Other Tools to end the Exploitation of Children Today ("PROTECT") Act of 2003.[10] Through the PROTECT Act, not only did Congress directly amend the guidelines to add new sentencing enhancements and create new

statutory mandatory minimum penalties, but the underlying conduct triggering such enhancements and penalties increasingly applied to more offenders.[11] Due to advancements in technology, enhancements that were only intended to apply to the most serious child pornography offenses were routinely applied to most non-production child pornography offenders. At the same time, within range sentences were imposed in less than one-third of non-production child pornography cases.[12] Differences in charging practices also contributed to sentencing disparities—particularly the decision to charge a defendant with possession (requiring no mandatory minimum sentence) versus receipt or distribution (requiring a five-year mandatory minimum sentence), as well as plea agreements with stipulations limiting a defendant's exposure to sentencing enhancements.[13]

Based on those findings, the Commission concluded that the non-production child pornography sentencing scheme should be revised to account for technological changes in offense conduct, emerging social science research about offender behavior, and variations in offender culpability and sexual dangerousness.[14] The Commission recommended that three primary factors be considered when imposing sentences in non-production child pornography cases: (1) the **content** of the offender's child pornography collection and nature of the offender's collecting behavior; (2) the offender's degree of involvement with other offenders, particularly in an internet **community** devoted to child pornography and child sexual exploitation; and (3) the offender's engagement in sexually abusive or exploitative **conduct** in addition to the child pornography offense.[15]

In order to revise §2G2.2 to more adequately account for these three factors and to eliminate the disproportionate emphasis on outdated measures of culpability, the Commission recommended that Congress enact legislation providing the Commission express authority to amend the guideline provisions that were promulgated pursuant to specific congressional directives.[16] The Commission explained that such authority would enable it to consider amendments to account for changes in typical offense behavior (*e.g.*, revising enhancements involving the type and number of images to reflect the current spectrum of offender culpability), technological advancements (*e.g.*, revising enhancements involving distribution and use of a computer to reflect the widespread modern use of computers and internet technologies such as P2P file sharing programs), and emerging social science knowledge (*e.g.*, revising the "pattern of activity" enhancement and creating a new enhancement for offender involvement in child pornography communities).[17]

The Commission also recommended that Congress align the statutory penalty schemes for receipt offenses (requiring a five-year mandatory minimum sentence) and possession offenses (requiring no mandatory minimum sentence).[18] The Commission noted that Congress's prior rationale for punishing receipt more severely than possession had been largely eliminated.[19] Specifically, the underlying offense conduct in the typical receipt case was indistinguishable from the typical possession case, yet widespread sentencing disparities existed among similarly situated offenders sentenced under the non-production child pornography guideline based largely on whether they were charged with receipt or possession.[20] The Commission also noted that Congress may wish to revise the penalty structure governing distribution offenses to reflect the evolution of technologies used to distribute child pornography and to differentiate between different types of distribution.[21]

To date, Congress has not implemented the Commission's statutory or guideline recommendations. Therefore, §2G2.2 remains largely unchanged, with the guideline enhancements for non-production child pornography offenders at issue in the 2012 *Child Pornography Report* still in effect. As a result, judges have continued to sentence most non-production child pornography offenders below their guideline ranges, most often by imposing variances pursuant to 18 U.S.C. § 3553(a).

This report focuses on non-production child pornography offenses and provides updated data from fiscal year 2019 regarding the three factors the Commission previously identified as the recommended focus in sentencing child pornography offenders: content, community, and conduct. Specifically, this report analyzes the content of the offender's collection, the offender's level of involvement with other individuals in child pornography communities, and any engagement by the offender in sexually abusive conduct in addition to the child pornography offense. In doing so, this report examines the evolution of technology since the 2012 *Child Pornography Report* and its continued impact on offender conduct and the widespread applicability of sentencing enhancements in the non-production child pornography guideline. This report also examines the growing sentencing disparities identified in the 2012 *Child Pornography Report* by analyzing the impact of charging decisions and plea agreements on the final sentence, as well as the exercise of judicial discretion in sentencing offenders outside their guideline ranges. Finally, this report provides a recidivism analysis of non-production child pornography offenders released from incarceration or placed on probation in 2015.

## PROTECT Act of 2003

Congress directly amended the guidelines to add new sentencing enhancements and created new statutory mandatory minimum penalties. As a result, the underlying conduct triggering such enhancements and penalties increasingly applied to more offenders.

## 2012 *Child Pornography Report*

The Commission concluded that the non-production child pornography sentencing scheme should be revised to account for technological changes, emerging social science research, and variations in offender culpability and sexual dangerousness.

Recommendations:

- Focus sentencing of these offenders on three primary factors: content, community, and conduct.
- Enact legislation providing the Commission with express authority to amend the guidelines promulgated pursuant to congressional directives.
- Align the statutory penalty schemes for receipt offenses and possession offenses.

## This Report

This report provides updated data from fiscal year 2019 regarding content, community, and conduct. It also examines the evolution of technology since the 2012 *Child Pornography Report* and its continued impact on offender conduct and the widespread applicability of sentencing enhancements. Lastly, it provides a recidivism analysis of non-production offenders.

# Key Findings

**1 Facilitated by advancements in digital and mobile technology, non-production child pornography offenses increasingly involve voluminous quantities of videos and images that are graphic in nature, often involving the youngest victims.**

- *In fiscal year 2019, non-production child pornography offenses involved a median number of 4,265 images, with some offenders possessing and distributing millions of images and videos.*
- *Over half (52.2%) of non-production child pornography offenses in fiscal year 2019 included images or videos of infants or toddlers, and nearly every offense (99.4%) included prepubescent victims.*

**2 Constrained by statutory mandatory minimum penalties, congressional directives, and direct guideline amendments by Congress in the PROTECT Act of 2003, §2G2.2 contains a series of enhancements that have not kept pace with technological advancements. Four of the six enhancements—accounting for a combined 13 offense levels—cover conduct that has become so ubiquitous that they now apply in the vast majority of cases sentenced under §2G2.2.**

- *For example, in fiscal year 2019, over 95 percent of non-production child pornography offenders received enhancements for use of a computer and for the age of the victim (images depicting victims under the age of 12).*
- *The enhancements for images depicting sadistic or masochistic conduct or abuse of an infant or toddler (84.0% of cases) or having 600 or more images (77.2% of cases) were also applied in most cases.*

**3 Because enhancements that initially were intended to target more serious and more culpable offenders apply in most cases, the average guideline minimum and average sentence imposed for non-production child pornography offenses have increased since 2005.**

- *The average guideline minimum for non-production child pornography offenders increased from 98 months in fiscal year 2005 to 136 months in fiscal year 2019.*

- *The average sentence increased more gradually, from 91 months in fiscal year 2005 to 103 months in fiscal year 2019.*

**4 Although sentences imposed remain lengthy, courts increasingly apply downward variances in response to the high guideline ranges that apply to the typical non-production child pornography offender.**

- *In fiscal year 2019, less than one-third (30.0%) of non-production child pornography offenders received a sentence within the guideline range.*

- *The majority (59.0%) of non-production child pornography offenders received a variance below the guideline range.*

- *Non-government sponsored below range variances accounted for 42.2 percent of sentences imposed, and government sponsored below range variances accounted for 16.8 percent.*

**5 Section 2G2.2 does not adequately account for relevant aggravating factors identified in the Commission's 2012 *Child Pornography Report* that have become more prevalent.**

- *More than forty percent (43.7%) of non-production child pornography offenders participated in an online child pornography community in fiscal year 2019.*

- *Nearly half (48.0%) of non-production child pornography offenders engaged in aggravating sexual conduct prior to, or concurrently with, the instant non-production child pornography offense in fiscal year 2019. This represents a 12.9 percentage point increase since fiscal year 2010, when 35.1 percent of offenders engaged in such conduct.*

**6 Consistent with the key aggravating factors identified in the Commission's 2012 *Child Pornography Report*, courts appeared to consider participation in an online child pornography community and engaging in aggravating sexual conduct when imposing sentences, both in terms of the length of sentence imposed and the sentence relative to the guideline range.**

- *In fiscal year 2019, the average sentence imposed increased from 71 months for offenders who engaged in neither an online child pornography community nor aggravating sexual conduct, to 79 months for offenders who participated in an online child pornography community, to 134 months for offenders who engaged in aggravating sexual conduct.*

- *In fiscal year 2019, offenders who engaged in aggravating sexual conduct were sentenced within their guideline ranges at a rate nearly three times higher than offenders who did not participate in online child pornography communities or engage in aggravating sexual conduct (44.3% compared to 15.6%).*

**7 As courts and the government contend with the outdated statutory and guideline structure, sentencing disparities among similarly situated non-production child pornography offenders have become increasingly pervasive. Charging practices, the resulting guideline ranges, and the sentencing practices of judges have all contributed to some degree to these disparities.**

- *For example, the sentences for 119 similarly situated possession offenders ranged from probation to 228 months though these 119 possession offenders had the same guideline calculation through the application of the same specific offense characteristics and criminal history category.*

- *The sentences for 52 similarly situated receipt offenders ranged from 37 months to 180 months though these 52 receipt offenders had the same guideline calculation through the application of the same specific offense characteristics and criminal history category.*

- *The sentences for 190 similarly situated distribution offenders ranged from less than one month to 240 months though these 190 distribution offenders had the same guideline calculation through the application of the same specific offense characteristics and criminal history category.*

**8 When tracking 1,093 non-production child pornography offenders released from incarceration or placed on probation in 2015, 27.6 percent were rearrested within three years.**

- *Of the 1,093 offenders, 4.3 percent (47 offenders) were rearrested for a sex offense within three years.*

- *Eighty-eight offenders (8.1% of the 1,093) failed to register as a sex offender during the three-year period.*

# Methodology

Figure 1.
District Court Documents Received by the Commission




To fulfill its statutory responsibilities, the Commission collects and analyzes data on federal sentences for every federal felony and Class A misdemeanor offender sentenced each year.[22] Courts are statutorily required to submit five sentencing documents to the Commission within 30 days of entry of judgment in a criminal case: (1) the charging document; (2) the plea agreement; (3) the Presentence Report ("PSR"); (4) the Judgment and Commitment order; and (5) the Statement of Reasons form. The Commission extracts and codes data from these documents, including sentencing data, demographic variables, statutory information, guideline application decisions, and departure and variance information. This report uses data from the Commission's fiscal years 2005–2019 Offender Datafiles.

Figure 2.
Federal Offenders Sentenced in Fiscal Year 2019

**FEDERAL OFFENDERS SENTENCED IN FY 2019**
**70,537**



NON-PRODUCTION CHILD PORNOGRAPHY OFFENDERS
1,340



The Commission also undertook an extensive special coding project to collect and analyze data on non-production child pornography offenses and offender characteristics beyond the information regularly collected in the Offender Datafiles and reported in the Commission's annual *Sourcebook of Federal Sentencing Statistics*. The Commission analyzed 1,340 cases in which offenders were sentenced under §2G2.2 in fiscal year 2019 for which courts submitted sufficient sentencing documentation.[23] The resulting data provides a more complete picture of the offenders' conduct.

The special coding project examined the content of the offenders' collection and their collecting behavior, involvement in child pornography communities, and engagement in aggravating conduct (including contact and non-contact sex offenses), as well as the impact of prosecutorial charging decisions and plea agreements on sentencing outcomes. These topics and additional information regarding the methodology are discussed in Chapters 2, 3, and 4. The Commission also studied the recidivism of non-production child pornography offenders released from incarceration or placed on probation in 2015 to determine the extent to which this group was arrested for new criminal offenses following reentry into the community. The recidivism methodology and findings are discussed in Chapter 5.

# Overview of Sentencing Framework

Chapter

1

# Statutory Scheme

| Possession | | Receipt/Distribution | |
|---|---|---|---|
| *Prior Sex Conviction?* | | *Prior Sex Conviction?* | |
| No | Yes | No | Yes |
| 0 to 10 years *or* 0 to 20 years *(depending on age of victim)* | 10 to 20 years | 5 to 20 years | 15 to 40 years |

Congress has long expressed its concern for child pornography offenses and the severity of penalties for child pornography offenders. Congressional work in this area most recently culminated in the PROTECT Act of 2003, establishing the current statutory penalties and sentencing guidelines for non-production child pornography offenses.[24] In the PROTECT Act, Congress created new mandatory minimum penalties for receipt and distribution offenses and increased the statutory maximum penalties for all non-production child pornography offenses. Congress also directly amended the child pornography sentencing guidelines by increasing the number of enhancements and limiting judges' ability to depart below the then-mandatory guideline ranges in child pornography cases.

The federal child pornography statutory scheme prohibits acts related to the production, advertisement, distribution, transportation, importation, receipt, solicitation, and possession of child pornography in chapter 110 of title 18 of the United States Code.[25]

The primary types of non-production offenses are distribution,[26] receipt, and possession of child pornography. Distribution and receipt offenses each carry a mandatory minimum term of five years of imprisonment and a maximum term of 20 years.[27] If a defendant has a prior federal or state conviction for one or more qualifying sex offenses, the penalty range for distribution and receipt offenses increases to a mandatory minimum term of 15 years of imprisonment and a maximum term of 40 years.[28] Possession, by contrast, has no mandatory minimum, carrying a statutory range of zero to ten years of imprisonment (or zero to 20 years of imprisonment if the offender possessed child pornography depicting a prepubescent minor or a minor under the age of 12).[29] Offenders convicted of possession of child pornography with a prior federal or state conviction for a qualifying sex offense face a statutory imprisonment range of ten to 20 years.[30]

Significantly, the conduct underlying a receipt conviction is usually indistinguishable from a possession conviction, which does not carry a mandatory minimum sentence. Receipt offenders, however, are subject to the same statutory penalties as distribution offenders, including a mandatory minimum sentence of at least five years of imprisonment. The offense of receipt requires a defendant's knowledge that he or she is coming into possession of child pornography at the time the image or video is received, so a defendant's knowing possession of child pornography does not by itself establish that the defendant also knowingly received it.[31] However, it is exceedingly rare that a possession offender would unwittingly receive child pornography and later decide to possess it.[32] Thus, as a practical matter, the conduct underlying a receipt or possession charge is materially identical. Nevertheless, the statutory penalty range is determined by whether the defendant is convicted of possession or receipt.

The PROTECT Act also created a mandatory minimum term of supervised release of five years for all child pornography offenders and raised the maximum statutory term of supervised release from three years for most child pornography offenders to a lifetime term for all child pornography offenders.[33]

# Sentencing Guidelines

The sentencing guideline for non-production child pornography offenses is found in Chapter Two, Part G, Subpart 2 (Sexual Exploitation of a Minor) of the *Guidelines Manual*. Section 2G2.2 has a two-tiered system for assigning a base offense level based on the defendant's most serious conviction.[34] If a defendant is convicted of possession of child pornography, the base offense level is 18.[35] If a defendant is convicted of receipt or distribution, the base offense level is 22.[36] However, if a defendant's actual conduct was limited to receipt or solicitation of child pornography, and the defendant did not intend to traffic in or distribute child pornography, that offense level is reduced by two levels to 20.[37]

Section 2G2.2 contains six enhancements based on aggravating circumstances: (1) victims under the age of 12 or prepubescent minors;[38] (2) the defendant distributed child pornography;[39] (3) the images included sadistic or masochistic acts or violence or the exploitation of an infant or toddler;[40] (4) the defendant engaged in a "pattern of activity" involving the "sexual abuse or exploitation of a minor;"[41] (5) the defendant used a computer to commit the offense;[42] and (6) the offense involved a certain number of images.[43]

Consistent with changes made by the PROTECT Act, the supervised release guidelines recommend a lifetime term of supervised release for all child pornography offenders.[44]

Chapter Two, Part G, Subpart 2
of the *Guidelines Manual*
(Sexual Exploitation of a Minor)

***Specific Offense Characteristics***

**§2G2.2(b)(2)**
*Victim prepubescent or under 12*
**2-level increase**

**§2G2.2(b)(3)**
*Distribution of child pornography*
**2- to 7-level increase**

**§2G2.2(b)(4)**
*Sadistic or masochistic conduct or abuse of an infant or toddler*
**4-level increase**

**§2G2.2(b)(5)**
*Pattern of activity involving sexual abuse or exploitation*
**5-level increase**

**§2G2.2(b)(6)**
*Use of a computer*
**2-level increase**

**§2G2.2(b)(7)**
*Number of images*
**2-to 5-level increase**

[redacted]

# Data Overview

## Chapter 2

# Introduction

## This chapter provides data analyses of offenders sentenced under the non-production child pornography guideline, focusing on offender and offense characteristics.

*The analyses in this section include data on offenders sentenced between fiscal years 2005 to 2019 under a Guidelines Manual effective November 1, 2004 or later. The Commission used fiscal year 2005 as the earliest point of analysis to evaluate a 15-year period after the PROTECT Act and its impact on statutory penalties and the guidelines. The analyses provide a snapshot of fiscal year 2019 data and highlight trends over the 15-year period.*

Figure 3.
§2G2.2 Offenders by Type of Child Pornography Offense
*Fiscal Year 2019*




### Fiscal Year 2019 Snapshot

Non-production child pornography offenders represented a small percentage of the overall federal offender population in fiscal year 2019. Of the 70,537 federal offenders sentenced in fiscal year 2019 with complete case documentation sent to the Commission, 1.9 percent (1,340 offenders) were sentenced under §2G2.2 as their primary guideline. Section 2G2.2 divides offenders into three groups: (1) those convicted of possession (base offense level 18) (hereinafter "possession offenders"); (2) those convicted of receipt who did not intend to distribute (base offense level 22 with a 2-level reduction to offense level 20) (hereinafter "receipt offenders"); and (3) those convicted of receipt with intent to distribute as well as those convicted of distribution (base offense level 22) (hereinafter "distribution offenders"). Of the 1,340 non-production offenders sentenced in fiscal year 2019, 42.5 percent were possession offenders, 10.9 percent were receipt offenders, and 46.6 percent were distribution offenders. Offenders convicted of receipt or distribution of child pornography and assigned base offense level 20 or 22 are subject to the five-year mandatory minimum penalty.

Figure 4.
Trend in Number of §2G2.2 Offenders by Type of Child Pornography Offense




As discussed in Chapter One, the statutory penalties for non-production child pornography offenses increase if the offender has a qualifying prior conviction for a sex offense. Among non-production child pornography offenders, possession offenders received a mandatory minimum sentence due to a qualifying sex offense conviction at the highest rate. Of the 1,340 offenders, 8.8 percent were possession offenders and faced a ten-year mandatory minimum penalty because they were convicted of possession and had a qualifying prior sex offense. Comparatively, 4.7 percent were distribution offenders and 1.0 percent were receipt offenders who had a qualifying predicate conviction and faced a 15-year mandatory minimum penalty as a result.[45]

## Trends from Fiscal Years 2005 to 2019

The increase in federal child pornography offenses over time can largely be attributed to technological changes that increased the accessibility of child pornography and decreased the cost of its production and duplication.[46] The number of non-production child pornography cases generally increased between fiscal years 2005 and 2012. After peaking in 2012 with 1,735 cases, the number of non-production child pornography cases steadily decreased, reaching its lowest point since 2012 in fiscal year 2019, with 1,340 offenders sentenced under §2G2.2.

Over time, the combined receipt and distribution cases (carrying a five-year mandatory minimum) overtook possession cases as the most common type of non-production child pornography offense. Possession cases were predominant from fiscal years 2007 to 2011, but after 2011, the number of receipt and distribution cases surpassed possession cases. The gap widened between fiscal years 2017 and 2019. The largest difference occurred in fiscal year 2019, with 202 more receipt and distribution offenders sentenced than possession offenders.

## Characteristics of Non-Production Child Pornography Offenders
*Fiscal Year 2019*

**80.3%**

### White

Most non-production child pornography offenders were White (80.3%). This contrasts with all other federal offenders, who were 19.1 percent White.

**99.4%**

### Male

Nearly all were male (99.4%). This contrasts with all other federal offenders, who were 87.6 percent male.

**41 yrs**

### Average Age

The average age was 41 years old, while the average age of all other federal offenders in fiscal year 2019 was 36 years old.

**55.7%**

### College Educated

Over half attended college compared to one-fifth (20.6%) of all other offenders.

### Less Extensive Criminal History




Three-quarters (75.9%) were assigned to CHC I, the lowest category.

By contrast, fewer than half (43.8%) of all other federal offenders were assigned to CHC I.




### Offender and Offense Characteristics

Non-production child pornography offenders sentenced under §2G2.2 differ from the general federal offender population with respect to demographic factors and criminal history. Non-production child pornography offenders tend to be racially homogenous, older, have higher levels of education, and have limited or no prior criminal histories. Most non-production child pornography offenders were White (80.3%) and U.S. citizens (96.3%). Nearly all were male (99.4%). This contrasts with all other federal offenders, who were 19.1 percent White, 55.9 percent U.S. citizens, and 87.6 percent male.

The average age of non-production child pornography offenders was 41 years old, while the average age of all other federal offenders in fiscal year 2019 was 36 years old. Non-production child pornography offenders generally attained a higher degree of education than all other offenders, with over half (55.7%) of non-production child pornography offenders attending college compared to one-fifth (20.6%) of all other offenders.

Non-production child pornography offenders have less extensive criminal histories compared to other federal offenders. In fiscal year 2019, 75.9 percent of non-production child pornography offenders were assigned to Criminal History Category I (the lowest category, requiring no more than one criminal history point). By contrast, 43.8 percent of all other federal offenders were assigned to Criminal History Category I. To add further context, more than two-thirds (69.1%) of non-production child pornography offenders had zero criminal history points compared to roughly a third (32.9%) of all other offenders sentenced in fiscal year 2019.

Finally, non-production child pornography offenses are unique because of the number of specific offense characteristics that apply to the vast majority of offenders sentenced under §2G2.2. The incidence of the underlying conduct and circumstances triggering sentencing enhancements has grown, particularly due to the evolution and prevalence of technology used to commit child pornography offenses. The

2012 *Child Pornography Report* explained that by fiscal year 2010, four of the six enhancements in §2G2.2(b)—together accounting for 13 offense levels—applied to the typical non-production child pornography offender and thus failed to meaningfully distinguish between more culpable and less culpable offenders.[47]

In fiscal year 2019, these enhancements each continued to apply in the vast majority of non-production child pornography cases. Notably, over 95 percent of non-production child pornography offenders received enhancements for use of a computer and for the age of the victim (images depicting victims under the age of 12). The enhancements for images depicting sadistic or masochistic conduct or abuse of an infant or toddler (84.0% of cases) or having 600 or more images (77.2% of cases) were also applied in most cases.

The frequency with which these enhancements apply is fairly consistent between the non-production child pornography offense types. The enhancements are intended to increase the offense level based on the presence of an aggravating factor, but they routinely apply to the typical distribution, receipt, and possession offender, with minimal variation in application rate. For example, distribution and possession offenders received the 2-level enhancement for the age of the victim at nearly identical rates (96.8% and 96.3%, respectively). All three groups of non-production child pornography offenders received the 2-level enhancement for use of a computer over 93 percent of the time. And although distribution offenders received the sadistic or masochistic conduct or abuse of an infant or toddler enhancement at a slightly higher rate (89.6%), there is little variation in the rate between receipt and possession offenders (80.8% and 78.6%, respectively). Likewise, although receipt offenders received an increase for the number of images at a slightly lower rate (87.7%), there is little difference between the application rates for distribution and possession offenders (97.0% and 95.4%, respectively).

Thus, across all non-production child pornography offense types, §2G2.2 fails to distinguish adequately between more and less severe offenders.



Case 1:26-cr-00021-BAH Document 40-4 Filed 10/23/26 Page 27 of 95


Figure 5.
Trend in Sentence Length by Child Pornography Offense




# Sentencing Characteristics

## Sentence Length

In fiscal year 2019, nearly all non-production child pornography offenders (99.0%) were sentenced to a term of imprisonment, with an average sentence of 103 months.[48] Mirroring the seriousness of each non-production child pornography offense type as measured by §2G2.2, distribution offenders received the longest sentences, on average (135 months), followed by receipt (96 months) and possession (68 months) offenders.

The trends from fiscal years 2005 to 2019 show that the sentence length imposed in non-production child pornography cases has generally remained stable over time across offense types. Largely a function of the difference in the base offense levels, sentences for distribution offenders have remained the highest over time, followed by sentences for receipt and possession offenders.

Figure 6.
Average Guideline Minimum and Sentence Imposed by Child Pornography Offense
*Fiscal Year 2019*




## Average Guideline Minimum and Average Sentence Imposed[49]

### Fiscal Year 2019 Snapshot

Although the analysis above shows little variation in the application rates of specific offense characteristics between the three types of non-production child pornography offenses, the bottom of the average §2G2.2 guideline range—that is, the average guideline minimum—is highest for distribution offenders, followed by receipt and possession offenders. The difference in the average guideline minimum is driven primarily by the starting point in the guideline calculation—the base offense level—rather than the specific offense characteristics. Thus, the ascension of the base offense level, rather than guideline enhancements, results in average guideline minimums that reflect, at least to some degree, the ascending seriousness of the offense type under §2G2.2.

In fiscal year 2019, the average sentence for non-production child pornography offenders was substantially lower than the average guideline minimum. For non-production child pornography offenses overall, the difference between the average guideline minimum (136 months) and average sentence imposed (103 months) was 33 months or 24.3 percent. Among the individual offense types, distribution offenders had the highest average guideline minimum (181 months) and highest average sentence imposed (135 months), a difference

Figure 7.
Trend in Average Guideline Minimum and Sentence Imposed for All §2G2.2 Offenses




of 46 months or 29.1 percent. Possession offenders had a similar difference between the average guideline minimum (93 months) and average sentence imposed (68 months), a difference of 25 months or 31.1 percent. Receipt offenders had the smallest difference between the average guideline minimum (109 months) and average sentence imposed (96 months), a difference of 13 months or 12.7 percent.

## Trends from Fiscal Years 2005 to 2019[50]

Since the passage of the PROTECT Act, the average guideline minimum for non-production child pornography offenses has increased over time. This, in turn, has been accompanied by an increasing gap between the average guideline minimum and average sentence imposed. Over time, the average guideline minimum for non-production child pornography offenders has increased steadily, from an average of 98 months in fiscal year 2005 to an average of 136 months in fiscal year 2019. The average sentence has increased more gradually, from an average sentence of 91 months in fiscal year 2005 to an average sentence of 103 months in fiscal year 2019.[51] Accordingly, the gap between the average guideline minimum and average sentence imposed has generally widened over time, though the gap appears to have stabilized somewhat between fiscal years 2014 and 2019. Although the difference between the average guideline minimum and average sentence imposed has remained somewhat stable since fiscal year 2014, the long term trend shows that most courts believe §2G2.2 is generally too severe and does not appropriately measure offender culpability in the typical non-production child pornography case.

Figure 8.
Sentences Relative to the Guideline Range for All §2G2.2 Offenses
*Fiscal Year 2019*




## Sentences Imposed Relative to the Guideline Range

### Fiscal Year 2019 Snapshot

The non-production child pornography guideline has been subject to longstanding criticism from stakeholders and has one of the lowest rates of within-guideline range sentences each year.[52] Courts increasingly apply downward variances in response to the high guideline ranges that now apply to the typical non-production child pornography offender, although sentences remain lengthy.

Only 39.6 percent of non-production child pornography offenders were sentenced under the *Guidelines Manual*.[53] Less than one-third (30.0%) of non-production child pornography offenders received a sentence within the guideline range in fiscal year 2019. Among the individual offense types, receipt offenders were sentenced within the guideline range at the highest rate (41.8%), followed by possession (32.2%) and distribution (25.3%) offenders.

Figure 9.
Sentences Relative to the Guideline Range by Type of Child Pornography Offense
*Fiscal Year 2019*



Figure 10.
Trend in Sentences Relative to the Guideline Range for All §2G2.2 Offenses




Of the non-production child pornography offenders, 8.9 percent received a departure below the guideline range based on a government-sponsored departure (3.6%),[54] court-sponsored downward departure (3.1%), or a downward departure based on substantial assistance to the government (2.2%).[55] Relatively few offenders (0.8%) received a departure above the applicable guideline range.

The majority of non-production child pornography offenders (59.0%) received a variance below the guideline range under 18 U.S.C. § 3553(a).[56] More than twice as many variances below the guideline range were non-government sponsored (42.2%) than government-sponsored (16.8%). Distribution cases received the highest rate of downward variances (65.8%), followed by possession cases (55.0%), and receipt cases (45.9%).

## Trends from Fiscal Years 2005 to 2019

The percentage of non-production child pornography cases sentenced below the guideline range has changed over time. From fiscal years 2005 to 2011, the rate of within-range sentences decreased rapidly (from 73.3% to 32.7%) while the rate of downward variances increased rapidly (from 15.6% to 52.7%). Starting in fiscal year 2011, the rate of within-range sentences began stabilizing, decreasing only slightly from 32.7 percent in fiscal year 2011 to 30.0 percent in fiscal year 2019. The rate of downward variances increased from fiscal year 2005 to its peak at 63.0 percent in fiscal year 2017. Since the peak in fiscal year 2017, the rate of variances below the guideline range decreased slightly to 59.0 percent. The rate of substantial assistance departures, downward departures, and upward departures or variances has remained relatively steady over time.

# Effects of Departures and Variances on Sentencing Outcomes

## Fiscal Year 2019 Snapshot

Finally, the Commission analyzed the rate at which, and extent to which, departures and variances resulted in sentences below the guideline range in cases sentenced under §2G2.2 in fiscal year 2019. The Commission compared the average guideline minimum (the average bottom of the guideline range) with the average sentence imposed in: (1) cases in which an offender received a government-sponsored downward departure or variance through §5K1.1 (Substantial Assistance), a joint motion, a binding plea under Federal Rule of Criminal Procedure 11(c)(1)(C), or another plea agreement; and (2) cases in which an offender received a downward variance or departure that was initiated solely by the defense or sentencing court (non-government sponsored).

The rate of non-government sponsored sentences below the guideline range for non-production child pornography offenders in fiscal year 2019 (45.3% of cases) is essentially unchanged from fiscal year 2010 (44.3% of cases).[57] By comparison, while comprising a smaller percentage of departures or variances, the rate of government sponsored below-range sentences has increased by 9.1 percentage points since fiscal year 2010. Of the 1,340 non-production child pornography offenders sentenced in fiscal year 2019, 22.5 percent received a government-sponsored departure or variance below the guideline range compared to only 13.4 percent in fiscal year 2010.

Figure 11.
Average Guideline Minimum and Sentence Imposed for §2G2.2 Below-Range Cases
*Fiscal Year 2019*




Both government and non-government sponsored departures or variances resulted in strikingly similar and substantial sentence reductions below the average guideline minimum.[58] The average guideline minimum was identical (138 months) for both offenders who received a government-sponsored below-range sentence and offenders who received a non-government sponsored below-range sentence. The average sentence length for non-government sponsored below-range cases (85 months) and government-sponsored below-range cases (82 months) was also similar. Thus, there was little difference between the effect of government and non-government sponsored departures or variances on the extent to which sentences were imposed below the guideline range for non-production child pornography offenders in fiscal year 2019.

# Content, Community, and Conduct

## Chapter 3




# Introduction

This chapter examines the three primary factors identified in the 2012 *Child Pornography Report* as recommended areas of focus in sentencing non-production child pornography offenders: (1) content; (2) community; and (3) conduct. In the 2012 *Child Pornography Report*, the Commission examined social science research and data collected from other entities to discuss the content of non-production offenders' collections and their engagement in child pornography communities. Additionally, to examine conduct, the Commission completed a coding project to analyze the offenders' criminal sexually dangerous behavior. The Commission concluded that the existing non-production child pornography sentencing guideline failed to account adequately for variations in offender culpability, sexual dangerousness, and changes in technology. The Commission concluded that §2G2.2 should be revised to focus on content, community, and conduct as the most relevant and distinguishing factors of non-production child pornography offenses and offender behavior.

***For this report, the Commission conducted a more comprehensive coding project of data from fiscal year 2019 to analyze non-production child pornography offender behavior related to the content of child pornography collections, participation in child pornography communities, and engagement in aggravated conduct not captured by the guidelines.***

## Content

The first section of this chapter analyzes data regarding the **content** of the offender's child pornography collection and nature of the offender's collecting behavior.

## Community

The second section examines the offender's degree of involvement with others in an internet **community** devoted to child pornography and child sexual exploitation.

## Conduct

The third section examines the offender's engagement in sexually abusive or exploitative **conduct** in addition to the child pornography offense, either during the instant offense or in prior history.

***The final section of this chapter examines how the presence of these factors affects sentence length and the position of the sentence relative to the guideline range.***

# Content and Collection Behavior

Figure 12.
§2G2.2 Offenders by Child Pornography Offense
*Fiscal Year 2019*




In the 2012 *Child Pornography Report*, information about offenders' child pornography collections came primarily from social science research and judicial opinions.[59] Three sources provided data from law enforcement officials on child pornography images from the years 2000 to 2009: the National Juvenile Online Victimization Survey ("Online Victimization Survey"); the Child Exploitation and Online Protection database; and the National Center for Missing and Exploited Children.[60] These sources showed that the number of images containing very young victims, graphic sexual content, sexual penetration, and violent imagery had become more prevalent over time.[61]

After describing child pornography images generally, the 2012 *Child Pornography Report* provided excerpts of presentence reports and judicial opinions describing representative images found in child pornography cases.[62] Consistent with the survey data, the judicial opinions and presentence reports described violent and graphic content. Some minor victims appeared to be in pain or tortured, with images of prepubescent minors being penetrated by other minors or adults and images of bestiality, urination, and defecation.[63]

In this report, the Commission coded information from 1,340 non-production child pornography cases from fiscal year 2019 to analyze the content of the offenders' collections. This data set includes 625 distribution offenders, 146 receipt offenders, and 569 possession offenders.

Using charging documents, plea agreements, and presentence reports, the Commission coded information to identify factors related to the content of the offenders' collections. These factors included: (1) the quantity of still images and videos in the offender's collection; (2) the age of the youngest victim depicted; (3) the gender of the victims depicted; (4) the method of receiving child pornography; (5) the method of distributing child pornography; (6) where the offender stored the child pornography; and (7) whether sophisticated efforts were made to conceal the distribution, receipt, or possession of the child pornography collection.

Figure 13.
Total Image Equivalency[67]
*Fiscal Year 2019*




## Quantity of Images and Videos

Technological changes have increased the volume and accessibility of child pornography. As a result of such changes, the typical offender's collection in fiscal year 2019 was voluminous and contained a wide variety of graphic sexual images, including images of very young victims. Most of the possession, receipt, and distribution offenses involved both images and videos. Of the 1,340 offenders, 981 (73.2%) had both images and videos, 166 offenders had only images (no videos), and the remaining 90 offenders had only videos (no images).[64] The prevalence of videos in an offender's collection is higher today than in the data provided in the 2012 *Child Pornography Report*; for example, the Online Victimization Survey in 2006 showed that 58.0 percent of offenders had at least one video.[65]

As discussed in Chapter Two, most non-production child pornography offenses in fiscal year 2019 included a quantity of images, videos, or both that qualified for the maximum 5-level enhancement triggered under §2G2.2(b)(7) because the offense involved 600 or more images. An application note in the guideline defines each video as equivalent to 75 images.[66] Figure 13 shows the total number of combined images and videos after converting each video to 75 images.

Most offenders across all three non-production child pornography offense types have well above the 600 images needed to qualify for the maximum 5-level enhancement under §2G2.2(b)(7). The maximum number of images for possession and distribution offenders numbered in the millions, exemplifying how technology has facilitated the ability to acquire and send enormous quantities of child pornography. Although all three types of offenders had large quantities of images, there was some difference between the offenders that generally appeared to reflect the seriousness of their offenses as measured by §2G2.2. Distribution offenders had the highest median number of images (6,300 images), followed by receipt (4,674 images) and possession offenders (2,350 images).

Figure 14.
Age of Youngest Victim
*Fiscal Year 2019*




## Age of Victims

A majority of the non-production child pornography offenders had images or videos of very young victims. In fiscal year 2019, over half (52.2%) of the offenders had images or videos of infants or toddlers (22.8% and 29.4%, respectively) and nearly every offender (99.4%) had images or videos depicting victims who were prepubescent or under the age of 13.[68] In other words, less than one percent of non-production offenders had images or videos consisting solely of victims age 13 years or older.

Although most non-production child pornography offenders had images of very young victims, there was some variation among the different types of offenders. Distribution offenders most commonly had images or videos of the youngest victims, followed by receipt offenders, and then possession offenders. Specifically, a majority of distribution (58.9%) and receipt (56.2%) offenders had images or videos of infants or toddlers. Among offenders sentenced for distribution, 27.4 percent of the cases involved images or videos of infant victims. An additional 31.5 percent of distribution cases involved images or videos of toddlers. Among receipt offenders, 16.2 percent of the offenders had images or videos of infant victims and an additional 40.0 percent had images or videos of toddlers. Comparatively, slightly less than half (43.9%) of possession offenders had images or videos of infants (19.4%) and toddlers (24.5%).

Figure 15.
Gender of Victims
*Fiscal Year 2019*

*All §2G2.2 Offenses*




*By Child Pornography Offense*

| Gender | Distribution | Receipt | Possession |
|---|---|---|---|
| Female | 61.6% | 65.6% | 62.9% |
| Male | 9.6% | 6.6% | 8.6% |
| Both | 28.7% | 27.9% | 28.5% |

## Gender of Victims

There is little variation in the gender of the victims depicted in the non-production child pornography images among offenders sentenced for distribution, receipt, and possession. Most offenses involved images depicting female victims only, with the percentages of such images for distribution offenders (61.6%), receipt offenders (65.6%), and possession offenders (62.9%) hewing closely to the overall rate for non-production child pornography offenders (62.5%). A similar percentage of distribution, receipt, and possession offenses involved child pornography depicting both genders, with 28.6 percent of non-production offenses overall involving images depicting both genders. A small minority of non-production child pornography offenses involved images or videos depicting male victims only (8.9%).

## Methods of Receipt

Technological advancements have facilitated offenders' access to child pornography. By 2012, widespread internet use had made it easy for offenders to receive child pornography. The 2012 *Child Pornography Report* identified three main methods of receiving child pornography through the internet—peer-to-peer ("P2P") file sharing networks,[69] email or instant message, and websites.[70] The 2012 *Child Pornography Report* also noted that 6.0 percent of offenders fell into a catch-all "other" category that included receiving child pornography by text messages or mail.[71] Today, P2P file sharing and texting, email, or instant message remain the most prevalent methods of receipt for non-production child pornography offenders.[72]

All fiscal year 2019 offenders used mobile or digital means to acquire child pornography. The most common method of receiving child pornography for distribution and possession offenders was through a P2P network (43.8% and 32.0%, respectively), while the most common method of receiving child pornography for receipt offenders was through a website (34.9%). The fiscal year 2019 data analysis captures changes in technology that have introduced additional methods by which offenders received child pornography, including internet cloud-based hosts[73] (7.7%) and social media platforms (4.7%).

Table 1.
Method of Receipt
*Fiscal Year 2019*

| Method of Receipt | All §2G2.2 | | Distribution | | Receipt | | Possession | |
|---|---|---|---|---|---|---|---|---|
| **Total Cases** | **1,340** | | **625** | | **146** | | **569** | |
| | **N** | **%** | **N** | **%** | **N** | **%** | **N** | **%** |
| *Peer-to-Peer Network* | *492* | *36.7%* | *274* | *43.8%* | *36* | *24.7%* | *182* | *32.0%* |
| *Text/Email/Instant Message* | *309* | *23.1%* | *181* | *29.0%* | *29* | *19.9%* | *99* | *17.4%* |
| *Website* | *260* | *19.4%* | *80* | *12.8%* | *51* | *34.9%* | *129* | *22.7%* |
| *Cloud-based Host* | *103* | *7.7%* | *60* | *9.6%* | *8* | *5.5%* | *35* | *6.2%* |
| *Social Media Platform* | *63* | *4.7%* | *31* | *5.0%* | *9* | *6.2%* | *23* | *4.0%* |
| *Internet (Unspecified)* | *46* | *3.4%* | *20* | *3.2%* | *7* | *4.8%* | *19* | *3.3%* |
| *Chatroom* | *38* | *2.8%* | *22* | *3.5%* | *0* | *0.0%* | *16* | *2.8%* |
| *Live Streaming* | *14* | *1.0%* | *5* | *0.8%* | *1* | *0.7%* | *8* | *1.4%* |
| *Self Produced or Unknown* | *44* | *3.3%* | *15* | *2.4%* | *15* | *10.3%* | *14* | *2.5%* |

## Methods of Distribution

Offenders have also exploited technology to increase the methods by which they distribute child pornography. In the 2012 *Child Pornography Report*, P2P file sharing was the primary method of distribution, followed by email or instant message.[74] In fiscal year 2019, P2P file sharing and texting, email, or instant message were the most prevalent methods of distribution for non-production child pornography offenders. Of the 1,340 non-production child pornography offenders, the sentencing documents detailed evidence that 915 offenders (68.3% of offenders) distributed child pornography.[75] Table 2 analyzes the means by which the offenders distributed child pornography. Of the 1,340 offenders, 38.5 percent distributed child pornography through a P2P network, with the majority of those offenders using a P2P network as their exclusive method of distribution.[76] Moreover, a P2P network was the most common method of distributing child pornography for distribution, receipt, and possession offenders. Thus, although additional methods of distribution have surfaced through technological advancements, P2P networks remain the primary method of distribution for most offenders.

Text, email, or instant message (21.6% of cases) remained the second most common method to distribute child pornography. As noted in the 2012 *Child Pornography Report*, these "personal" methods of distribution indicate that the offender participated in an online child pornography community, which is discussed in greater detail in the next section.

Although there is considerable overlap with the methods of distribution described in the 2012 *Child Pornography Report*, the Commission's fiscal year 2019 analysis demonstrates that new methods of electronic distribution have emerged in lockstep with advancements in technology. Accordingly, this report captures additional categories that were not included in the 2012 *Child Pornography Report*, such as distributing child pornography through cloud-based hosts and social media platforms.[77] Cloud-based hosting and social media platforms were used to distribute child pornography in 7.0 percent and 4.3 percent of the fiscal year 2019 cases, respectively. Only a small number of offenders (0.5%) distributed child pornography via a live streaming platform, which by its nature presents evidentiary challenges and is difficult to detect. While the vast majority of distribution is conducted through electronic-based

Table 2.
Method of Distribution
*Fiscal Year 2019*

| Method of Distribution | All §2G2.2 | | Distribution | | Receipt | | Possession | |
|---|---|---|---|---|---|---|---|---|
| **Total Cases** | **1,340** | | **625** | | **146** | | **569** | |
| | **N** | **%** | **N** | **%** | **N** | **%** | **N** | **%** |
| **Cases with Distribution Conduct** | **915** | **68.3%** | **564** | **90.2%** | **31** | **21.2%** | **320** | **56.2%** |
| *Peer-to-Peer Network* | *516* | *38.5%* | *300* | *48.0%* | *23* | *15.8%* | *193* | *33.9%* |
| *Text/Email/Instant Message* | *290* | *21.6%* | *207* | *33.1%* | *5* | *3.4%* | *78* | *13.7%* |
| *Cloud-based Host* | *94* | *7.0%* | *71* | *11.4%* | *2* | *1.4%* | *21* | *3.7%* |
| *Social Media Platform* | *58* | *4.3%* | *35* | *5.6%* | *3* | *2.1%* | *20* | *3.5%* |
| *Chatroom* | *49* | *3.7%* | *30* | *4.8%* | *0* | *0.0%* | *19* | *3.3%* |
| *Website* | *33* | *2.5%* | *24* | *3.8%* | *0* | *0.0%* | *9* | *1.6%* |
| *Hand-to-Hand* | *15* | *1.1%* | *7* | *1.1%* | *1* | *0.7%* | *7* | *1.2%* |
| *Live Streaming* | *7* | *0.5%* | *4* | *0.6%* | *0* | *0.0%* | *3* | *0.5%* |

methods today, a small number of offenders (15 offenders) distributed child pornography through hand-to-hand transfers. Among the offenders who distributed via a hand-to-hand exchange, some were inmates already incarcerated for a child pornography offense who exchanged cell phones containing child pornography images between each other while in prison.

## Storing Child Pornography

Very large volumes of data can be stored today as smaller and more easily transportable devices have proliferated. Some offenders possess child pornography collections numbering in the hundreds of thousands or even millions of images and videos. The typical non-production offender stored child pornography in more than one place, with 57.6 percent of offenders storing their collections on two or more devices.[78]

Table 3.
Method of Storage
*Fiscal Year 2019*

| Method of Storage | All §2G2.2 | | Distribution | | Receipt | | Possession | |
|---|---|---|---|---|---|---|---|---|
| **Total Cases** | **1,340** | | **625** | | **146** | | **569** | |
| | **N** | **%** | **N** | **%** | **N** | **%** | **N** | **%** |
| *Computer* | *892* | *66.6%* | *440* | *70.4%* | *87* | *59.6%* | *365* | *64.2%* |
| *Phone/Tablet* | *599* | *44.7%* | *295* | *47.2%* | *62* | *42.5%* | *242* | *42.5%* |
| *Flash Drive/External Drive* | *584* | *43.6%* | *285* | *45.6%* | *57* | *39.0%* | *242* | *42.5%* |
| *Cloud-based Storage* | *178* | *13.3%* | *101* | *16.2%* | *12* | *8.2%* | *65* | *11.4%* |
| *Hard Copy* | *8* | *0.6%* | *4* | *0.6%* | *1* | *0.7%* | *3* | *0.5%* |
| *VHS/DVD* | *6* | *0.5%* | *1* | *0.2%* | *3* | *2.1%* | *2* | *0.4%* |
| *Video Game Console* | *5* | *0.4%* | *2* | *0.3%* | *0* | *0.0%* | *3* | *0.5%* |
| *Self-produced or Unknown* | *44* | *3.3%* | *15* | *2.4%* | *15* | *10.3%* | *14* | *2.5%* |

Table 4.
Method of Concealment
*Fiscal Year 2019*

| Method of Concealment | All §2G2.2 | | Distribution | | Receipt | | Possession | |
|---|---|---|---|---|---|---|---|---|
| **Total Cases** | **1,340** | | **625** | | **146** | | **569** | |
| | N | % | N | % | N | % | N | % |
| **Cases with Concealment** | **214** | **16.0%** | **69** | **11.0%** | **38** | **26.0%** | **107** | **18.8%** |
| *Dark Web* | *136* | *10.2%* | *35* | *5.6%* | *31* | *21.2%* | *70* | *12.3%* |
| *Software* | *65* | *4.9%* | *24* | *3.8%* | *6* | *4.1%* | *35* | *6.2%* |
| *Encryption* | *36* | *2.7%* | *20* | *3.2%* | *5* | *3.4%* | *11* | *1.9%* |
| *Hidden Files* | *11* | *0.8%* | *6* | *1.0%* | *1* | *0.7%* | *4* | *0.7%* |
| *Cryptocurrency* | *10* | *0.8%* | *0* | *0.0%* | *5* | *3.4%* | *5* | *0.9%* |

Nearly all non-production child pornography offenders stored their collections on electronic devices or online. Two-thirds (66.6%) of non-production child pornography offenders stored their child pornography collections on a computer hard drive. Slightly less than half of the offenders stored child pornography on a mobile phone or tablet device (44.7%) or on an external drive such as a flash drive (43.6%). Additionally, 13.3 percent of the offenders maintained a child pornography collection online in a cloud-based host. Very few offenders retained hard copies of images (0.6%) or videos on VHS or DVD (0.5%).

## Sophisticated Methods of Concealing the Offense

Not only have technological advancements increased access to child pornography, but technologies aiding in the concealment of child pornography have challenged the government's ability to detect and prosecute offenders. The 2012 *Child Pornography Report* discussed social science research examining how offenders exploited technology to conceal their offenses through obscuring their location and identity, or safeguarding their child pornography collections.[79] In this report, the Commission coded information to identify the percentage of non-production child pornography cases in fiscal year 2019 that involved sophisticated efforts to conceal the offense, such as using the Dark Web,[80] software that wipes files, encryption,[81] or using cryptocurrency[82] to facilitate the transfer of child pornography.

In fiscal year 2019, the Commission identified 16.0 percent of non-production child pornography offenders engaged in sophisticated concealment efforts. Notably, receipt offenders concealed the offense at the highest rate among the non-production child pornography offenders (26.0%). Comparatively, 18.8 percent of possession offenders and 11.0 percent of distribution offenders engaged in concealment efforts.

The most common method of concealment was through the Dark Web, with 10.2 percent of all non-production child pornography offenders receiving or distributing child pornography on the Dark Web. Again, receipt offenders used the Dark Web at the highest rate (21.2%). A higher percentage of possession offenders (12.3%) concealed the offense by using the Dark Web than distribution offenders (5.6%).

The next most common concealment method was using software to wipe or delete files (4.9%). While identified infrequently, non-production offenders also used encryption (2.7%) and cryptocurrency (0.8%) to facilitate the transmission of child pornography.

# Child Pornography Communities

## Overview

In the 2012 *Child Pornography Report*, the Commission examined the role of socialization and how internet communities contributed to the child pornography market and the development of offenders' sexual interest in children.[83] Like the discussion regarding the content of child pornography collections, the 2012 *Child Pornography Report* relied primarily on third party studies, information from the Department of Justice, and judicial opinions to discuss the role of online child pornography communities. As a proxy for examining online child pornography community participation, the Commission performed a data analysis of fiscal year 2010 child pornography cases regarding the receipt or distribution of child pornography through private or "closed" P2P file sharing programs and other "personal" forms of transmission, such as through email or a chatroom.[84]

The 2012 *Child Pornography Report* examined social science research regarding how offenders socialized within online child pornography communities. Motivation for participating in such communities varied, from finding trading partners to furthering a sexual interest in children.[85] The level of engagement in communities also varied, with the lowest level of socialization involving an offender seeking to collect or share child pornography online.[86] Progressively higher levels of socialization included using more interactive technologies to communicate about producing child pornography and discussing sexual interest in children through instant message, email, or online chatrooms.[87] Some communities were highly organized to screen prospective members and facilitate the trading of images.[88] The more sophisticated communities had explicit rules about security precautions, content posting, and gaining access to the group's images.[89]

The Commission cautioned that while the culpability of offenders may be affected by their degree of participation in online child pornography communities and their use of sophisticated technology to share child pornography, existing social science research was inconclusive regarding whether an offender's degree of community involvement was associated with an increased risk of committing other sex offenses.[90] However, the Commission noted that some members produced new child pornography to gain access to other images.[91]

The 2012 *Child Pornography Report* also examined social science research regarding how child pornography communities provided social and supportive environments that normalized deviant beliefs about children. The Commission found that online communities provided a forum to discuss sexual interest in children without fear of condemnation and helped offenders to develop positive feelings about their online deviant sexual identities.[92] However, the Commission noted that research was mixed regarding the pathways from such attitudes to other types of sex offending.[93]

The 2012 *Child Pornography Report* concluded its examination of child pornography communities by discussing their contribution to the child pornography market. Social science research had not yet addressed whether criminal punishments had affected the commercial or non-commercial markets for child pornography since the advent of the internet and P2P file sharing.[94] The Commission's own data analysis of fiscal year 2010 child pornography cases revealed that the typical non-production offender received or distributed child pornography using a P2P program and not for financial gain.[95] In approximately 25 percent of cases, offenders engaged in "personal" distribution to another individual through chatrooms, email, or closed or private P2P programs.[96]

## 2012 *Child Pornography Report*

The Commission concluded that the non-production child pornography sentencing scheme should be revised to account for technological changes, emerging social science research, and variations in offender culpability and sexual dangerousness.

**Recommendations:**

- Focus sentencing of these offenders on three primary factors: content, community, and conduct.
- Enact legislation providing the Commission with express authority to amend the guidelines promulgated pursuant to congressional directives.
- Align the statutory penalty schemes for receipt offenses and possession offenses.

Figure 16.
Child Pornography Community Participation Among §2G2.2 Offenders
*Fiscal Year 2019*




## Findings

In this report, the Commission conducted a robust coding project to collect data regarding offenders' participation in online child pornography communities. Rather than relying solely on the method of receipt or distribution as a proxy for community participation, the Commission collected specific data related to offenders' interactions with other individuals online. Using fiscal year 2019 data, the Commission identified an offender as part of a child pornography community if he or she engaged in any of the following: (1) participating in an online group whose members interact with each other primarily via the internet through posts, discussions, and one-on-one chatting in a forum devoted to child pornography; (2) having conversations with at least one other individual about child pornography or the sexual abuse of a minor; (3) distributing or receiving child pornography via personal means (*e.g.*, text, email, or instant message); or (4) working with another individual to produce child pornography.

More than forty percent (43.7%) of the 1,340 non-production child pornography offenders sentenced in fiscal year 2019 belonged to a child pornography community. The more serious types of non-production child pornography offenders under §2G2.2 were more likely to participate in a community (50.9% of distribution offenders and 41.8% of receipt offenders). However, even 36.4 percent of possession offenders, the least serious type of non-production offender under §2G2.2, participated in a child pornography community.

The Commission also collected data regarding whether an offender's participation in an online child pornography community promoted additional aggravating conduct. In the next section, as part of a broader analysis of offender behavior, the Commission analyzes whether the offender's community participation involved aggravating conduct, such as communicating about producing child pornography or soliciting a child for sexual abuse.

# Aggravating Conduct

## Overview

In the 2012 *Child Pornography Report*, the Commission examined the relationship between child pornography offending and other aggravating sexual conduct. The Commission reviewed social science research regarding other types of sex offending in conjunction with child pornography offending. The Commission also undertook a special coding project to determine the percentage of non-production child pornography offenders who had previously or concurrently committed other sex offenses.[97]

The Commission found that while research had identified some correlation between viewing child pornography and other types of sex offending, most social science research suggested that viewing child pornography alone did not cause offenders to commit additional sex offenses absent other risk factors.[98] The primary risk factors for other sex offending were holding deviant sexual beliefs and anti-sociality.[99] Research also showed that viewing child pornography did not reduce the likelihood of committing other sex offending against children and that offenders who considered their use of child pornography to be preventative against additional sex offending were less likely to take responsibility for their actions.[100]

The Commission then conducted its own data analysis of the prevalence of prior and concurrent criminal sexually dangerous behavior among 1,654 non-production child pornography offenders sentenced in fiscal year 2010.[101] The 2012 *Child Pornography Report* defined "criminal sexually dangerous behavior" as: (1) contact sex offenses (any illegal sexually abusive conduct involving actual or attempted physical contact with a victim, before or concurrent with the non-production child pornography offense); (2) non-contact sex offenses (any illegal sexually abusive conduct not involving actual or attempted physical contact with a victim, such as soliciting a minor online, before or concurrently with the non-production child pornography offense); or (3) prior non-production child pornography offenses.[102] Thus, the Commission only coded an offender's conduct as criminal sexually dangerous behavior if it was illegal under state or federal law.[103] The Commission coded such conduct as criminal sexually dangerous behavior regardless of whether it resulted in a conviction.[104]

In the 2012 *Child Pornography Report*, the Commission found that 35.1 percent of non-production child pornography offenders in fiscal year 2010 engaged in criminal sexually dangerous behavior concurrently or prior to their instant child pornography charge.[105] However, the Commission cautioned that the true prevalence was likely higher because social science research showed that the actual rate of criminal sexually dangerous behavior among child pornography offenders was higher than the known rate.[106]

The Commission also found that the sentencing framework largely did not account for higher rates of criminal sexually dangerous behavior, save for the pattern of activity enhancement in the guidelines and the statutory enhancement for predicate sex offense convictions.[107] Of the offenders with known criminal sexually dangerous behavior histories in fiscal year 2010, 44.2 percent received the guideline or statutory enhancement for a predicate offense.[108] The remaining offenders did not receive either enhancement based on criminal sexually dangerous behavior, typically because the conduct did not constitute the required "pattern of activity" for the guideline enhancement or did not result in a conviction as required for the statutory enhancement.[109] Similarly, the guidelines' Criminal History Category did not account for criminal sexually dangerous behavior in a majority of cases because of the lack of a conviction, age of a conviction, or other requirement under §4A1.2, which provides instructions on the computation of an offender's criminal history.[110]

## Data Collection

In this report, the Commission analyzed fiscal year 2019 cases to identify offender engagement in sexually abusive or exploitative conduct (hereinafter "aggravating conduct") either prior to, or concurrent with, the instant offense. For purposes of this study, aggravating conduct includes the same components as the 2012 *Child Pornography Report*'s definition of criminal sexually dangerous behavior: (1) contact sex offenses; (2) non-contact sex offenses; and (3) prior non-production child pornography offenses. Consistent with the 2012 *Child Pornography Report*, within this broad categorization, the Commission identified aggravating conduct that encompasses not only illegal sexual contact with a victim (*e.g.*, child molestation involving rape or sexual assault), but also non-contact sex offenses (*e.g.*, illegally enticing a minor to engage in sexual conduct), as well as production of child pornography, which itself may involve contact with the victim (*e.g.*, an offender videotaping himself having sexual contact with a minor), and acts that do not involve contact (*e.g.*, an offender soliciting self-produced sexual images of a minor via the internet or a cellular phone, but not engaging in sexual contact with the minor).

In addition to attempted and completed acts involving actual victims, the Commission coded attempted criminal conduct involving perceived (but nonexistent) minors. The Commission reviewed presentence reports that recounted instances in which offenders engaged in a sexually-oriented internet "chat" with undercover law enforcement officers posing as minors. Frequently, such offenders solicited sex from the perceived minors, enticed the perceived minors to self-produce child pornography, or engaged in real-time sexual conduct via webcam (commonly called "cybersex"). If an offender arranged to meet a fictional minor for sexual contact and took affirmative steps to do so, such conduct was classified as an attempted "travel" offense. If

Figure 17.
Aggravating Conduct Among §2G2.2 Offenders
*Fiscal Year 2019*




the offender attempted to entice a perceived minor to engage in sexual conduct outside of the offender's physical presence or sight (*e.g.*, encouraging the minor to engage in mutual masturbation with the offender while the two "chatted" via instant message, email, or over the telephone), such conduct was deemed a non-contact "solicitation" or enticement offense. If an offender requested self-produced sexual images or a video from the fictional minor (to be made in response to the offender's request), such conduct was deemed attempted production of child pornography. If the offender transmitted child pornography, adult pornography, or sexual images of himself or herself to a perceived minor, such conduct was treated as a non-contact offense (*e.g.*, distributing obscenity to a minor or indecent exposure). Consistent with the 2012 *Child Pornography Report*, the Commission coded such conduct as aggravating sexual conduct regardless of whether it resulted in a conviction.

To identify aggravating conduct, the Commission analyzed presentence reports and plea agreements to determine whether the instant offense involved sexually abusive physical conduct, whether pretrial release was revoked for a sex offense or subsequent child pornography offense, and whether there was a criminal history of arrests or convictions for prior sexually abusive conduct or allegations of such conduct. Additionally, the Commission reviewed the Personal History section of the presentence report, which often described other allegations or admissions by the offender of engaging in aggravating sexual conduct.

## Findings

Nearly half (48.0% or 643 offenders) of the 1,340 non-production child pornography offenders in fiscal year 2019 engaged in aggravating conduct, either prior to or concurrently with their instant federal child pornography offense. Furthermore, distribution offenders, the most serious type of non-production child pornography offender under §2G2.2, had the highest prevalence of aggravating conduct at 51.2 percent, followed closely by receipt offenders at 50.0 percent. However, even 43.9 percent of possession offenders, the least serious type of non-production child pornography offender under §2G2.2, engaged in aggravating conduct either prior to or concurrently with their instant federal child pornography offense.

Of the 643 offenders who engaged in aggravating conduct in fiscal year 2019, 296 offenders (46.0%) received a guideline enhancement for pattern of activity or a

Figure 18.
Trend in Aggravating Conduct by §2G2.2 Offenders




statutory enhancement for a predicate offense. An additional 19 of the 643 offenders were also convicted of production of child pornography and faced a 15-year mandatory minimum sentence. Thus, although a substantial portion of the offenders who engaged in aggravating conduct received a guideline or statutory enhancement accounting for that behavior, the guideline and statutory sentencing scheme for non-production child pornography offenses did not directly provide for an increased sentence based on aggravating conduct in more than half of such cases.

Compared to the data analyzed in the 2012 *Child Pornography Report*, the fiscal year 2019 data shows an increase in the prevalence of aggravating conduct among every type of non-production child pornography offense. Significantly, the increase is most pronounced among possession offenders. The rate of aggravating conduct among possession offenders increased by 14.1 percentage points, from 29.8 percent in 2010 to 43.9 percent in 2019. Similarly, the prevalence of aggravating conduct for receipt offenders rose by 13.6 percentage points, from 36.4 percent to 50.0 percent. The prevalence increased slightly for distribution offenders, rising by 4.4 percentage points from 46.8 percent to 51.2 percent.

Table 5 lists the subcategories of aggravating conduct among the 643 offenders who engaged in aggravating conduct in fiscal year 2019. An offender who falls into more than one subcategory (*e.g.*, an offender with a prior rape offense and a separate non-contact solicitation offense) appears more than once; therefore, the total number of aggravating conduct events exceeds the 643 offenders who engaged in aggravating conduct. Among the non-production child pornography offenders, 22.2 percent engaged in two or more types of aggravating conduct.

Almost one-third (29.3%) of the non-production child pornography offenders engaged in a contact sex offense against a minor either prior to, or concurrently with, the instant non-production child pornography offense. Of the 1,340 non-production child pornography offenders, 11.1 percent were convicted of a contact sex offense against a minor. This includes offenders who engaged in a child pornography production offense that included sexual contact. A smaller percentage (6.5%) produced child pornography that did not include sexual contact either prior to, or concurrently with, the instant non-production offense.

Nearly one-fifth (19.8%) of non-production child pornography offenders committed a non-contact sex offense against a minor before or concurrently with the instant offense. Of the non-production offenders, 10.8 percent solicited a minor (either by contacting the minor directly or through communicating with an adult), and 12.8 percent either sent child pornography, adult pornography, or sexual images of himself to a minor, or committed a non-contact sexual offense (*e.g.*, indecent exposure). Separately, 12.9 percent of the offenders were previously convicted of a non-production child pornography offense.

Aggravating conduct involving a sexually abusive contact offense against an adult was comparatively rare among the non-production child pornography offenders. Less than two percent (1.4%) of non-production offenders engaged in such behavior.

Table 5.
Type of Aggravating Conduct Among §2G2.2 Offenders
*Fiscal Year 2019*

| Aggravating Conduct *(Conduct Occurred in Instant or Prior Offense)* | | |
|---|---|---|
| **Total Cases** | **1,340** | |
| | **N** | **%** |
| **Contact Sex Offenses Against a Minor** | **392** | **29.3%** |
| *Conviction* | *149* | *11.1%* |
| *Revocation* | *2* | *0.2%* |
| *Arrest* | *88* | *6.6%* |
| *Admission/Allegation* | *207* | *15.5%* |
| *Attempted/Travel* | *37* | *2.8%* |
| **Non-Contact Child Pornography Production Offenses** | **87** | **6.5%** |
| **Non-Contact Sex Offenses Against a Minor** | **265** | **19.8%** |
| *Solicitation of a Minor* | *144* | *10.8%* |
| *Sent Pornography to Minors* | *93* | *6.9%* |
| *Other Non-Contact Sex Offenses* | *88* | *6.6%* |
| **Prior Non-Production Child Pornography Offenses** | **173** | **12.9%** |
| **Contact Sex Offenses Against an Adult** | **19** | **1.4%** |

## Prior Convictions

When focusing only on an offender's conviction for a sex offense prior to the instant federal non-production child pornography offense—referred to as "precidivism" in the 2012 *Child Pornography Report*—more than one-fifth (20.8%) of the 1,340 non-production child pornography offenders (n = 279) were previously convicted of a sex offense. Of the 1,340 offenders, 9.9 percent (n = 132) had a prior conviction for a contact sex offense; 0.4 percent (n = 5) were convicted of an offense involving production of child pornography, and 11.9 percent (n = 159) were previously convicted of a non-production child pornography offense. An additional 35 offenders (2.6%) were convicted of a non-contact sex offense, such as enticement or solicitation of a minor.

Figure 19.
Average and Median Sentence Length by Offense Behavior
*Fiscal Year 2019*




## The Effect of Child Pornography Community Participation and Aggravating Conduct

### Sentence Length

The analyses above (Figures 16 and 17) show that in fiscal year 2019, over forty percent of non-production child pornography offenders participated in a child pornography community and nearly half of non-production offenders engaged in aggravating conduct prior to, or concurrently with, the instant offense. Although these behaviors are widespread, they are not so prevalent as to prohibit meaningful comparisons among non-production child pornography offenders. Thus, in contrast to the specific offense characteristics, which apply very frequently across all types of non-production child pornography offenders, these behaviors may provide a more effective means of distinguishing offenders based on culpability and dangerousness.

### Sentences Relative to the Guideline Range

The Commission previously identified participation in online child pornography communities and aggravating sexual conduct as factors that should be accounted for in the guidelines and in the sentences imposed on non-production child pornography offenders. Therefore, the Commission examined whether participation in a child pornography community or engaging in aggravating conduct did affect overall sentence length in fiscal year 2019. The Commission also examined whether these behaviors impacted the position of sentences relative to the guideline range for non-production child pornography offenders.

Consistent with the Commission's recommendations in the 2012 *Child Pornography Report*, participation in a child pornography community and engaging in aggravating conduct did impact the sentence length for non-production child pornography offenders. While the average and median sentence length for non-production child pornography offenders overall was 103 and 84 months, respectively, these figures varied depending on the presence of community participation or aggravating conduct.[111] Offenders who did not participate in a child pornography community or engage in aggravating conduct received the lowest average and median sentences (71 months and 63 months, respectively). Offenders who participated in a child pornography community (without aggravating conduct) had slightly higher sentences, with an average and median sentence of 79 and 71 months, respectively. Consistent with their increased culpability, offenders who engaged in aggravating conduct had the highest sentences, with substantially longer average and median sentences of 134 and 120 months, respectively.[112] Thus, sentencing courts likely account for these factors, at least in part, when imposing sentences, particularly with respect to the presence of aggravating conduct.

The presence of these factors also appeared to impact the rate at which courts imposed sentences within the guideline range. Over seventy-five percent of offenders who did not participate in a child pornography community or engage in aggravating conduct received downward variances, while only 15.6 percent of them received a within-guideline range sentence.

Comparatively, 69.7 percent of offenders who engaged in an online child pornography community (without aggravating conduct) received downward variances and a slightly higher percentage (19.0%) received a within-guideline range sentence.

Offenders who engaged in aggravating conduct received a substantially lower rate of downward variances (43.3% of cases), with a much higher rate (44.3%) receiving a sentence within the guideline range compared to offenders without aggravating conduct. Indeed, these offenders, who are arguably the most culpable among non-production child pornography offenders, received within-guideline range sentences at a rate that approaches the rate of within-guideline range sentences for the overall federal offender population in fiscal year 2019 (51.4%).[113] Thus, the presence of these factors—particularly aggravating conduct—appears to have a substantial effect on whether non-production child pornography offenders received a sentence within the guideline range, rather than a lower sentence through a downward variance.

Figure 20.
Sentences Relative to the Guideline Range by Offense Behavior
*Fiscal Year 2019*



# Sentencing Disparities

Chapter
4

# Introduction

The 2012 *Child Pornography Report* found that sentencing disparities in non-production child pornography cases increased after 2004, the last year in which most offenders were sentenced based on pre-PROTECT Act penalty ranges.[114] Among offenders sentenced under §2G2.2 in fiscal year 2010, nearly four out of five had their sentencing exposure limited by charging practices, stipulations in plea agreements, government-sponsored departures or variances, or court-sponsored departures or variances.[115] The Commission found disparities in the sentencing outcomes of similarly situated offenders based on whether they were convicted of possession versus receipt or distribution.[116] The Commission also found that sentencing outcomes differed among similarly situated offenders seemingly based on factors not accounted for by the guidelines.

In the years since, although courts appear to be considering many of the factors identified by the Commission in its 2012 *Child Pornography Report*, sentencing disparities in non-production child pornography cases have persisted. To examine the extent of sentencing disparities in non-production child pornography cases today, the Commission conducted a special coding project of the 1,340 cases sentenced under §2G2.2 in fiscal year 2019. Analyzing indictments, plea agreements, and presentence reports, the Commission focused on charging practices and the role both the government and courts played in limiting sentencing exposure when crafting sentences below the guideline range. This chapter also presents sentencing outcomes for offenders who were similarly situated with respect to their offense conduct and criminal histories.

**The Commission's fiscal year 2019 analysis reveals continued disparities in sentencing outcomes among offenders who ostensibly committed similar non-production child pornography offenses. Prosecutorial and judicial practices contribute to the sentencing disparities. Prosecutors limited non-production child pornography offenders' sentencing exposure by reducing charges in some cases. Additionally, offenders received substantial decreases below the guideline range based on government or court-sponsored departures and variances. Contrary to what one may expect, whether an offender's sentencing exposure was limited by either of these prosecutorial or judicial means did not necessarily correlate with whether the offender engaged in less serious offense conduct.**

# Charging Practices

Figure 21.
Final Offense of Conviction for Offenders Initially Charged with Distribution or Receipt of Child Pornography
*Fiscal Year 2019*




To analyze how charging practices affect sentencing exposure, the Commission examined the charging documents and judgments in the 1,340 non-production child pornography cases in fiscal year 2019 to compare the initial charges with the offenses for which the offender was eventually convicted and sentenced. Nearly all offenders convicted solely of possession had engaged in knowing or attempted receipt, distribution, or production of child pornography and, therefore, could have been charged with an offense carrying significantly higher penalties.[117]

Of the 1,340 non-production child pornography offenders in fiscal year 2019, 926 offenders were initially charged with distribution or receipt of child pornography, and thus faced a five-year mandatory minimum sentence.[118] For 22.8 percent of the 926 offenders initially charged with receipt or distribution, charges were reduced to possession, thus eliminating the five-year mandatory minimum sentence required for a receipt or distribution conviction. The remaining offenders continued to be subject to a five-year mandatory minimum sentence, with 38.0 percent convicted of receipt and 39.2 percent convicted of distribution.

Figure 22.
Final Offense of Conviction for Offenders Initially Charged with Production of Child Pornography
*Fiscal Year 2019*




Some offenders initially charged with production of child pornography, which carries a 15-year mandatory minimum sentence, also had their charges reduced. Fifty-three offenders initially charged with production offenses were sentenced under §2G2.2 after pleading guilty.[119] However, only approximately one-third (35.8% or 19 cases) of these offenders were convicted of production offenses. Almost two-thirds (64.2% or 34 cases) of the offenders initially charged with production offenses had all production charges dropped and thus faced reduced penalties after pleading guilty. Specifically, of the 53 offenders initially charged with production of child pornography, 12 offenders (22.6%) were convicted of distribution as their most serious offense and 13 offenders (24.5%) were convicted of receipt, thereby reducing their statutory required minimum sentence from 15 years to five years. Notably, nine of the 53 offenders (17.0%) initially charged with production of child pornography were convicted of possession as the most serious offense, thereby reducing their sentencing exposure from a 15-year mandatory minimum to a conviction with no minimum term of imprisonment.

# Distribution and Production Conduct

Figure 23.
Was Distribution Conduct Involved in the Child Pornography Offense?
*Fiscal Year 2019*




The Commission examined two factors likely to influence differences in sentence length to determine whether those factors explain why some offenders had their sentencing exposure limited by having more serious charges dropped. First, the Commission determined whether the offender distributed child pornography, because distributing child pornography is commonly cited as a basis for punishing non-production offenders more severely. Second, the Commission examined whether non-production offenders sentenced under §2G2.2 produced child pornography. Regardless of the charges and counts of conviction, the Commission coded information from the sentencing documents in the fiscal year 2019 non-production child pornography cases to determine whether offenders produced or distributed child pornography.

Distributing child pornography did not lead to more serious charges in many cases. To the contrary, offenders sentenced for possession actually distributed child pornography (56.8%) at a rate almost three times higher than those sentenced for receipt (21.2%). Therefore, the decision to charge possession instead of receipt may not always reflect the seriousness of offender conduct with respect to distribution.[120]

Figure 24.
Was Production Conduct Involved in the Child Pornography Offense?
*Fiscal Year 2019*




Conversely, offenders who produced child pornography were charged and convicted of more serious charges at a higher rate. The Commission examined how many offenders sentenced under §2G2.2 engaged in production or attempted production of child pornography concurrently with the instant federal offense, regardless of the charges and counts of conviction. Of the 1,340 non-production offenders sentenced under §2G2.2 in fiscal year 2019, 10.7 percent engaged in either the production (8.6%) or attempted production (2.1%) of child pornography.

Of the 1,340 non-production offenders sentenced in fiscal year 2019, distribution (12.6%) and receipt (17.1%) offenders produced or attempted to produce child pornography at a higher rate than possession offenders (6.8%). This suggests that with respect to the presence of production or attempted production conduct, the prosecutorial decision to charge distribution or receipt instead of possession may reflect, at least to some degree, the seriousness of offender conduct.

Overall, the Commission's analysis of distribution and production conduct shows that the presence of these factors do not strongly equate with more serious convictions and thus do not fully explain why some offenders have their sentencing exposure limited.

# Comparing Sentencing Outcomes

As discussed in Chapter Three, because the current statutory and guideline structure is outdated, courts are increasingly imposing sentences based on factors not accounted for in the guidelines, such as the three key factors identified in the Commission's 2012 *Child Pornography Report*: the content of the offender's collection; the offender's degree of involvement in an internet child pornography community; and the offender's prior or concurrent engagement in sexually abusive or exploitive conduct. However, in the absence of a guideline that accounts for these factors, courts cannot consider these key factors in a uniform manner.

The Commission analyzed the sentencing outcomes for a series of similarly situated possession, receipt, and distribution offenders to examine the extent of sentencing disparities among non-production child pornography offenders. The Commission compared offenders who received the same specific offense characteristics, and thus presumptively committed the offense in the same way, to analyze the degree to which courts imposed disparate sentences among similarly situated offenders. In doing so, the Commission replicated the 2012 *Child Pornography Report*'s examination of the most frequent sentencing outcomes among similarly situated offenders and found that sentencing disparities among similarly situated offenders continue to be pervasive.

In the 2012 *Child Pornography Report*, the Commission examined 498 non-production child pornography offenders in fiscal year 2010 whose guideline application represented the most common sentencing scenario for non-production child pornography offenders.[121] The analysis showed significant sentencing disparities not just between similarly situated offenders convicted of possession and offenders convicted of receipt, but also among offenders within the same conviction group—that is, sentencing disparities persisted even among similarly situated possession offenders as a distinct group and similarly situated receipt offenders as a distinct group.[122]

The Commission also compared similarly situated possession and distribution offenders.[123] This comparison also showed significant sentencing disparities not just between the two groups of offenders but within each distinct group alone.[124] The Commission concluded that because courts and parties in §2G2.2 cases believe the current statutory and guideline structure is outdated, they appear to fashion sentences often based on factors not accounted for in the guidelines, resulting in increasing sentencing disparities among similarly situated offenders.[125]

This report examines offenders in fiscal year 2019 who again represent the most common child pornography offender. The analysis below first compares the most common sentencing outcomes of possession and receipt offenders, followed by a comparison of the most common sentencing outcomes of similarly situated possession and distribution offenders. These analyses show that sentencing disparities for similarly situated non-production child pornography offenders persist today.

## Sentencing Outcomes for Common Possession and Receipt Offenses

This section analyzes sentencing outcomes for possession and receipt offenders with the most frequently applied specific offense characteristics. The most common possession offenders (119 cases) received a base offense level 18, four specific offense characteristics that are applied in the vast majority of cases,[126] a 3-level reduction for acceptance of responsibility, and were assigned to Criminal History Category I. The resulting guideline range for these possession offenders was 78 to 97 months.

Figure 25 shows the disparate sentencing outcomes for these similarly situated possession offenders. The horizontal axis of the graph depicts sentence length (in increasing increments, stated in months). The vertical axis shows the number of cases in each increment, as represented by vertical bars, comprising the 119 possession offenders. The shaded area of the graph represents the applicable guideline range for the possession offenders (78–97 months). The figures that follow in this section are constructed in the same format.

The analysis shows considerable differences in how these similarly situated possession offenders were sentenced. The average sentence for these 119 possession offenders was 47 months,[127] with the overwhelming majority

### Most Common §2G2.2 Guideline Application

***Possession Offenses***

*(119 Cases)*

| | |
|---|---|
| 18 | **§2G2.2(a)(1)**<br>*Base Offense Level* |
| 0 | **§2G2.2(b)(1)**<br>*Receipt only* |
| +2 | **§2G2.2(b)(2)**<br>*Victim prepubescent or under 12* |
| +4 | **§2G2.2(b)(4)**<br>*Sadistic or masochistic conduct or abuse of an infant or toddler* |
| +2 | **§2G2.2(b)(6)**<br>*Use of a computer* |
| +5 | **§2G2.2(b)(7)**<br>*600 or more images* |
| -3 | **§3E1.1**<br>*Acceptance of Responsibility* |
| 28 | **Final Offense Level**<br>**78-97 month range with CHC I** |

Figure 25.
Variation of Sentence Length Among Similarly Situated Possession Offenders
*Fiscal Year 2019*



(81.5%) sentenced below the guideline range. Notably, sentences ranged from probation to 228 months for these 119 possession offenders, who had the same guideline calculation through the application of the same specific offense characteristics and criminal history category.

A similar story unfolds with respect to similarly situated receipt offenders. The most common receipt offender (52 cases) received the same guideline range calculation as the possession offenders analyzed, except the base offense level started at 22 and was reduced by two levels because the actual conduct was limited to receipt of child pornography. The resulting guideline range for these receipt offenders was 97 to 121 months.

As with the possession offenders, the difference in sentencing outcomes for these similarly situated receipt offenders is considerable. The average sentence for these 52 receipt offenders was 81 months, with 69.2 percent sentenced below the guideline range. Remarkably, sentences ranged from 37 months to 180 months though these 52 receipt offenders had the same guideline calculation through the application of the same specific offense characteristics and criminal history category.

## Most Common §2G2.2 Guideline Application

***Receipt Offenses***
*(52 Cases)*

| | |
|---|---|
| 22 | **§2G2.2(a)(2)**<br>*Base Offense Level* |
| -2 | **§2G2.2(b)(1)**<br>*Receipt only* |
| +2 | **§2G2.2(b)(2)**<br>*Victim prepubescent or under 12* |
| +4 | **§2G2.2(b)(4)**<br>*Sadistic or masochistic conduct or abuse of an infant or toddler* |
| +2 | **§2G2.2(b)(6)**<br>*Use of a computer* |
| +5 | **§2G2.2(b)(7)**<br>*600 or more images* |
| -3 | **§3E1.1**<br>*Acceptance of Responsibility* |
| 30 | **Final Offense Level**<br>**97-121 month range with CHC I** |

Figure 26.
Variation of Sentence Length Among Similarly Situated Receipt Offenders
*Fiscal Year 2019*



Figure 27 combines the previous two figures to provide the sentencing outcomes for 171 similarly situated offenders, comprising 119 possession offenders and 52 receipt offenders. The only difference between the two groups of offenders is the starting point of their guideline calculation based on the count(s) of conviction. Applying §2G2.2 resulted in a guideline range of 78 to 97 months for the possession offenders and 97 to 121 months for the receipt offenders. Thus, the guideline provides different sentencing ranges for two groups of offenders who seemingly engaged in the same conduct.

There are considerable differences in how these similarly situated possession and receipt offenders were sentenced. The average sentence for these receipt offenders (81 months) was 34 months longer than the similarly situated possession offenders (47 months).[128] Taken together, the overall spread of sentences for the 171 similarly situated offenders ranges from probation to 228 months. This analysis reveals striking sentencing differences both among and between similarly situated possession and receipt offenders. Thus, courts are sentencing these offenders, in part, based on factors not accounted for in §2G2.2.

**Most Common §2G2.2 Guideline Application**

***Possession* vs. *Receipt***

| Possession | Receipt | |
|---|---|---|
| 18 | 22 | **§2G2.2(a)** *Base Offense Level* |
| 0 | -2 | **§2G2.2(b)(1)** *Receipt only* |
| +2 | +2 | **§2G2.2(b)(2)** *Victim prepubescent or under 12* |
| +4 | +4 | **§2G2.2(b)(4)** *Sadistic or masochistic conduct or abuse of an infant or toddler* |
| +2 | +2 | **§2G2.2(b)(6)** *Use of a computer* |
| +5 | +5 | **§2G2.2(b)(7)** *600 or more images* |
| -3 | -3 | **§3E1.1** *Acceptance of Responsibility* |
| 28 | 30 | **Final Offense Level** |

Figure 27.
Variation of Sentence Length Among Similarly Situated Possession and Receipt Offenders
*Fiscal Year 2019*



### Sentencing Outcomes for Common Possession and Distribution Offenders Who Distributed Child Pornography

This section analyzes the sentencing outcomes for possession and distribution offenders who received the same specific offense characteristics. The 82 possession offenders in this analysis received a base offense level 18, four specific offense characteristics that are applied in the vast majority of cases, as well as a 2-level distribution enhancement, a 3-level reduction for acceptance of responsibility, and were assigned to Criminal History Category I. The resulting guideline range for these 82 possession offenders was 97 to 121 months.

There are considerable differences in how these similarly situated possession offenders were sentenced. The average sentence for these 82 possession offenders was 57 months,[129] with the overwhelming majority (81.7%) sentenced below the applicable guideline range. Sentences ranged from time served to 121 months for these 82 possession offenders who had the same guideline calculation through the application of the same specific offense characteristics and criminal history category.

**§2G2.2 Guideline Application**

***Possession Offenses with Distribution Enhancement***

*(82 Cases)*

| | |
|---|---|
| 18 | **§2G2.2(a)(1)**<br>*Base Offense Level* |
| +2 | **§2G2.2(b)(2)**<br>*Victim prepubescent or under 12* |
| +2 | **§2G2.2(b)(3)**<br>*Other distribution* |
| +4 | **§2G2.2(b)(4)**<br>*Sadistic or masochistic conduct or abuse of an infant or toddler* |
| +2 | **§2G2.2(b)(6)**<br>*Use of a computer* |
| +5 | **§2G2.2(b)(7)**<br>*600 or more images* |
| -3 | **§3E1.1**<br>*Acceptance of Responsibility* |
| 30 | **Final Offense Level**<br>**97-121 month range with CHC I** |

Figure 28.
Variation of Sentence Length Among Similarly Situated Possession Offenders with Distribution Enhancement
*Fiscal Year 2019*



The most common distribution offender (190 cases) received the same guideline range calculation as the possession offenders analyzed above, except their base offense level started at 22 based on the statute of conviction. The resulting guideline range for these 190 distribution offenders was 151 to 188 months.

As with the possession offenders, sentencing disparities are evident among the most common distribution offenders. The average sentence for the most common distribution offender was 100 months, with 85.8 percent of the 190 offenders sentenced below the guideline range. Sentences ranged from less than a month to 240 months for these 190 distribution offenders who had the same guideline calculation based on the application of the same specific offense characteristics and criminal history category. Thus, as apparent from the nearly 20-year difference between the minimum and maximum sentence, courts are sentencing these offenders, in part, based on factors not accounted for in §2G2.2.

Figure 30 combines the two figures above to provide the sentencing outcomes for 272 similarly situated offenders, comprising 82 possession offenders and 190 distribution

### §2G2.2 Guideline Application

***Distribution Offenses***

*(190 Cases)*

| | |
|---|---|
| 22 | **§2G2.2(a)(1)**<br>*Base Offense Level* |
| +2 | **§2G2.2(b)(2)**<br>*Victim prepubescent or under 12* |
| +2 | **§2G2.2(b)(3)**<br>*Other distribution* |
| +4 | **§2G2.2(b)(4)**<br>*Sadistic or masochistic conduct or abuse of an infant or toddler* |
| +2 | **§2G2.2(b)(6)**<br>*Use of a computer* |
| +5 | **§2G2.2(b)(7)**<br>*600 or more images* |
| -3 | **§3E1.1**<br>*Acceptance of Responsibility* |
| 34 | **Final Offense Level**<br>**151-188 month range with CHC I** |

Figure 29.
Variation of Sentence Length Among Similarly Situated Distribution Offenders
*Fiscal Year 2019*



offenders. The only difference between the two groups of offenders is the starting point of their guideline calculation based on the statute of conviction. Applying §2G2.2 resulted in a guideline range of 97 to 121 months for the possession offenders and 151 to 188 months for the distribution offenders. Thus, the guideline provided different sentencing ranges for two groups of offenders who seemingly engaged in the same conduct.

Figure 30 below again shows marked differences in how these similarly situated possession and distribution offenders were sentenced. The average sentences for these distribution offenders (100 months) was 43 months longer than the similarly situated possession offenders (57 months).[130] Taken together, the overall spread of sentences for the 272 similarly situated offenders is substantial, ranging from time served to 240 months. Thus, consistent with the Commission's finding in the 2012 *Child Pornography Report*, disparities between these similarly situated possession and distribution offenders remain pronounced, as do disparities among offenders within the same group.

## §2G2.2 Guideline Application

***Possession* vs. *Distribution***

| Possession | Distribution | |
|---|---|---|
| 18 | 22 | **§2G2.2(a)** *Base Offense Level* |
| +2 | +2 | **§2G2.2(b)(2)** *Victim prepubescent or under 12* |
| +2 | +2 | **§2G2.2(b)(3)** *Other distribution* |
| +4 | +4 | **§2G2.2(b)(4)** *Sadistic or masochistic conduct or abuse of an infant or toddler* |
| +2 | +2 | **§2G2.2(b)(6)** *Use of a computer* |
| +5 | +5 | **§2G2.2(b)(7)** *600 or more images* |
| -3 | -3 | **§3E1.1** *Acceptance of Responsibility* |
| 30 | 34 | **Final Offense Level** |

Figure 30.
Variation of Sentence Length Among Similarly Situated Possession and Distribution Offenders with Same Distribution Enhancement
*Fiscal Year 2019*



# Recidivism

## Chapter 5

A primary issue facing sentencing judges and policymakers is the extent to which offenders sentenced under the non-production child pornography guideline recidivate—and, in particular, engage in new sex offenses ("sexual recidivism")—after reentering the community. Recidivism information is central to three of the primary purposes of punishment described in the Sentencing Reform Act—specific deterrence, incapacitation, and rehabilitation—all of which focus on the prevention of future crimes through correctional intervention. Information about recidivism is also relevant to the Commission's obligation to formulate sentencing policy that "reflect[s], to the extent practicable, advancement in knowledge of human behavior as it relates to the criminal justice process."[131]

## Introduction

This chapter analyzes the recidivism rates of federal non-production child pornography offenders released from incarceration or placed on probation in 2015. The Commission selected these offenders to account for, and balance, two primary research requirements:

1. the need to provide for a minimum three-year follow-up period during which a specific group of offenders was in the community;[132] and

2. the need to study a group of offenders whose crimes were committed when internet use was common in order to provide recidivism data relevant to current offenders.

Offenders who were placed on probation or released from incarceration in 2015 satisfy both criteria to a sufficient degree.

## Methodology for Recidivism Study

The methodology used for this report is consistent with the Commission's most recent recidivism studies. To examine the rate of known recidivism of non-production child pornography offenders, the Commission entered into a data-sharing agreement with the FBI's Criminal Justice Information Services (CJIS) Division and the Administrative Office of the United States Courts. Under the agreement, the Commission gained electronic access to criminal history records through the CJIS's Interstate Identification Index (III).[133] The Commission identified all offenders sentenced under the non-production child pornography guideline who were released or put on probation in 2015 and could be matched to the FBI's Record of Arrest and Prosecution database ("RAP sheets").[134] These offenders were tracked for three years after release from prison or placement on probation. In

addition, the Commission collected data on their federal child pornography offense and offense characteristics from the relevant sentencing documents.

Although RAP sheets are generally considered the best source of data for recidivism studies, they can only be used to determine the rate of *known recidivism*. Some amount of criminal activity, including recidivism, is unreported—commonly referred to as the "dark figure" of crime.[135] This so-called "dark figure" of crime looms large in sexual offenses against children, which often go unreported or undetected[136] and therefore will not appear on RAP sheets. Accordingly, any research on sex offender recidivism based on reported arrests, including the Commission's recidivism findings, should be viewed as a conservative measurement of actual recidivism.

The Commission's study group included 1,093 non-production child pornography offenders who satisfied four conditions:

1. They were United States citizens released from federal prison or placed on probation for their non-production child pornography offense in 2015;

2. Their original sentencing documents (*e.g.*, presentence reports and statement of reasons) provided complete guideline application information;

3. They were matched successfully to RAP sheets; and

4. They were tracked in the community for three years immediately after release following service of prison sentences[137] (or, in the case of a small minority, during service of their probation terms) for their federal child pornography offenses.

For this study, recidivism is defined as any of the following arrest events[138] occurring within the three-year study period:

- an arrest that led to a conviction for a felony or qualifying misdemeanor offense;
- an arrest with no evidence of an acquittal or dismissal;[139] or
- a reported "technical" violation of the conditions of an offender's probation or supervised release that led to an arrest or revocation.[140]

New criminal arrests included felony offenses and, with certain exceptions, misdemeanors that were committed during the three-year period.[141] Arrests with dispositions of an acquittal or dismissal of all charges were not considered recidivist events.

The Commission analyzed the *overall recidivism* and *sexual recidivism* rates. Overall recidivism refers to any criminal justice failure that resulted in either an arrest (with or without a conviction) for a new criminal offense or an arrest (with or without a revocation) for a "technical" violation of the offender's conditions of supervision. As part of the "overall recidivism" analysis, the Commission identified individuals who failed to register as sex offenders as well as offenders who were arrested for a crime that was not a sex offense.

Sexual recidivism is a subset of overall recidivism and refers to arrests for:

1. contact sex offenses (*e.g.*, rape or sexual assault); or

2. non-contact sex offenses (*e.g.*, indecent exposure).

## Offender and Offense Characteristics

**89.1%**

### White

Most non-production child pornography offenders released or placed on probation in 2015 were White (89.1%) followed by Hispanic (6.4%), Black (2.7%), and Other races (1.8%).

**99.6%**

### Male

Nearly all were male (99.6%).

**41 yrs**

### Average Age

The average age at sentencing was 41 years old, while the average age at release was 45 years old.

**98.4%**

### Sentenced to Prison

The median sentence length was 60 months.




### Less Extensive Criminal History




Most had little or no criminal history.




## Characteristics of Non-Production Child Pornography Offenders Released or Placed on Probation in 2015

The Commission studied non-production child pornography offenders released or placed on probation in 2015 because it is a recent group of offenders that could be tracked for three years. These non-production child pornography offenders have several characteristics that are associated with lower recidivism rates, such as lengthy sentences, their age at sentencing and release, and minimal criminal history.[142]

Like the offenders sentenced in fiscal year 2019, the non-production child pornography offenders released or placed on probation in 2015 were predominantly White (89.1%) and male (99.6%). When initially sentenced, the average age of non-production child pornography offenders released in 2015 was 41 years. When released from prison, their average age was 45 years.

Nearly all non-production child pornography offenders in this recidivism study were sentenced to a term of imprisonment (98.4%) for their instant federal offense. Of the non-production child pornography offenders released in 2015, the median sentence length was 60 months. Over half (54.0%) received a sentence between 60 months and 119 months, and another 11.1 percent received a sentence of 120 months or more.

The median term of supervised release imposed on non-production child pornography offenders released in 2015 was 120 months.

Most non-production child pornography offenders released or placed on probation in 2015 had little or no criminal history. Over 86 percent were in Criminal History Category I (the lowest category). Less than two percent were in higher criminal history categories—Criminal History Category IV (1.1%), V (0.6%), or VI (0.2%).

Figure 31.
Recidivism Events by Non-Production Child Pornography Offenders Released or Placed on Probation in 2015 After Three-Year Follow-Up Period




## Results of the Recidivism Study

The overall recidivism rate of the 1,093 non-production child pornography offenders was 27.6 percent (302 of 1,093 offenders) three years after release from incarceration (or the commencement of probation). Of the 1,093 offenders, 16.0 percent were arrested for a crime that was not a sex offense or related to the offender's status as a sex offender (depicted as "general recidivism" in Figure 31).

The sexual recidivism rate for all non-production child pornography offenders was 4.3 percent (47 of the 1,093 offenders). An additional 7.3 percent of offenders were arrested or had their term of supervised release revoked for failing to register as a sex offender.[143]

### Rearrest Offense

In addition to the overall recidivism rate among non-production child pornography offenders, the Commission identified any criminal event during the three-year study period for which offenders were rearrested (Figure 31). Some offenders were rearrested more than once.[144] Of the 302 non-production child pornography offenders who recidivated, an administration of justice offense[145] was the most common new crime (179 offenders or 16.4% of the 1,093 offenders). Failure to register as a sex offender was the second most common offense among those who recidivated. Eighty-eight offenders (8.1% of the 1,093 offenders) failed to register as a sex offender following the non-production child pornography offense.[146] Although occurring infrequently, 14 non-production child pornography offenders (1.3% of the 1,093 offenders) were arrested for a contact sex offense and 36 offenders (3.3% of the 1,093 offenders) were arrested for a non-contact sex offense.

Figure 32.
Time to First Rearrest for Non-Production Child Pornography Offenders Released or Placed on Probation in 2015




## Time to Rearrest

The Commission measured the period of time between reentry into the community and the first recidivism event. Figure 32 shows the recidivism rates over time in six-month increments. Among those non-production child pornography offenders who recidivated for a sex offense, the median time to the first arrest was twelve months, meaning that one-half of those offenders were arrested for a sex offense within twelve months of their release, while the other half recidivated more than twelve months after release. Among those offenders who were arrested for an offense other than a sex offense, the median time to rearrest was eight months.

# Conclusion

# Conclusion

The guideline covering the distribution, receipt, and possession of child pornography, §2G2.2, is largely the result of statutory mandatory minimum penalties, congressional directives to the Commission, and direct amendments to the guideline by Congress in the PROTECT Act of 2003. The Commission's 2012 *Child Pornography Report* recommended that Congress authorize the Commission to revise §2G2.2 to eliminate outdated guideline enhancements and more fully account for relevant aggravating factors. Congress has not passed legislation amending either the statutory penalty scheme or the directives to the Commission. The guideline, therefore, remains largely intact. Although non-production child pornography offenses make up only a small portion of the federal caseload, interest in their penalty structure remains heightened because of the nature of these offenses, the harm to the victims, and their high variance rate compared to other federal offenses. This update to the Commission's 2012 *Child Pornography Report* is intended to provide Congress, judges, and other stakeholders with current information on non-production child pornography offenses and offender behavior.

A central theme of the Commission's 2012 *Child Pornography Report* remains true today: the sentencing enhancements in §2G2.2 have not kept pace with technological advancements. Facilitated by technology, child pornography offenses increasingly involve images in great quantities and of a graphic nature, often depicting the youngest of victims. These factors are already accounted for in §2G2.2 by a series of enhancements that were initially added to target more serious offenses and more culpable offenders. However, the conduct covered by four of the six enhancements—accounting for a combined 13 offense levels—has become so ubiquitous that they now apply in the vast majority of cases sentenced under §2G2.2. Conversely,

## Related Reports

***History of the Child Pornography Guidelines***

**2009**

***Report to the Congress: Federal Child Pornography Offenses***

**2012**

***Mandatory Minimum Penalties for Federal Sex Offenses***

**2019**

significant aspects of an offender's collecting behavior, involvement in a child pornography community, and aggravating sexual conduct such as past or concurrent contact offenses may not be accounted for in the guideline at all. In short, the guideline is both overinclusive and underinclusive. Thus, it no longer effectively differentiates among offenders in terms of either the seriousness of the offense or culpability of the offender.

The inadequacies of the current penalty structure impact the sentencing practices of the courts and the charging practices of the government. Far fewer non-production child pornography offenders are sentenced within their guideline range under §2G2.2 compared to other federal offenders. Judges have continued to sentence most non-production child pornography offenders below the guideline range, most often by imposing variances pursuant to their authority under 18 U.S.C. § 3553(a), but also increasingly at the request of the government. Furthermore, the government often limits the sentencing exposure of non-production child pornography offenders by reducing distribution and receipt charges, which carry mandatory minimum penalties of at least five years, to possession charges, which carry no mandatory minimum penalty.

**For More Information**

Visit the Commission's website for additional resources on the child pornography guidelines.

*www.ussc.gov*

While courts are increasingly sentencing based on non-guideline factors, the key factors identified in the Commission's 2012 *Child Pornography Report* are reflected in sentencing practices in the aggregate. Consistent with the Commission's recommendations, offenders who participated in an online child pornography community or engaged in aggravating conduct received longer sentences than offenders who did not engage in such conduct. Furthermore, the offenders who engaged in the more serious conduct also were significantly more likely to receive a sentence within their applicable guideline range and less likely to receive a downward variance.

A more granular analysis revealed, however, significant sentencing disparities among similarly situated offenders as courts and the government contend with the outdated statutory and guideline structure. The analysis shows pervasive sentencing disparities not only between similarly situated offenders convicted of possession and offenders convicted of receipt, but also among similarly situated possession offenders as a distinct group and similarly situated receipt offenders as a distinct group. Charging practices, the resulting guideline ranges, and sentencing practices of judges all contributed to some degree to these disparities. Therefore, even though the key factors identified in the 2012 *Child Pornography Report* influence sentences, they cannot be considered in a sufficiently uniform manner in the absence of a properly calibrated guideline that jettisons outdated factors.

# Appendices

# Appendix A

Table A-1.
Districts with Highest Number of Non-Production Child Pornography Cases
*Fiscal Year 2019*

| Top Districts | |
|---|---|
| | N |
| **By Number of Cases** | |
| *Eastern Virginia* | *50* |
| *Middle Florida* | *47* |
| *Western Missouri* | *45* |
| *Southern Florida* | *44* |
| *Eastern Missouri* | *40* |

Table A-2.
Districts with Non-Production Child Pornography as Highest Percentage of Caseload
*Fiscal Year 2019*

| Top Districts | |
|---|---|
| | % |
| **By Percentage of Caseload** | |
| *Northern New York* | *7.1%* |
| *Wyoming* | *6.9%* |
| *Eastern Virginia* | *6.4%* |
| *Western Pennsylvania* | *6.3%* |
| *Western Missouri* | *6.0%* |

## Geographic Distribution of Non-Production Child Pornography Cases

Tables A-1 to A-3 examine the geographic distribution of non-production child pornography cases across circuit and district courts. In fiscal year 2019, non-production child pornography cases were prosecuted in every circuit and almost all district courts, but the number of cases in each circuit and district court varied substantially. Tables A-1 and A-2 show the district courts with the highest number of non-production child pornography cases, by highest raw number of cases, and by highest percentage of the total caseload, respectively. Table A-3 provides the total number of non-production child pornography cases in each circuit and district.

Of the 1,340 cases in fiscal year 2019, the five districts with the highest number of non-production child pornography cases were as follows: 50 cases from the Eastern District of Virginia; 47 cases from the Middle District of Florida; 45 cases from the Western District of Missouri; 44 cases from the Southern District of Florida; and 40 cases from the Eastern District of Missouri.

The five districts where non-production child pornography cases made up the highest percentage of the district's overall caseload were the Northern District of New York (7.1%), the District of Wyoming (6.9%), the Eastern District of Virginia (6.4%), the Western District of Pennsylvania (6.3%), and the Western District of Missouri (6.0%).

## Table A-3.
## Non-Production Child Pornography Cases in Each Circuit and District
## *Fiscal Year 2019*

| | | Distribution | | | | Receipt | | | | Possession | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **CIRCUIT** | **Total Number** | **Total** | | **Non-Recidivists** | **Recidivists** | **Total** | | **Non-Recidivists** | **Recidivists** | **Total** | | **Non-Recidivists** | **Recidivists** |
| District | **of Cases** | N | % | N | N | N | % | N | N | N | % | N | N |
| **TOTAL** | **1,340** | **625** | **46.6%** | **559** | **63** | **146** | **10.9%** | **132** | **13** | **569** | **42.5%** | **455** | **118** |
| | | | | | | | | | | | | | |
| **D.C. CIRCUIT** | **7** | **4** | **57.1%** | **3** | **1** | **0** | **0.0%** | **0** | **0** | **3** | **42.9%** | **3** | **0** |
| District of Columbia | **7** | 4 | 57.1% | 3 | 1 | 0 | 0.0% | 0 | 0 | 3 | 42.9% | 3 | 0 |
| | | | | | | | | | | | | | |
| **FIRST CIRCUIT** | **42** | **15** | **35.7%** | **13** | **2** | **1** | **2.4%** | **1** | **0** | **26** | **61.9%** | **19** | **7** |
| Maine | **7** | 5 | 71.4% | 4 | 1 | 0 | 0.0% | 0 | 0 | 2 | 28.6% | 1 | 1 |
| Massachusetts | **12** | 4 | 33.3% | 3 | 1 | 1 | 8.3% | 1 | 0 | 7 | 58.3% | 4 | 3 |
| New Hampshire | **2** | 2 | 100.0% | 2 | 0 | 0 | 0.0% | 0 | 0 | 0 | 0.0% | 0 | 0 |
| Puerto Rico | **13** | 1 | 7.7% | 1 | 0 | 0 | 0.0% | 0 | 0 | 12 | 92.3% | 11 | 1 |
| Rhode Island | **8** | 3 | 37.5% | 3 | 0 | 0 | 0.0% | 0 | 0 | 5 | 62.5% | 3 | 2 |
| | | | | | | | | | | | | | |
| **SECOND CIRCUIT** | **93** | **39** | **41.9%** | **31** | **7** | **9** | **9.7%** | **8** | **1** | **45** | **48.4%** | **38** | **8** |
| Connecticut | **6** | 3 | 50.0% | 3 | 0 | 2 | 33.3% | 2 | 0 | 1 | 16.7% | 1 | 0 |
| New York | | | | | | | | | | | | | |
| Eastern | **21** | 12 | 57.1% | 11 | 1 | 1 | 4.8% | 1 | 0 | 8 | 38.1% | 8 | 0 |
| Northern | **22** | 14 | 63.6% | 10 | 4 | 2 | 9.1% | 1 | 1 | 6 | 27.3% | 4 | 2 |
| Southern | **18** | 2 | 11.1% | 2 | 0 | 1 | 5.6% | 1 | 0 | 15 | 83.3% | 11 | 4 |
| Western | **21** | 7 | 33.3% | 4 | 2 | 3 | 14.3% | 3 | 0 | 11 | 52.4% | 10 | 2 |
| Vermont | **5** | 1 | 20.0% | 1 | 0 | 0 | 0.0% | 0 | 0 | 4 | 80.0% | 4 | 0 |
| | | | | | | | | | | | | | |
| **THIRD CIRCUIT** | **74** | **38** | **51.4%** | **34** | **4** | **11** | **14.9%** | **9** | **2** | **25** | **33.8%** | **17** | **8** |
| Delaware | **4** | 1 | 25.0% | 1 | 0 | 0 | 0.0% | 0 | 0 | 3 | 75.0% | 1 | 2 |
| New Jersey | **20** | 12 | 60.0% | 11 | 1 | 3 | 15.0% | 3 | 0 | 5 | 25.0% | 1 | 4 |
| Pennsylvania | | | | | | | | | | | | | |
| Eastern | **22** | 13 | 59.1% | 10 | 3 | 4 | 18.2% | 3 | 1 | 5 | 22.7% | 4 | 1 |
| Middle | **6** | 4 | 66.7% | 4 | 0 | 2 | 33.3% | 1 | 1 | 0 | 0.0% | 0 | 0 |
| Western | **22** | 8 | 36.4% | 8 | 0 | 2 | 9.1% | 2 | 0 | 12 | 54.5% | 11 | 1 |
| Virgin Islands | **0** | 0 | 0.0% | 0 | 0 | 0 | 0.0% | 0 | 0 | 0 | 0.0% | 0 | 0 |
| | | | | | | | | | | | | | |
| **FOURTH CIRCUIT** | **147** | **79** | **53.7%** | **72** | **5** | **16** | **10.9%** | **14** | **2** | **52** | **35.4%** | **41** | **13** |
| Maryland | **18** | 11 | 61.1% | 8 | 1 | 0 | 0.0% | 0 | 0 | 7 | 38.9% | 4 | 5 |
| North Carolina | | | | | | | | | | | | | |
| Eastern | **9** | 8 | 88.9% | 8 | 0 | 0 | 0.0% | 0 | 0 | 1 | 11.1% | 0 | 1 |
| Middle | **19** | 11 | 57.9% | 11 | 0 | 4 | 21.1% | 4 | 0 | 4 | 21.1% | 3 | 1 |
| Western | **24** | 16 | 66.7% | 16 | 0 | 2 | 8.3% | 1 | 1 | 6 | 25.0% | 6 | 0 |
| South Carolina | **13** | 3 | 23.1% | 2 | 1 | 0 | 0.0% | 0 | 0 | 10 | 76.9% | 8 | 2 |
| Virginia | | | | | | | | | | | | | |
| Eastern | **50** | 25 | 50.0% | 23 | 2 | 10 | 20.0% | 9 | 1 | 15 | 30.0% | 12 | 3 |
| Western | **3** | 2 | 66.7% | 1 | 1 | 0 | 0.0% | 0 | 0 | 1 | 33.3% | 1 | 0 |
| West Virginia | | | | | | | | | | | | | |
| Northern | **5** | 0 | 0.0% | 0 | 0 | 0 | 0.0% | 0 | 0 | 5 | 100.0% | 5 | 0 |
| Southern | **6** | 3 | 50.0% | 3 | 0 | 0 | 0.0% | 0 | 0 | 3 | 50.0% | 2 | 1 |

**Table A-3 (cont.)**

| CIRCUIT | Total Number | Distribution | | | | Receipt | | | | Possession | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Total | | Non-Recidivists | Recidivists | Total | | Non-Recidivists | Recidivists | Total | | Non-Recidivists | Recidivists |
| District | of Cases | N | % | N | N | N | % | N | N | N | % | N | N |
| **FIFTH CIRCUIT** | **147** | **61** | **41.5%** | **58** | **3** | **13** | **8.8%** | **13** | **0** | **73** | **49.7%** | **67** | **6** |
| Louisiana | | | | | | | | | | | | | |
| Eastern | **7** | 2 | 28.6% | 2 | 0 | 2 | 28.6% | 2 | 0 | 3 | 42.9% | 3 | 0 |
| Middle | **2** | 0 | 0.0% | 0 | 0 | 1 | 50.0% | 1 | 0 | 1 | 50.0% | 1 | 0 |
| Western | **13** | 2 | 15.4% | 1 | 1 | 1 | 7.7% | 1 | 0 | 10 | 76.9% | 7 | 3 |
| Mississippi | | | | | | | | | | | | | |
| Northern | **6** | 3 | 50.0% | 3 | 0 | 0 | 0.0% | 0 | 0 | 3 | 50.0% | 3 | 0 |
| Southern | **3** | 0 | 0.0% | 0 | 0 | 0 | 0.0% | 0 | 0 | 3 | 100.0% | 3 | 0 |
| Texas | | | | | | | | | | | | | |
| Eastern | **17** | 4 | 23.5% | 4 | 0 | 3 | 17.6% | 3 | 0 | 10 | 58.8% | 9 | 1 |
| Northern | **25** | 8 | 32.0% | 8 | 0 | 4 | 16.0% | 4 | 0 | 13 | 52.0% | 13 | 0 |
| Southern | **39** | 23 | 59.0% | 21 | 2 | 0 | 0.0% | 0 | 0 | 16 | 41.0% | 15 | 1 |
| Western | **35** | 19 | 54.3% | 19 | 0 | 2 | 5.7% | 2 | 0 | 14 | 40.0% | 13 | 1 |
| **SIXTH CIRCUIT** | **111** | **66** | **59.5%** | **58** | **8** | **13** | **11.7%** | **12** | **1** | **32** | **28.8%** | **23** | **9** |
| Kentucky | | | | | | | | | | | | | |
| Eastern | **4** | 2 | 50.0% | 2 | 0 | 1 | 25.0% | 1 | 0 | 1 | 25.0% | 1 | 0 |
| Western | **13** | 9 | 69.2% | 7 | 2 | 0 | 0.0% | 0 | 0 | 4 | 30.8% | 2 | 2 |
| Michigan | | | | | | | | | | | | | |
| Eastern | **24** | 14 | 58.3% | 12 | 2 | 2 | 8.3% | 2 | 0 | 8 | 33.3% | 6 | 2 |
| Western | **8** | 7 | 87.5% | 5 | 2 | 1 | 12.5% | 1 | 0 | 0 | 0.0% | 0 | 0 |
| Ohio | | | | | | | | | | | | | |
| Northern | **33** | 22 | 66.7% | 20 | 2 | 7 | 21.2% | 6 | 1 | 4 | 12.1% | 3 | 1 |
| Southern | **11** | 4 | 36.4% | 4 | 0 | 1 | 9.1% | 1 | 0 | 6 | 54.5% | 4 | 2 |
| Tennessee | | | | | | | | | | | | | |
| Eastern | **11** | 3 | 27.3% | 3 | 0 | 0 | 0.0% | 0 | 0 | 8 | 72.7% | 6 | 2 |
| Middle | **4** | 3 | 75.0% | 3 | 0 | 1 | 25.0% | 1 | 0 | 0 | 0.0% | 0 | 0 |
| Western | **3** | 2 | 66.7% | 2 | 0 | 0 | 0.0% | 0 | 0 | 1 | 33.3% | 1 | 0 |
| **SEVENTH CIRCUIT** | **85** | **44** | **51.8%** | **37** | **7** | **12** | **14.1%** | **11** | **1** | **29** | **34.1%** | **18** | **11** |
| Illinois | | | | | | | | | | | | | |
| Central | **13** | 8 | 61.5% | 8 | 0 | 2 | 15.4% | 1 | 1 | 3 | 23.1% | 1 | 2 |
| Northern | **9** | 6 | 66.7% | 4 | 2 | 0 | 0.0% | 0 | 0 | 3 | 33.3% | 1 | 2 |
| Southern | **12** | 8 | 66.7% | 7 | 1 | 1 | 8.3% | 1 | 0 | 3 | 25.0% | 2 | 1 |
| Indiana | | | | | | | | | | | | | |
| Northern | **10** | 2 | 20.0% | 2 | 0 | 3 | 30.0% | 3 | 0 | 5 | 50.0% | 4 | 1 |
| Southern | **25** | 13 | 52.0% | 10 | 3 | 5 | 20.0% | 5 | 0 | 7 | 28.0% | 5 | 2 |
| Wisconsin | | | | | | | | | | | | | |
| Eastern | **8** | 4 | 50.0% | 4 | 0 | 0 | 0.0% | 0 | 0 | 4 | 50.0% | 4 | 0 |
| Western | **8** | 3 | 37.5% | 2 | 1 | 1 | 12.5% | 1 | 0 | 4 | 50.0% | 1 | 3 |
| **EIGHTH CIRCUIT** | **188** | **95** | **50.5%** | **80** | **15** | **28** | **14.9%** | **25** | **2** | **65** | **34.6%** | **44** | **22** |
| Arkansas | | | | | | | | | | | | | |
| Eastern | **7** | 3 | 42.9% | 3 | 0 | 0 | 0.0% | 0 | 0 | 4 | 57.1% | 3 | 1 |
| Western | **10** | 3 | 30.0% | 3 | 0 | 1 | 10.0% | 0 | 1 | 6 | 60.0% | 3 | 3 |
| Iowa | | | | | | | | | | | | | |
| Northern | **4** | 1 | 25.0% | 1 | 0 | 2 | 50.0% | 2 | 0 | 1 | 25.0% | 1 | 0 |
| Southern | **24** | 11 | 45.8% | 10 | 1 | 4 | 16.7% | 4 | 0 | 9 | 37.5% | 6 | 3 |
| Minnesota | **20** | 16 | 80.0% | 7 | 9 | 2 | 10.0% | 2 | 0 | 2 | 10.0% | 0 | 2 |
| Missouri | | | | | | | | | | | | | |
| Eastern | **40** | 11 | 27.5% | 11 | 0 | 1 | 2.5% | 1 | 0 | 28 | 70.0% | 18 | 10 |
| Western | **45** | 33 | 73.3% | 29 | 4 | 9 | 20.0% | 7 | 1 | 3 | 6.7% | 3 | 1 |
| Nebraska | **17** | 9 | 52.9% | 9 | 0 | 2 | 11.8% | 2 | 0 | 6 | 35.3% | 5 | 1 |
| North Dakota | **5** | 2 | 40.0% | 2 | 0 | 1 | 20.0% | 1 | 0 | 2 | 40.0% | 1 | 1 |
| South Dakota | **16** | 6 | 37.5% | 5 | 1 | 6 | 37.5% | 6 | 0 | 4 | 25.0% | 4 | 0 |

## Table A-3 (cont.)

| CIRCUIT | Total Number | Distribution | | | | Receipt | | | | Possession | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Total | | Non-Recidivists | Recidivists | Total | | Non-Recidivists | Recidivists | Total | | Non-Recidivists | Recidivists |
| District | of Cases | N | % | N | N | N | % | N | N | N | % | N | N |
| **NINTH CIRCUIT** | **221** | **96** | **43.4%** | **88** | **8** | **19** | **8.6%** | **17** | **2** | **106** | **48.0%** | **90** | **16** |
| Alaska | **6** | 3 | 50.0% | 3 | 0 | 0 | 0.0% | 0 | 0 | 3 | 50.0% | 3 | 0 |
| Arizona | **39** | 21 | 53.8% | 20 | 1 | 0 | 0.0% | 0 | 0 | 18 | 46.2% | 18 | 0 |
| California | | | | | | | | | | | | | |
| Central | **17** | 4 | 23.5% | 4 | 0 | 1 | 5.9% | 1 | 0 | 12 | 70.6% | 12 | 0 |
| Eastern | **20** | 14 | 70.0% | 10 | 4 | 3 | 15.0% | 1 | 2 | 3 | 15.0% | 0 | 3 |
| Northern | **17** | 3 | 17.6% | 3 | 0 | 4 | 23.5% | 4 | 0 | 10 | 58.8% | 8 | 2 |
| Southern | **17** | 6 | 35.3% | 6 | 0 | 3 | 17.6% | 3 | 0 | 8 | 47.1% | 8 | 0 |
| Guam | **0** | 0 | 0.0% | 0 | 0 | 0 | 0.0% | 0 | 0 | 0 | 0.0% | 0 | 0 |
| Hawaii | **1** | 1 | 100.0% | 1 | 0 | 0 | 0.0% | 0 | 0 | 0 | 0.0% | 0 | 0 |
| Idaho | **15** | 5 | 33.3% | 5 | 0 | 0 | 0.0% | 0 | 0 | 10 | 66.7% | 9 | 1 |
| Montana | **8** | 2 | 25.0% | 1 | 1 | 2 | 25.0% | 2 | 0 | 4 | 50.0% | 2 | 2 |
| Nevada | **27** | 13 | 48.1% | 12 | 1 | 4 | 14.8% | 4 | 0 | 10 | 37.0% | 8 | 2 |
| Northern Mariana Islands | **0** | 0 | 0.0% | 0 | 0 | 0 | 0.0% | 0 | 0 | 0 | 0.0% | 0 | 0 |
| Oregon | **23** | 17 | 73.9% | 16 | 1 | 0 | 0.0% | 0 | 0 | 6 | 26.1% | 5 | 1 |
| Washington | | | | | | | | | | | | | |
| Eastern | **15** | 5 | 33.3% | 5 | 0 | 2 | 13.3% | 2 | 0 | 8 | 53.3% | 6 | 2 |
| Western | **16** | 2 | 12.5% | 2 | 0 | 0 | 0.0% | 0 | 0 | 14 | 87.5% | 11 | 3 |
| **TENTH CIRCUIT** | **85** | **26** | **30.6%** | **24** | **2** | **6** | **7.1%** | **5** | **1** | **53** | **62.4%** | **43** | **10** |
| Colorado | **8** | 0 | 0.0% | 0 | 0 | 0 | 0.0% | 0 | 0 | 8 | 100.0% | 6 | 2 |
| Kansas | **17** | 9 | 52.9% | 9 | 0 | 2 | 11.8% | 2 | 0 | 6 | 35.3% | 6 | 0 |
| New Mexico | **9** | 4 | 44.4% | 3 | 1 | 1 | 11.1% | 0 | 1 | 4 | 44.4% | 2 | 2 |
| Oklahoma | | | | | | | | | | | | | |
| Eastern | **3** | 0 | 0.0% | 0 | 0 | 0 | 0.0% | 0 | 0 | 3 | 100.0% | 3 | 0 |
| Northern | **7** | 3 | 42.9% | 3 | 0 | 2 | 28.6% | 2 | 0 | 2 | 28.6% | 2 | 0 |
| Western | **7** | 2 | 28.6% | 2 | 0 | 0 | 0.0% | 0 | 0 | 5 | 71.4% | 4 | 1 |
| Utah | **23** | 2 | 8.7% | 2 | 0 | 0 | 0.0% | 0 | 0 | 21 | 91.3% | 16 | 5 |
| Wyoming | **11** | 6 | 54.5% | 5 | 1 | 1 | 9.1% | 1 | 0 | 4 | 36.4% | 4 | 0 |
| **ELEVENTH CIRCUIT** | **140** | **62** | **44.3%** | **61** | **1** | **18** | **12.9%** | **17** | **1** | **60** | **42.9%** | **52** | **8** |
| Alabama | | | | | | | | | | | | | |
| Middle | **6** | 5 | 83.3% | 5 | 0 | 0 | 0.0% | 0 | 0 | 1 | 16.7% | 0 | 1 |
| Northern | **3** | 1 | 33.3% | 1 | 0 | 0 | 0.0% | 0 | 0 | 2 | 66.7% | 2 | 0 |
| Southern | **4** | 3 | 75.0% | 3 | 0 | 0 | 0.0% | 0 | 0 | 1 | 25.0% | 1 | 0 |
| Florida | | | | | | | | | | | | | |
| Middle | **47** | 27 | 57.4% | 27 | 0 | 6 | 12.8% | 6 | 0 | 14 | 29.8% | 11 | 3 |
| Northern | **5** | 3 | 60.0% | 3 | 0 | 0 | 0.0% | 0 | 0 | 2 | 40.0% | 1 | 1 |
| Southern | **44** | 15 | 34.1% | 14 | 1 | 9 | 20.5% | 8 | 1 | 20 | 45.5% | 20 | 0 |
| Georgia | | | | | | | | | | | | | |
| Middle | **10** | 2 | 20.0% | 2 | 0 | 1 | 10.0% | 1 | 0 | 7 | 70.0% | 6 | 1 |
| Northern | **14** | 5 | 35.7% | 5 | 0 | 1 | 7.1% | 1 | 0 | 8 | 57.1% | 8 | 0 |
| Southern | **7** | 1 | 14.3% | 1 | 0 | 1 | 14.3% | 1 | 0 | 5 | 71.4% | 3 | 2 |

# Appendix B

Figure B-1.
Trend in Within-Range Sentences for Non-Production Child Pornography Offenses




This graph shows how the percentage of within-range sentences for non-production child pornography offenses have changed over time, both overall and for each individual offense type. Between fiscal years 2005 to 2019, the rate of within-range sentences decreased for each offense type. While rates of within-range sentences are lower today compared to the rates in fiscal year 2005 or at the time of the 2012 *Child Pornography Report*'s publication, the percentage of within-range sentences increased for receipt and possession offenses from fiscal years 2016 to 2019. Notably, the rate of within-range sentences increased 14.7 percentage points for receipt cases, from 27.1 percent in 2016 to 41.8 percent in 2019. The within-range rate for possession cases increased more modestly by 3.6 percentage points, from 28.6 percent in 2016 to 32.2 percent in 2019. Conversely, the within-range rate for distribution cases remained relatively unchanged in the most recent years of this report, hovering around 25 percent from fiscal years 2015 to 2019.

# Appendix C

Figure C-1.
Trend in Average Guideline Minimum and Sentence Imposed for Child Pornography Possession Offenses[147]




Figures C-1, C-2, and C-3 show the average guideline minimum and sentence imposed from fiscal years 2005 to 2019 for possession, receipt, and distribution cases.

In possession cases, the difference between the average guideline minimum and average sentence imposed has increased over time. From fiscal years 2005 to 2007, the difference between the average guideline minimum and average sentence was narrow and remained relatively stable. Starting in fiscal year 2007, however, the gap between the average guideline minimum and average sentence imposed began widening. From fiscal years 2010 to 2019, the difference between the average sentence and average guideline minimum increased 38.9 percent from 18 to 25 months. Since fiscal year 2016, however, the difference between the average guideline minimum and average sentence imposed has somewhat stabilized.

Figure C-2.
Trend in Average Guideline Minimum and Sentence Imposed for Child Pornography Receipt Offenses[148]




Compared to possession offenses, receipt offenses have shown a closer and more stable relationship between the average guideline minimum and average sentence imposed over time. From fiscal years 2005 to 2007, the difference between the average guideline minimum and average sentence imposed remained narrow, with the lines intersecting at times. Beginning in fiscal year 2008, the difference between the average guideline minimum and average sentence began gradually widening. From fiscal years 2010 to 2019, the difference between the average guideline minimum and average sentence increased by 85.7 percent, from seven to 13 months. However, the difference between the average guideline minimum and average sentence has somewhat stabilized in the most recent years.

Figure C-3.
Trend in Average Guideline Minimum and Sentence Imposed for Child Pornography Distribution Offenses[149]




As with the other non-production child pornography offenses, the difference between the average guideline minimum and average sentence imposed for distribution offenses increased overall from fiscal years 2005 to 2019. From fiscal years 2005 to 2007, the gap between the two lines remained relatively stable, ranging from 11 months to 17 months. Starting in fiscal year 2008, however, the gap widened substantially. Although the difference between the average guideline minimum and average sentence imposed for distribution offenses is substantially wider today compared to fiscal year 2005, the difference has remained relatively stable in recent years. From fiscal years 2010 to 2019, the difference increased by only one month (from 45 to 46 months or 2.2%).

## Endnotes

1 U.S. Sent'g Comm'n, Report to the Congress: Federal Child Pornography Offenses (2012), https://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/sex-offense-topics/201212-federal-child-pornography-offenses/Full_Report_to_Congress.pdf [hereinafter 2012 Child Pornography Report].

2 U.S. Sent'g Comm'n, *Guidelines Manual*, §2G2.2 (Nov. 2018) [hereinafter USSG].

3 USSG §2G2.1.

4 2012 Child Pornography Report, *supra* note 1, at 126–27 (noting that the number of non-production child pornography cases increased from 77 cases (accounting for 0.2% of the total caseload) in fiscal year 1992 to 1,717 cases (accounting for 2.0% of the total caseload) in fiscal year 2010).

5 *Id.* at 1.

6 *Id.* at 312–13.

7 *Id.* at 5.

8 *Id.* at 312.

9 *Id.* at 314–15 (defining criminal sexually dangerous behavior to include actual or attempted contact sex offenses, non-contact sex offenses, and prior non-production child pornography offenses).

10 Pub. L. No. 108–21, 117 Stat. 650.

11 2012 Child Pornography Report, *supra* note 1, at 316.

12 *Id.* at 317.

13 *Id.*

14 *Id.* at xvii.

15 *Id.* at 320.

16 *Id.* at 321–22.

17 *Id.* at 322–25.

18 *Id.* at 326–30.

19 *Id.* at 328–29.

20 *Id.* at 329.

21 *Id.* at 329–30.

22 As authorized by Congress, the Commission's research responsibilities include: (1) the establishment of a research and development program to serve as a clearinghouse and information center for the collection, preparation, and dissemination of information on federal sentencing practices; (2) the publication of data concerning the sentencing process; (3) the systematic collection and dissemination of information concerning sentences actually imposed and the relationship of such sentences to the factors set forth in section 3553(a) of title 18; and (4) the systematic collection and dissemination of information regarding the effectiveness of sentences imposed. 28 U.S.C. § 995(a)(12)–(16).

23 Eight offenders who were sentenced under §2G2.2 but not convicted of a non-production child pornography offense were excluded from this analysis. The eight offenders were convicted of some other offense and §2G2.2 was applied through a cross-reference or applied as a pseudo-count. One offender whose offense involved morphing of images was also excluded from the analysis. Finally, one additional offender identified as having insufficient documentation for the special coding project was excluded from the analysis.

24 Pub. L. No. 108–21, 117 Stat. 650.

25 18 U.S.C. §§ 2251, 2252, 2252A, 2260.

26 Distribution offenses include the transportation and importation of child pornography. *See id.*

27 18 U.S.C. §§ 2252(b)(1), 2252A(b)(1), 2260(c)(2).

28 The enumerated predicate sex offenses include prior convictions under title 18, section 1591, chapter 71, chapter 109A, or chapter 117, or under section 920 of title 10 (article 120 of the Uniform Code of Military Justice), or under the laws of any state relating to aggravated sexual abuse, sexual abuse, or abusive sexual conduct involving a minor or ward, or the production, possession, receipt, mailing, sale, distribution, shipment, or transportation of child pornography, or sex trafficking of children. 18 U.S.C. §§ 2252(b)(1) and 2252A(b)(1).

29 18 U.S.C. §§ 2252(b)(2) and 2252A(b)(2).

30 *Id.*

31 *See, e.g.*, United States v. Myers, 355 F.3d 1040, 1042 (7th Cir. 2004).

32 2012 Child Pornography Report, *supra* note 1, at 147 n.60.

33 Pub. L. No. 108–21, § 101, 117 Stat. 650.

34 USSG §2G2.2(a).

35 USSG §2G2.2(a)(1).

36 USSG §2G2.2(a)(2).

37 USSG §2G2.2(b)(1).

38 A 2-level enhancement applies if the material involved a prepubescent minor or minor who had not attained the age of 12. USSG §2G2.2(b)(2).

39 Enhancements ranging from 2- to 7-levels apply based on varying degrees of distribution conduct. USSG §2G2.2(b)(3)(B)–(F). If the offense involved distribution for pecuniary gain, the increase is based on the number of levels from the table in §2B1.1 (Theft, Property Destruction, and Fraud) corresponding to the retail value of the material, but not less than 5 levels. USSG §2G2.2(b)(3)(A).

40 A 4-level enhancement applies if the material portrayed sadistic or masochistic conduct or other depictions of violence, or the sexual abuse or exploitation of an infant or toddler. USSG §2G2.2(b)(4).

41 A 5-level enhancement applies if the defendant engaged in a pattern of activity involving the sexual abuse or exploitation of a minor. USSG §2G2.2(b)(5).

42 A 2-level enhancement applies if the offense involved the use of a computer or an interactive computer service. USSG §2G2.2(b)(6).

43 A 2-level enhancement applies if the offense involved at least ten images but fewer than 150; a 3-level enhancement applies if the offense involved at least 150 images but fewer than 300; a 4-level enhancement applies if the offense involved at least 300 images but fewer than 600; and a 5-level enhancement applies if the offense involved 600 or more images. USSG §2G2.2(b)(7).

44 *See* USSG §§5D1.1(a)(1) (Imposition of a Term of Supervised Release) & 5D1.2(b) (Term of Supervised Release) (policy statement "recommend[ing]" the "statutory maximum term of supervised release" for all offenders convicted of "a sex offense," including a child pornography offense).

45 The percentages in the first pie differ slightly from the percentages in the second pie because three offenders who were convicted of possession and received the statutory recidivist enhancement had the guideline applied as a distribution offender (*i.e.*, base offense level 22) and one offender had the guideline applied as a receipt offender (*i.e.*, base offense level 22 with a 2-level reduction because the conduct was limited to receipt or solicitation).

46 2012 Child Pornography Report, *supra* note 1, at 41.

47 *See* 2012 Child Pornography Report, *supra* note 1, at 139, 141, 316 (explaining that in fiscal year 2010, the enhancements for prepubescent minor or a minor under the age of 12, use of a computer, and number of images applied in more than 90% of non-production cases, and the enhancement for sadistic and masochistic images applied in more than 70% of non-production cases).

48 Cases with sentences of 470 months or greater (including life) or probation were included in the sentence average computations as 470 months and zero months, respectively. The information presented in this analysis includes conditions of confinement as described in §5C1.1.

49 *See id*. Cases with guideline minimums of 470 months or greater (including life) were included in the guideline minimum average computations as 470 months. Guideline minimums account for applicable statutory mandatory penalties. *See* USSG §5G1.1.

50 *See id.*

51 The trends from fiscal years 2005 to 2019 for possession, receipt, and distribution offenses appear in Appendix B.

52 *See* 2012 Child Pornography Report, *supra* note 1, at 213.

53 Cases sentenced under the *Guidelines Manual* comprises all cases in which the sentence imposed was within the applicable guideline range or, if outside the range, where the court cited one or more of the departure reasons in the *Guidelines Manual* as a basis for the sentence.

54 "Government-sponsored" departures include cases in which a reason for the sentence indicated that the prosecution initiated, proposed, or stipulated to a sentence outside of the guideline range, either pursuant to a plea agreement or as part of a non-plea negotiation with the defendant. Substantial assistance motions filed by the prosecution are categorized separately.

55 There are two types of "substantial assistance" motions filed by the prosecution—the first seeks a downward departure below the applicable guideline range, and the second seeks a downward departure below a statutory mandatory minimum sentence. *Compare* USSG §5K1.1, *with* 18 U.S.C. § 3553(e).

56 Variance cases are those in which the sentence was outside the guideline range where the court did not cite any guideline reason for the sentence.

57 2012 Child Pornography Report, *supra* note 1, at 224.

58 *See supra* notes 48, 49.

59 2012 Child Pornography Report, *supra* note 1, at 84–92.

60 *Id.* at 85.

61 *Id.* at 84–92.

62 *Id.* at 90–92.

63 *Id.* at 90.

64 Of the 1,340 offenders, 103 were excluded from this analysis because (1) the precise number of images was not provided in the sentencing documents or (2) the offender attempted receipt or viewed (or attempted to view) child pornography, but there was no evidence that the offender downloaded the images or videos.

65 2012 Child Pornography Report, *supra* note 1, at 86.

66 USSG §2G2.2, comment. (n.6 (B)(ii)).

67 *See supra* note 64 and accompanying text.

68 The Commission is not providing a direct comparison to the third-party data relied upon in the 2012 *Child Pornography Report* because that data was collected from different sources using different methodologies.

69 Peer-to-peer file sharing, commonly called "P2P," refers to a software program or application that enables computers to share files easily over the internet. Computers connected through use of the same P2P software are deemed part of the same P2P network. P2P networks allow users to connect to other computers and swap files with one another.

70 2012 Child Pornography Report, *supra* note 1, at 149 (showing that P2P, websites, and email/instant message accounted for 94% of all receipt conduct in fiscal year 2010).

71 *Id.*

72 Some non-production child pornography offenders received child pornography by more than one method. Accordingly, the data provided in Table 1 will not sum to 100%.

73 "Cloud-based" host refers to remote digital storage accessed through internet connectivity. Files are stored in the "cloud" on remote servers maintained by third-party service providers and accessed by users through the internet. The "cloud" allows individuals to access software, files, and storage, without downloading such files or software to their personal computers or data storage systems.

74 2012 Child Pornography Report, *supra* note 1, at 150.

75 Of the 625 offenders sentenced as distribution offenders (*i.e.*, assigned base offense level 22 under §2G2.2 and did not receive a 2-level reduction under §2G2.2(b)(1)), information regarding the method of distribution was not available for 61 offenders. These offenders were convicted solely of transportation or importation of child pornography or the information was not otherwise specified in the sentencing documentation.

76 The offenders who distributed child pornography through a P2P network include 438 offenders who only distributed through a P2P network and 33 offenders who distributed through a P2P network as well as through other means.

77 The 2012 *Child Pornography Report* noted that 5.9% of offenders who distributed child pornography fell into a catchall "other" category that included hand-to-hand distribution and distribution via social media and photo sharing sites, among others. 2012 Child Pornography Report, *supra* note 1, at 150.

78 Accordingly, because offenders use more than one means to store child pornography, the data provided in Table 3 below will not sum to 100%.

79 2012 Child Pornography Report, *supra* note 1, at 57–59.

80 The Dark Web refers to a part of the internet located beyond the reach of traditional internet browsers. It is accessible only through use of special software and is designed to allow users and website operators to remain anonymous and difficult to trace.

81 Encryption secures data (in the form of images, videos, and text) so that it cannot be easily understood without a password or decryption software.

82 Cryptocurrency is a form of virtual asset that can be exploited for criminal use because it is decentralized and thus allows for a degree of anonymity.

83 2012 Child Pornography Report, *supra* note 1, at 92–99.

84 *Id.* at 98–99.

85 *Id.* at 92.

86 *Id.* at 93.

87 *Id.*

88 *Id.* at 94–95.

89 *Id.*

90 *Id.* at 94.

91 *Id.* at 96.

92 *Id.* at 97.

93 *Id.* at 97–98.

94 *Id.* at 98.

95 *Id.*

96 *Id.* at 99.

97 The 2012 *Child Pornography Report* referred to this aggravating conduct as "criminal sexually dangerous behavior" or "CSDB."

98 2012 Child Pornography Report, *supra* note 1, at 102.

99 *Id.* at 103.

100 *Id.* at 103–04.

101 The 2012 *Child Pornography Report* supplemented its findings with an analysis of 382 offenders sentenced in the first quarter of fiscal year 2012. The Commission also compared those results to offenders sentenced in fiscal years 1999 and 2000 to study the prevalence of criminal sexually dangerous behavior over time. *Id.* at 169.

102 *Id.* at 174.

103 *Id.* at 176.

104 *Id.* at 179.

105 *Id.* at 181, 201.

106 *Id.* at 173, 204.

107 *Id.* at 186–87.

108 *Id.*

109 *Id.*

110 *Id.* at 195.

111 *See supra* notes 48, 49.

112 These findings are consistent with the 2012 *Child Pornography Report*, which showed that offenders with criminal sexually dangerous behavior histories had substantially higher average sentences (138 months) than those without a history of criminal sexually dangerous behavior (74 months). 2012 Child Pornography Report, *supra* note 1, at 199.

113 The fiscal year 2019 data for all offense types showed that 75.0% of sentences were imposed under the *Guidelines Manual*, 51.4% within the guideline range, 23.2% below the guideline range through a downward variance, and 1.9% above the guideline range through an upward variance. *See* U.S Sent'g Comm'n, 2019 Sourcebook of Federal Sentencing Statistics 84 (2020), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2019/2019-Annual-Report-and-Sourcebook.pdf.

114 *See* 2012 Child Pornography Report, *supra* note 1, at 213–18 (discussing growing sentencing disparities among non-production cases since 2004).

115 *Id.* at 244.

116 *Id.* at 245.

117 In fiscal year 2019, of the 569 possession offenders, evidence that the offender engaged in knowing or attempted receipt, distribution, or production of child pornography was present in 98.6% of the cases. For the remaining 1.4% (n=8), the offender was charged and convicted of attempted possession or access with intent to view child pornography. For these eight cases, the offender viewed (or attempted to view) child pornography on a website or in an online chat, but there was no evidence that the offender downloaded the images or videos. *See also* 2012 Child Pornography Report, *supra* note 1, at 147 (finding evidence in the presentence reports that 95.3% of possession offenders knowingly received child pornography in fiscal year 2010).

118 There were 928 offenders sentenced under §2G2.2 whose most serious initial charge was distribution or receipt. Two offenders were excluded from this analysis due to missing information.

119 Five additional offenders were initially charged with production but convicted of a lesser offense. The five offenders were excluded from the analysis because the sentencing documents did not detail any actual or attempted production.

120 The Commission also found that while only 14.5% of non-production child pornography offenders were subject to an enhanced mandatory minimum sentence for having certain predicate sex offense convictions, possession offenders actually made up a larger share of recidivists than the more serious receipt and distribution offenders. *See supra*, Figure 3.

121 2012 Child Pornography Report, *supra* note 1, at 213.

122 *Id.* at 215.

123 *Id.* at 215–16.

124 *Id.* at 216.

125 *Id.* at 244.

126 As described in Chapter Two of this report, these four commonly applied enhancements involve images depicting a prepubescent minor or a minor under the age of 12, images depicting sadistic or masochistic conduct, the use of a computer, and having 600 or more images.

127 *See supra* notes 48, 49.

128 The findings were similar for the fiscal year 2010 offenders analyzed in the 2012 *Child Pornography Report*, with slightly higher average sentences for possession offenders (52 months) and receipt offenders (81 months) with these guideline calculations. 2012 Child Pornography Report, *supra* note 1, at 215.

129 *See supra* notes 48, 49.

130 The findings were similar for the fiscal year 2010 offenders analyzed in the 2012 *Child Pornography Report* with slightly higher average sentences for distribution offenders (109 months) and possession offenders (70 months) with these guideline calculations. 2012 Child Pornography Report, *supra* note 1, at 216.

131 28 U.S.C. § 991(b)(1)(C).

132 Generally, a minimum three-year follow-up period is needed for a recidivism study of sex offenders. *See* R. Karl Hanson et al., *The Principles of Effective Correctional Treatment Also Apply To Sexual Offenders: A Meta-Analysis*, 36 Crim. Just. & Behav. 865, 887 (2009); *but cf.* Niklas Langstrom, *Long-Term Follow-Up of Criminal Recidivism in Young Sex Offenders: Temporal Patterns and Risk Factors*, 8 Psych., Crime & Law 41 (2001) (noting that studies indicate the risk for criminal reoffending by adult sex offenders may persist for decades).

133 The dataset used to conduct the analyses in this chapter includes information obtained pursuant to an interagency agreement with the Federal Bureau of Investigation and therefore cannot be publicly released.

134 The RAP database contains information voluntarily reported by law enforcement agencies across the country as well as information provided by federal agencies. It contains information on felonies, misdemeanors, and certain municipal and traffic offenses.

135 *See* William G. Skogan, *Dimensions of the Dark Figure of Unreported Crime*, 23 Crime & Delinquency 41, 50 (1977).

136 *See* Nicholas Scurich & Richard S. John, *The Dark Figure of Sexual Recidivism*, 37 Behav. Sci. & The Law 158 (2019); Ryan C. W. Hall & Richard C. W. Hall, *A Profile of Pedophilia: Definition, Characteristics of Offenders, Recidivism, Treatment Outcomes, and Forensic Issues*, 82 Mayo Clinic Proc. 457, 460–61 (2007) (noting that studies show that only an "estimated 1 in 20 cases of child sexual abuse is reported or identified" and that "an arrest was made in only 29% of reported juvenile sexual assaults").

137 Release following service of a prison sentence means release from the custody of the Federal Bureau of Prisons into the community for the first time following incarceration for the federal child pornography offense. Offenders were removed from the sample if they died in prison or while on probation during the study period.

138 Rearrest was selected as the recidivism measure because many states do not report dispositions following arrest. A 2015 Government Accountability Office report indicated that only 16 states reported that more than 75% of their arrest records had dispositions during the relevant time-period. *See* U.S. Gov't Accountability Off., GAO-15-162, Criminal History Records: Additional Actions Could Enhance The Completeness Of Records Used For Employment-Related Background Checks 18 (2015), https://www.gao.gov/assets/gao-15-162.pdf.

139 RAP sheets did not always report the ultimate disposition of a case following an arrest. Consistent with other recidivism studies, arrests without dispositions were counted as well as arrests resulting in convictions. *See* Cassia Spohn & David Holleran, *The Effect of Imprisonment on Recidivism Rates of Felony Offenders: A Focus on Drug Offenders*, 40 Criminology 329, 333 (2002) ("[A]rrest is a better indicator of offender recidivism than is conviction.").

140 Revocations of probation or supervised release result from violations of the conditions of supervision related to either: (1) the commission of a new crime, or (2) "technical" violations (or both). For this analysis, violations that were reported without dispositions were included along with violations that led to a reported sanction (*e.g.*, imprisonment).

141 The Commission's study excluded misdemeanor traffic offenses.

142 *See* U.S. Sent'g Comm'n, The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders (2017), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170309_Recidivism-CH.pdf; U.S. Sent'g Comm'n, The Effects of Aging on Recidivism Among Federal Offenders 10-11 (2017), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf.

143 Offenders who committed a contact or non-contact sex offense are excluded from this category.

144 Individual offenders may have been rearrested more than once during the three-year follow-up period; consequently, the total number of rearrests (n=433) exceeds the total number of non-production child pornography offenders who recidivated (n=302).

145 Administration of justice offenses include contempt of court, failure to appear, obstruction of justice, escape, prison contraband, and probation and parole violations (excluding failure to register as a sex offender).

146 *See supra* note 143 and accompanying text.

147 *See supra* notes 48, 49.

148 *See supra* notes 48, 49.

149 *See supra* notes 48, 49.

**United States Sentencing Commission**

www.ussc.gov

THURGOOD MARSHALL FEDERAL JUDICIARY BUILDING
ONE COLUMBUS CIRCLE N.E.
SUITE 2-500, SOUTH LOBBY
WASHINGTON, DC 20002-8002

*This document was produced and published at U.S. taxpayer expense.*

