# EXHIBIT 6

# Deconstructing the Myth of Careful Study:
# A Primer on the Flawed Progression of the Child Pornography Guidelines

Troy Stabenow[1]

January 1, 2009

## Table of Contents


I. **Introduction** .......... 2

II. **The Commission in Charge** .......... 3

- A. **1987 Guidelines** .......... 4
- B. **1988 Amendment** .......... 4

III. **The Seeds of Conflict** .......... 4

IV. **Congress Takes Charge** .......... 6

- A. **1991 Amendment** .......... 6
- B. **1996 Amendment** .......... 9

V. **The 1996 Report to Congress** .......... 12

- A. **Troubling Methodology** .......... 13
- B. **Use of a Computer Enhancement** .......... 15
- C. **Comments by the Commission** .......... 16

VI. **Congress Reacts to the Commission's Report** .......... 17

- A. **2000 Amendment** .......... 17
- B. **2001 Amendment** .......... 19

VII . **Congress Yields Power to the Department of Justice** .......... 19

- A. **The Protect Act** .......... 19
- B. **2003 Amendments** .......... 23


---

[1] Assistant Federal Public Defender, Western District of Missouri, Jefferson City Branch Office. Copyright January 1, 2009. All Rights Reserved. This revision includes additional data not available in the May and July 2008 versions of this article, and changes the examples in Part VII to reflect current statutory penalties and Guidelines. All suggestions, comments, corrections, criticisms, and written opinions by courts accepting or rejecting the positions of this paper would be appreciated, and should be sent to troy_stabenow@fd.org. Please do not request advice on a particular case unless there is an unusual issue or use of this paper. Special thanks to Amy Baron-Evans for her contributions to Section IX, and for her editorial review throughout. Thanks also to David Johnson and Virginia Grady of the FPD Office in Colorado for their input, corrections, and advice.

**C. 2004 Amendment................................................................ 24**

**VIII. The Typical Defendant................................................................ 26**

**IX. Additional Factors To Consider................................................................30**

**X. The Implications of Gall and Kimbrough on Child Pornography Cases................................................................ 33**

**XI. Conclusion................................................................ 38**

**Appendix A: Guideline Changes Charts: 1987 to Present.................................. 39**

**Appendix B: Letter from the Commission opposing increased penalties.......... 41**

**Appendix C: Select Portion of Amendment 664.................................................. 44**

## I. Introduction

In 1997, child pornography offenders[2] received a mean sentence of 20.59 months confinement.[3] *See* Federal Justice Statistics Resource Center, "*Type of sentence for defendants convicted*," http://fjsrc.urban.org/tsec.cfm. In 2007, defendants sentenced for the same conduct received a mean sentence of 91.30 months confinement. *Id.* This represents a 443% increase in the mean imposed sentence for this class of offenders. The mean, by year:

| Year | Total Cases | # Prison Cases | Mean Confinement (Months) | # Probation Cases | Total Mean (months prison) |
|---|---|---|---|---|---|
| 1997 | 238 | 183 | 26.79 | 55 | 20.59 |
| 1998 | 273 | 225 | 38.86 | 48 | 32.02 |
| 1999 | 368 | 313 | 39.13 | 55 | 33.28 |
| 2000 | 417 | 376 | 44.85 | 41 | 40.44 |
| 2001 | 440 | 380 | 46.26 | 60 | 39.95 |
| 2002 | 499 | 457 | 45.65 | 42 | 41.80 |
| 2003 | 553 | 504 | 46.12 | 49 | 42.03 |
| 2004 | 652 | 618 | 55.99 | 34 | 53.07 |
| 2005 | 947 | 884 | 65.78 | 63 | 61.40 |
| 2006 | 1036 | 1008 | 80.21 | 28 | 78.04 |
| 2007 | 1170 | 1145 | 93.30 | 25 | 91.30 |

[2] For the purpose of this section, a child pornography defender is any person convicted for possessing, receiving, or distributing child pornography in violation of 18 United States Code Sections 2252 or 2252A, but who was not involved in the production or attempted production of child pornography. This correlates to an offender punished pursuant to Guideline Section 2G2.2 of the 2008 Federal Sentencing Guidelines.

[3] Calculated as follows: 183 defendants received a mean sentence of 26.79 months confinement, while 55 defendants received sentence of probation (0 months confinement). The "Total Mean" for all 238 defendants: (183x26.79) + (55x0) = 4,902.57 / 238 = 20.59.

The Sourcebook of Federal Sentencing Statistics, 2007, which tracks data by fiscal instead of calendar year documents 1,025 sentences for 2G2.2 offenses in Fiscal Year 2007[4]. *See* 2007 Sourcebook, http://www.ussc.gov/ANNRPT/2007/SBTOC07.htm. Of these 1,025 cases, 351 involved downward departures or variances, of which 219 were pure "Booker" variances). *Id*. at Table 28. Despite the high ration (34%) of sentences below the initially applicable Guidelines by federal judges, mean sentences nevertheless soared by 13.26 months per defendant over the similar defendants sentenced just one calendar year earlier.

The pertinent question to ask is what caused such an incredible increase over the last decade? Does the typical offender today require 70.71 months, or almost six full years, more confinement than the same offender a decade ago? Is there a rational basis for an average annual increase of over seven months per imposed sentence? Most importantly, are these changes the result of "an empirical approach based on data about past practices" *Kimbrough v. United States*, 128 S. Ct. 558, 567 (2007).

The answer to these questions is a resounding "no." As this article demonstrates, the changes to the child pornography guidelines are not the product of an empirically demonstrated need for consistently tougher sentencing. Instead, these changes are largely the consequence of numerous morality earmarks, slipped into larger bills over the last fifteen years, often without notice, debate, or empirical study of any kind. Congressionally mandated changes were even enacted to prevent the Commission from implementing carefully considered modifications which would have *lowered* applicable offense levels.

Familiarity with the history of § 2G2.2 is therefore crucial to appropriate sentencing. While judges "may not presume that the Guidelines range is reasonable," courts may nevertheless be forgiven for believing that pornography guidelines reflect the latest research and knowledge in the field. *See Gall v. United States*, 128 S. Ct. 586 (2007) at 596-97; *see also Rita v. United States*, 127 S. Ct. 2456 (2007) at 2465. It is incumbent upon the defense attorney to provide evidence to the contrary. This paper provides the tools for a defense presentation to the court that the child pornography guidelines, as applied to a particular defendant, are not based on sound research and reflective experience, and therefore fail to produce an appropriate sentence.

Several sections in particular may provide useful material for educating the courts. These sections, which could be excerpted to form the basis of a sentencing motion, include sections III, IV-A, IV-B, V, VII, VIII, IX, and Appendix A.

## II. The Commission in Charge: April 13, 1987 to November 1, 1990

For the first three years of the Guidelines regime, the provisions of § 2G2.2 were the result of study at the Commission, without obvious outside interference. These years are

---

[4] The 2007 Sourcebook documents 1,025 cases at Table 28, and either 1,033 or 1,084 cases at Table 17. Because Table 28 provides more detailed statistics, and provides data on departures and variances, it is relied upon for the purposes of this article.

reviewed below, with changes indicated by bold, italicized type:

**A. 1987**

On April 13, 1987, the Sentencing Commission submitted its initial § 2G2.2 offering. *See* U.S.S.G. § 1A1.1(n.1). At the time, simple possession of child pornography was not a federal crime, so § 2G2.2 was limited to "transporting, receiving, or trafficking" offenses.

***§ 2G2.2***
***Base Offense Level: 13***
***Specific Characteristics:***

| | |
|---|---|
| ***(b)(1) a minor under 12 years:*** | ***+2*** |
| ***(b)(2) if distribution of < $100,000 in value*** | ***+5*** |
| ***(b)(2) if > $100,000 in value, see 2F1.1*** | |

**B. 1988**

On June 15, 1998, the Sentencing Commission amended specific characteristic § 2G2.2(b)(1). *See* Amendment 31, U.S.S.G. App. C. Study indicated that "an alternative measure" was necessary "for determining whether the material involved an extremely young minor for cases in which the actual age of the minor is unknown." *Id.* The phrase "or a prepubescent minor" was added to "a minor under the age of twelve years." *Id.*

§ 2G2.2
Base Offense Level: 13
Specific Characteristics:

| | |
|---|---|
| (b)(1) ***a prepubescent minor or*** a minor under 12 years: | +2 |
| (b)(2) if distribution of < $100,000 in value | +5 |
| (b)(2) if > $100,000 in value, see 2F1.1 | |

**II. The Seeds of Conflict**

On November 29, 1990, Congress criminalized the possession of child pornography. *See* Pub.L. 101-647, Title III, § 323(a), (b), Nov. 29, 1990, 104 Stat. 4818, 4819. Congress also raised maximum possible penalties, introduced a mandatory minimum for repeat offenders, and directed that "the United States Sentencing Commission shall amend existing guidelines for sentences involving sexual crimes against children, including offenses contained in chapter 109A of title 18, so that more substantial penalties may be imposed if the Commission determines current penalties are inadequate." *Id.*

The Commission had to immediately consider whether to treat possession of child pornography as equivalent to trafficking, or whether to create a separate Base Offense Level. On January 17, 1991, the Sentencing Commission published its proposed solution. *See* 56 FR 1846-01, 1991 WL 310646 (F.R.). The solution consisted of three parts:

First, a new section, § 2G2.4, with a Base Offense Level of 10, would be created for the offense of possession of child pornography, and the analogous offenses of receiving and transporting child pornography. *Id.* In instances where the relevant conduct involved an association with trafficking, a cross reference to § 2G2.2 would apply. *Id.*

Second, the Commission modified § 2G2.2 to apply only to cases involving "Selling or Possessing with Intent to Sell" child pornography. *Id.* The proposal included a new, four-level specific offense enhancement for "material that portrays sadistic or masochistic conduct or other depictions of violence." *Id.* This specific offense enhancement was neither recommended for, nor applied to the newly created § 2G2.4.

Third, the Commission inserted an application note to § 2G2.2 encouraging consideration of "an upward departure" where "the defendant sexually abused a minor at any time, whether or not such sexual abuse occurred during the course of the offense." *Id.*

The Commission determined that current penalties were adequate and that it would be inadvisable to introduce more substantial penalties. *Id*.

The Commission would later explain the reasoning for these changes in a detailed letter to Congress. *See* Appendix B; *see also* 137 Cong. Rec. H6736-02, 1991 WL 187764 (Cong.Rec.). In reviewing its 1991 decision to create a new, lower base offense level for receipt, possession, and transportation, the Commission would state:

> It is important for Congress to recognize that the Commission is now in a position to provide, to an extent unparalleled by previous sources, detailed data on actual sentencing practices under the guidelines-information that we hope Congress will consider in its decision on sentencing policy... The Commission's guidelines, taking into account proposed amendments we recently sent to the Congress for its review, continue to require substantially tougher penalties than typically were imposed under pre-guidelines practice. In fact, a number of judges had written the Commission to express the view that the offense level for the least serious forms of conduct under § 2G2.2 was too severe and that the Commission had failed to consider mitigating factors that warranted a lower sentence. Empirical data on non-distribution cases sentenced under § 2G2.2 during fiscal year 1990 suggest many judges share this view of sentence severity. Data indicates that 34 of 88 such cases were sentenced below the appropriate guideline range. This 38 percent below-guideline sentencing rate is more than two and one-half times the 14.4 percent downward departure rate for all guidelines in the same period. Moreover, there are indications that many prosecutors may share the judges' views, based on the fact that apparently only three such downward departure sentences have been appealed. *Id.*

Ultimately, the first part of this plan (i.e new § 2G2.4) was implemented via Guideline Amendment 372, effective November 1, 1991. The second and third parts of this solution (enhancements for sadistic material and a pattern of abuse) had already been implemented via Guideline Amendment 325, effective November 1, 1990. *See* Amendments 372 and 325, U.S.S.G. App. C.

§ 2G2.2
Base Offense Level: 13
Specific Characteristics:
(b)(1) prepubescent or a minor under 12 years: +2
(b)(2) if distribution of < $100,000 in value +5
(b)(2) if > $100,000 in value, see 2F1.1
***(b)(3) if material portrays sadistic or masochistic conduct, or other violence, +4***
***Application Note 4: The Commission recommends consideration of an upward departure for actual sexual abuse of a child at any time in the defendant's past.***

***§ 2G2.4***
***Base Offense Level 10***
***Specific Characteristics:***
***(b)(1) prepubescent or a minor under 12 years: +2***

## III. Congress Takes Charge: Nov 27, 1991 - 2003

### A. 1991

In June, 1991, Senator Jesse Helms of North Carolina learned of the Commission's proposed approach to "smut peddlers and pedophiles." *See* Treasury, Postal Service, Executive Office of the President, and Independent Agencies Appropriations, Fiscal Year 1992, 137 Cong. Rec. S10356-01, S10363). The carefully studied plan to refine § 2G2.2 and implement a new guideline for the lesser harms of possession, receipt, and transportation of child pornography, would be short-lived.

Shortly after the Commission published its 1991 modifications, Senator Helms received letters from two religious organizations opposed to the proposed Guideline modifications. *See* Exhibit 2, 137 Cong. Rec. S10322-04. The Religious Alliance Against Pornography, wrote, "We are profoundly disappointed to discover that the proposed guidelines recommended reduced sentencing levels for transporting, receiving, and possessing child pornography...We believe the pending Crime Bill offers an appropriate and opportune time to make vital adjustments consistent with the seriousness of the crime." *Id.* Morality in the Media echoed this opinion, requesting "if anything, the penalties should be made stricter, not weaker." *Id.*

Based upon these letters, Senator Helms introduced what can fairly be described as a morality earmark. On July 18, 1991, while most senators were in committee meetings, Senators Domenici and Helms briefly re-opened the pending debate on House Resolution 2622, the Treasury-Postal Service Appropriations Bill of 1991. *See* 137 Cong. Rec. S10322-04. Senator Domenici of New Mexico asked that the pending amendments be laid aside to allow Senator Helms to introduce an amendment regarding child pornography. *Id.* As there was no objection, Senator Helms took the floor and proposed "Amendment Number 780." *Id.* Amendment 780

would require the Commission to maintain receipt and transportation as § 2G2.2 offenses, and would direct expanded enhancements to both § 2G2.2 and § 2G2.4. *Id.* Since no other senators were present on the floor, the matter was "stacked" until the next roll call. *Id.* Ultimately, the amendment was included with several other amendments to the appropriations bill, and was approved by a vote of 99-0. *See* Treasury, Postal Service, Executive Office of the President, and Independent Agencies Appropriations, Fiscal Year 1992, 137 Cong. Rec. S10356-01, S10363).

Because the issue was never debated in the Senate, Senator Helms' remarks are the only record of Senate intent.[5] *Id.* As to Amendment 780, Senator Helms stated, incorrectly, "The Sentencing Commission recently, for some unbeknown reason, decided to reduce the sentence for these smut peddlers so low that most of these convicted smut peddlers and pedophiles will receive, at most, probation...The amendment instructs the Sentencing Commission to increase the penalty for child porn offenses so that offenders will serve at least some time in jail." *Id.*

On September 24, 1991, the House of Representatives received and considered Amendment 780. *See* 137 Cong. Rec. H6736-02. Inserted into the record was a letter from the Chair of the Sentencing Commission in which the Chair politely, but strongly, objected to Amendment 780. *Id.*; *See also* Appendix B. The Chair wrote:

> Regrettably, the debate in the Senate mischaracterized the Commission's recent actions as having reduced the guideline penalties for trafficking in child pornography. This is not correct. In point of fact, the Commission amendments assure that defendants who peddle child pornography will be sentenced as traffickers even if they successfully negotiate a plea to the lesser offense of simple possession of child pornography...
>
> ...In keeping with the overarching congressional mandate to ensure that defendants who commit similar offense conduct are treated similarly under the guidelines, the Commission determined that the new guideline should encompass other conduct of comparable seriousness to the new statutorily-created offense (simple possession of child pornography) that was formerly sentenced under § 2G2.2, including simple receipt. Recognizing that receipt is a logical predicate to possession, the Commission concluded that the guideline sentence in such cases should not turn on the timing or nature of law enforcement intervention, but rather on the gravity of the underlying conduct. In this regard, the Commission's rationalization of the offense conduct according to its severity parallels the manner in which illegal drug (or firearms) receipt and possession are treated similarly under the guidelines, while drug (or firearms) distribution or trafficking are treated more severely. **Senate Amendment No. 780, unfortunately, would negate the**

---

[5] To support his amendment, Senator Helms introduced the two letters mentioned above, and several recycled reports from 1986 and 1987 which discussed the general evils of child pornography. *See* Exhibit 2, 137 Cong. Rec. S10322-04. He did not introduce any empirical data regarding the (then) current state of federal sentencing, or the advisability or necessity of lengthier sentences. *Id.*

**Commission's carefully structured efforts to treat similar conduct similarly and to provide proportionality among different grades of seriousness of these offenses. Instead, it would require the Commission to rewrite the guidelines for these offenses in a manner that will reintroduce sentencing disparity among similar defendants and render the guidelines susceptible to plea bargaining manipulation**. [emphasis added].

For example, the Senate Amendment mandates the same base penalty for a defendant who, in response to a postal sting solicitation, orders one prohibited magazine as it does for an active "smut peddler." At the same time, the amendment would require the Commission to provide sentences that are 25 percent more severe if the defendant transports one prohibited magazine across state lines than if he is apprehended with nine child pornography movies in his home. Furthermore, through skillful plea bargaining, large-scale traffickers may be able to circumvent the nominally more severe penalties mandated by the Senate amendment by negotiating a plea to simple possession. **One primary reason Congress created the Sentencing Commission was to devise guidelines that avoid these unwarranted variations in sentencing for similar conduct. Amendment No. 780 will reintroduce the very problems the guidelines now prevent.** [emphasis added] *Id.*

After a brief discussion by just three representatives, Amendment 780 was added to the House bill by a vote of 414-18.[6] *See* 137 Cong. Rec. H6736-02; 1991 WL 187764 (Cong.Rec.). Amendment 780 would eventually become Section 632 of Public Law 102-141.

Although even the most zealous defense attorney would likely have agreed with Senator Helms that "smut peddlers and pedophiles" should serve "at least some time in jail," Amendment 780 had a vastly more expansive result. *See* Treasury, Postal Service, Executive Office of the President, and Independent Agencies Appropriations, Fiscal Year 1992 at 137 Cong. Rec. S10356-01, S10363. Amendment 780 was nothing less than a rejection of the empirical, studied approach to child pornography sentencing. Henceforth, major changes would come from Congress, and would be dictated not by experience and study, but instead by a general moral

[6] During the brief discussion, one objection to the Commission's analysis of receipt and distribution was offered as follows: "Virtually all enforcement is accomplished through sting operations conducted through the mails. As a result, most offenders (even active distributors) are caught in the act of receiving child pornography out of their mail box...If anything, the stated rationale supports treating receipt the same as distribution since distributors are likely to be caught in the act of receipt." *Id.* This position is objectionable on several grounds: first, these facts, if ever true, are now inaccurate and outdated; and second, no matter how popular this position might be politically, it is inconsistent with our system of justice. American justice does not punish defendants based on speculation about what other unrelated defendants might have done in some other cases, but instead, punishes the individual defendant for what they can be shown to have done in their particular case.

sense that the penalties for "smut peddlers" should always, and regularly, be made stricter, not weaker.

On November 27, 1991, in accordance with the directive of Section 632 of Public Law 102-141, signed by the President October 28, 1991, the Sentencing Commission drastically altered the Guidelines. *See* Amendments 435 and 436, U.S.S.G. App. C. In keeping with the directives of Senator Helms, as expressed in Section 632 of Public Law 102-141, a person sentenced for simple possession on November 28, 1991 received the same Base Offense Level as a serious trafficker sentenced just one day earlier.

Guideline Amendment 435 modified § 2G2.2 in the following ways: First, offenses involving the receipt, transportation, or advertisement of child pornography were all returned to § 2G2.2. *Id.* The new § 2G2.2 therefore described "Trafficking in Material Involving the Sexual Exploitation of a Minor; Receiving, Transporting, Shipping, or Advertising Material Involving the Sexual Exploitation of a Minor; Possessing Material Involving the Sexual Exploitation of a Minor with Intent to Traffic." *Id.* Second, the Base Offense Level was increased from 13 to 15. *Id.* Third, a new specific offense enhancement of a five level increase for a pattern of activity involving the sexual abuse or exploitation of a minor was inserted. *Id.*

§ 2G2.2
***Base Offense Level: 15***
Specific Characteristics:
(b)(1) prepubescent or a minor under 12 years: +2
(b)(2) if distribution of < $100,000 in value +5
(b)(2) if > $100,000 in value, see 2F1.1
(b)(3) if material portrays sadistic or masochistic conduct, or other violence, +4
***(b)(4) Pattern of Abuse +5***

Guideline Amendment 436 modified § 2G2.4 by redacting all offenses except simple possession. *Id.* The Base Offense Level was raised from 10 to 13. *Id.* A specific two-level offense characteristic for possessing ten or more "books, magazines, periodicals, films, video tapes, or other items containing a visual depiction involving the sexual exploitation of a minor" was added. *Id.*

§ 2G2.4
***Base Offense Level: 13***
Specific Characteristics:
(b)(1) prepubescent or a minor under 12 years: +2
***(b)(2) if 10 or more items: +2***

**B. 1996 Amendment.**

In March, 1995, as part of the Family Reinforcement Act, which was itself part of the "Contract with America," Representative William McCollum introduced House Resolution 1240,

"An Act to Combat Crime by Enhancing the Penalties for Certain Sexual Crimes Against Children." *See* H.R. REP. 104-90,1995 U.S.C.C.A.N. 759, 1995 WL 136512 (Leg.Hist.) 759. House Resolution 1240 proposed to raise by at least two levels the Base Offense Level for the producers and distributors of child pornography, and to increase by at least two levels the Total Offense Level in cases of a violation of 18 U.S.C. 2251(c)(1)(A) or 2252 (a)(1)-(3), where a computer was used to "transmit the notice of," or "transport or ship" the visual depictions. *Id*; *See also* 141 Cong. Rec. H4122-01, 1995 WL 143978 (Cong.Rec.).

The Judiciary Committee promptly forwarded the measure to the main body of the House, noting, "the sexual crimes addressed by H.R. 1240 are usually prosecuted by state authorities rather than federal authorities. Assuming that this situation continues, the Congressional Budget Office estimates that the increased sentences under this bill would have no significant impact on the operating costs of federal prisons." *Id.* This statement was generally correct for the time, as demonstrated by the fact that in 1993, federal prosecutors accepted for prosecution only 25 of the 79 obscenity/pornography cases presented to them. *See* Compendium of Federal Justice Statistics, 1993 at Table 1.2; http://www.ojp.usdoj.gov/bjs/abstract/cfjs93.htm.

The measure arrived at the House on April 4, 1995. *See* 141 Cong. Rec. H4122-01, 1995 WL 143978 (Cong.Rec.). As described on the floor of the House, the bill "directs the Sentencing Commission, created by the Congress in 1984, to serve as an independent entity within the judicial branch, to increase the offense levels for certain crimes involving child obscenity;" to increase "by a minimum of 17 months incarceration the range of penalties that may be imposed for creating child pornography. It increases by a minimum of 6 months incarceration the penalties that may be imposed for trafficking child pornography. It increases by a minimum of 1 year incarceration the penalties that may be imposed for trafficking in child pornography if a computer was used in the transmission of the material or transmission of an advertisement for the material." *Id.*

The debate, such as it was, provides meaningful insight into the perceived focus of the bill. After two members praised the bill, and one member praised a colleague for fair play, Representative Lofgren addressed the House. *Id.* Rep. Lofgren lamented the "wimpy" sentences for child pornographers, and advised, "We need to take a look at the underlying statute, not just advisory recommendations by the Sentencing Commission." *Id.* She then recommended that both parties should jointly work towards a punishment of mandatory life imprisonment for this:

> "lucrative business that rewards people who would abuse children, who would force them to do sexual acts on video, it is a lucrative business. If the abusers of children for money knew that they faced life imprisonment, I think it would have a salutary impact . . .We could have done something tough. But instead all we have got is a little hole punch, a little phrase, and it does not mean very much." *Id.*

Rep. Lofgren was followed by Representative Conyers, who explained,

> "There were two ways that we could have moved in this area. One is to direct the U.S.

> Sentencing Commission to increase penalties for child obscenity violations. The other was to go into the underlying statute of some of these anti-pornography laws and attempt to increase the penalties there, but we might have gotten into a wide area that would infringe on civil liberties questions and other highly technical questions, and this bill would not have come up...This is one of the few bills during this first 100 days that, by moving with some dispatch, we have not offended any sensibilities." *Id.*

From these discussions, it is clear that House Resolution 1240 was designed with two primary purposes in mind. First, to avoid the need for debate, study, and considered review. Second, to increase the punishment for those who produced and trafficked child pornography for profit. As Senator Lofgren noted, it exactly achieved these goals, moving from introduction before the Judiciary Committee to unanimous passage by the House in just three short weeks. *Id.*

The measure arrived at the Senate on April 6, 1995. *See* 141 Cong. Rec. S5519-02, 1995 WL 169823 (Cong.Rec.)**.** Upon arrival, Senators Grassley, Hatch, and Thurmond jointly proposed a seemingly minor amendment to the newly re-labeled Sex Crimes Against Children Prevention Act of 1995. *Id.* This "minor" amendment would extend the resolution to include all defendants convicted of child pornography offenses, not just the producers and traffickers of the material. *See* 141 Cong. Rec. H14319-02. As in the House however, discussion was limited to the target population of child pornography producers and mass distributors. *Id.* Senator Grassley discussed the dangers of the "business forum" that traders in child pornography had found using computers. *See* 141 Cong. Rec. S5509-02. Senator Hatch then enlisted the support of the Senate with the following impassioned speech:

> Obscenity is a plague upon the moral fabric of this great Nation. It poisons the minds and spirits of our youth and fuels the growth of organized crime. Child pornography, a particularly pernicious evil, is something that no civilized society can tolerate.
>
> To this end, I am introducing legislation to increase the penalties imposed under sections 2251 and 2252 of title 18 of the United States Code, upon those who exploit and degrade the weakest and most helpless members of our society, our children. **Those persons who choose to engage in sexual exploitation of children, whether to satisfy prurient desire or to gain filthy lucre, must be made to feel the full weight of the law** and suffer a punishment commensurate with the seriousness of their offense. [emphasis added]
>
> In addition to increasing the penalties for distributing child pornography or otherwise sexually exploiting children, I am pleased to note that **this legislation helps our law enforcement efforts in this area keep pace with changing technology by increasing the penalties for the use of computers in connection with the distribution of child pornography**. As an ever-increasing percentage of Americans, and especially our young people, enter the information superhighway, it is critical that we act to ensure that this highway is not littered with the debris of child pornography. [emphasis added]

The bill also directs the Sentencing Commission to assess the impact of these increased penalties and to report to Congress any necessary modifications in the law. The Sentencing Commission will also be required to survey the recidivism rates for those who commit sex crimes against children and analyze the effect of treatment for those offenders.

*Id.*

The bill passed by unanimous consent. *See* 141 Cong. Rec. H14319-02. Public Law 104-71 was enacted December 23, 1995. On April 30, 1996, the Commission, as directed, published these Congressional changes. *See* 61 Fed. Reg. 20,306 (1996). As per Public Law 104-71 the Commission included provisions to raise the base offense levels in §§ 2G2.1, 2G2.2, and 2G2.4; and to provide a two-level enhancement under §2G2.2 "if a computer was used for the transmission of the material or a notice or advertisement" and § 2G2.4 for use of a computer "if the defendant's possession of the material resulted from the defendant's use of a computer." *Id.*

The Commission separately recommended to expand the definition of "pattern of activity involving sexual abuse" to reflect and respond to differing case opinions within the circuits about the applicability of the enhancement. *Id.* Amendment 537 took effect November 1, 1996. *See* Amendment 537, U.S.S.G. App. C.

§ 2G2.2
**Base Offense Level: 17**
Specific Characteristics:
(b)(1) prepubescent or a minor under 12 years +2
(b)(2) if distribution of < $100,000 in value +5
(b)(2) if > $100,000 in value, see 2F1.1
(b)(3) if material portrays sadistic or masochistic conduct, or other violence, +4
(b)(4) Pattern of Abuse +5
**(b)(5) transmission of material or notice by computer +2**

§ 2G2.4
**Base Offense Level: 15**
Specific Characteristics:
(b)(1) prepubescent or a minor under 12 years: +2
(b)(2) if 10 or more items: +2
**(b)(3) Possession as a result of computer use +2**

## IV. The 1996 Report to Congress

Section 6, Sex Crimes Against Children Prevention Act of 1995 (SCACPA), required the Sentencing Commission to "submit a report to Congress concerning offenses involving child pornography and other sex offenses against children" within 180 days. *See* Pub L. 104-71. In June 1996, while Amendment 537 was still pending, the Sentencing Commission presented a detailed, forty-two page report to Congress. *See* Report to Congress, Sex Offenses Against Children, 1996; http://www.ussc.gov/r_congress/SCAC.HTM; *See also* Attachment A.

**A. Troubling Methodology:**

The Commission opened the report by observing "Penalties for sex offenses against children have been increased several times in recent years and are quite severe. Nevertheless, the Commission's analysis indicates that some amendments may be appropriate to increase sentences for the most dangerous offenders, to ensure consistency in sentencing, and to clarify certain provisions that have been improperly interpreted and used." *Id.* at i.

The primary focus of the report were these "most dangerous offenders." After a review of only 112 child pornography cases, the Commission concluded that "a significant portion of child pornography offenders have a criminal history that involves the sexual abuse or exploitation of children and that those with such histories are at a greater risk of recidivism."[7] *Id*. at i, 3, 29. It was with these particular offenders in mind, and to "ensure lengthy incarceration of the most dangerous offenders" that the Commission "significantly increased sentences for some child pornography offenses," "expanded the definition of a pattern of activity involving the sexual exploitation or abuse of a minor," and recommended that Congress should "increase the statutory maximum for production." *Id.* at i, ii.

These recommendations informed opinion within Congress, and became the basis for further Congressionally directed changes in 1998, 2000, and 2003. It is worth asking, however, whether the data derived from such a small sample size in 1994 and 1995 should still be affecting policy in 2008. Does the information still hold true today? It does not.

We should understand that the 112 cases reviewed by the Commission represented only about one-third of child pornography cases presented for prosecution during that time frame. *See* Compendium of Federal Justice Statistics, 1993, at Table 1.2. In the early to mid 1990s, the United States rarely prosecuted child pornography offenses, selecting only the truly egregious offenders for federal prosecution. *See* H.R. REP. 104-90,1995 U.S.C.C.A.N. 759, 1995 WL 136512 (Leg.Hist.) 759; *see also* Compendium of Federal Justice Statistics, 1993 at Table 1.2. Generic offenders were prosecuted in state court. *Id.*

By 2006, when 2,191 defendants were federally prosecuted for child pornography offenses, federal authorities had broadened their reach, and were routinely prosecuting less egregious instances of misconduct. *See* Bureau of Justice Statistics Bulletin: "Federal Prosecution of Child Sex Exploitation Offenses, 2006," at page 5; available at http://www.ojp.usdoj.gov/bjs/pub/pdf/fpcseo06.pdf. This rise in prosecutions accompanied the formation of agencies such as the Innocent Images Project in 1995 (56 offices nationwide); the Internet Crimes Against Children Task Force (56 offices nationwide); the National Center for Missing and Exploited Children; and the introduction of local projects such as "Project Safe Childhood," and "Operation Predator."*Id.* at pages 1, 2, 3. While total sex offense prosecutions rose from 431 in 1994 to 2,191 in 2006, an average of 15% growth per year for over a decade, child

[7] The Commission studied a total of 423 cases, of which only 112 cases were of child pornography. *Id.* at 1,2. Of the 112, 90 were limited to possession, receipt, or trafficking of child pornography (as opposed to production). *Id.* at 4.

pornography cases accounted for 82% of the growth in case load. *Id*. at page 1.




Next, the small pool of offenders in 1995 produced skewed data. The group studied by the Commission included "a significant portion of child pornography offenders [who] have a criminal history that involves the sexual abuse or exploitation of children." That group bears little resemblance to the average offender sentenced pursuant to 2G2.2 today. In 2006, 79.9% of child pornography defendants had no prior felonies of any kind, let alone a criminal history of past "sexual abuse or exploitation." *Id.* at page 5.

Furthermore, the 1996 report was based upon a study of all "sex offenses against children." *Id.* at i. As a result, the small 1996 study pool included the crimes of transporting children for prostitution, criminal sexual abuse, production of child pornography, etc. *Id.* at 4. Today, while 12.5 % of child pornography clients of all types have any association with the production of child pornography, all of these offenders are either directly controlled by 2G2.1, 2G2.3, 2G2.5, or are cross-referenced to these Guidelines.[8] Thus, **none** of the standard 2G2.2 defendants have any association with the production of child pornography. While producers, molesters, and enticers have, by their criminal conduct, demonstrated that they can and will molest children, the average defendant sentenced pursuant to 2G2.2 has no history of any inappropriate contact with minors. The net result of these demographic differences is that the defendant towards whom the strongest comments and recommendations in the 1996 report were targeted, the "large-scale, commercial

[8] Calculated by examining Table 17 of the 2007 Sourcebook. Total production related offenses [164 (2G2.1) + 1 (2G2.3) + 2 (2G2.5)] / Total child pornography offenses [164 (2G2.1) + 1,033 (2G2.2) + 1 (2G2.3) + 129 (2G2.4) + 2 (2G2.5)].

pornographers," and the "most dangerous repeat offenders" have almost no relation to the typical client sentenced pursuant to 2G2.2. *See* 1996 Report to Congress at pages ii, 28.

In 1995, 1998, 2000, and 2003, Congress legislated changes that continue to affect all defendants today. *See* Amendments 535, 575, 592, 649 and 661, U.S.S.G. App. C. These changes modified the Guidelines in an effort aimed at combating the pernicious evil of repeat abusers, pornography producers, and mass distributors. The methodology behind this tinkering, such as it was, can be demonstrated to apply to only a small portion of the 2G2.2 defendants today. Why then should courts blindly prescribe lengthy prison terms to correct a problem that isn't present in the case before them. Looked at another way, would we want a doctor to prescribe medicine based on a decade old medical text, written by well meaning legislators, despite clear evidence that his patient did not suffer from the symptoms the text and medicine were designed to address? For the overwhelming majority of today's 2G2.2 defendants, the applied Base Offense Level and specific offense enhancements are predicated upon a series of premises which do not accompany their case, or even their class of crime. The prosecution should have to establish the continued applicability of the assumptions underlying the Guidelines in each case. Without a demonstration that the defendant was involved in the behavior targeted by Congress and the Commission, the only remaining data is that which supported the Base Offense Levels of November 1, 1991. In this environment, respect for the Guidelines should be withheld, and the Court should consider a variance.

**B. Use of a Computer Enhancement**

The 1996 Report to Congress critically reviewed the congressionally mandated two-level enhancement for use of a computer. This two level enhancement, dictated in 1995 by the SCACPA (see Section III-B above) had yet to be enacted, but already the Commission could foresee problems.

First, the Commission noted that the Senate amendment, which extended the scope of the act to include possession offenses, was made without any legislative history to explain the concerns motivating the change. *Id.* at 30. The initial offering in the House limited the change to instances of trafficking. The House made a clear record that the measure was designed to (1) fight the wide dissemination and instantaneous transmission in computer-assisted trafficking of child pornography, (2) combat the increased difficulty of investigation and prosecution by law enforcement officials, (3) minimize the increased likelihood that child pornography will be viewed by and harm children, and (4) limit the potential for pedophiles to lure children into sexual relations through the computer. *Id.*, discussing the legislative history of the SCACPA found at H.R. Rep. No 90, 104th Congr., 1st Sess. 3-4 (1995) as reprinted in 1996 U.S.C.C.A.N. 759.

Although the Commission added the enhancement as directed in the final version of the SCACPA, it noted " Not all computer use is equal...sentencing policy should be sensitive to these differences in culpability so that punishments are tailored to fit the circumstances of each individual's case." *Id.* at 29. Without a rationale for applying the broadened enhancement, the Commission was left to observe:

"Online pornography comes from the same pool that can be found in specialty magazines or

> adult bookstores...thus, the differences between print and computerized porn is not in the content of the images, but in the means of distribution. The seriousness of a crime involving computerized trafficking in child pornography depends in part on 1) the degree to which the computer use facilitates the widespread and instantaneous distribution of images, and 2) the degree to which it increases the likelihood that children will be exposed to the images. Different types of computer use have different effects on these two harms. "Downloading" cyberporn is similar to receiving pornography through the mail...At the other end are large-scale, commercial pornographers. Creating and maintaining a B[ulletin] B[oard] S[ystem] or Website with pornography is similar to opening an adult bookstore...persons who upload, send, or post illegal images to accessible sites should be held accountable for the harm done when child pornography is widely disseminates or falls into the hands of children." *Id.* at 28.

> "What seems apparent is that a person's culpability depends on *how* they use a computer..." *Id.* at 29.

> "The adjustment does not distinguish between persons who email images to a single, voluntary recipient and those who establish a BBS and distribute child pornography to large numbers of subscribers...the two-level adjustment might be narrowed to apply only to cases that involve distributing child pornography in a way that makes is widely accessible, such as posting it on a BBS or Website. However, a statutory amendment may be necessary to make these kinds of distinctions, because the current statutory directive is aimed broadly at all person who use a computer to transmit child porn, including receivers and possessors. " *Id.*

These concerns, expressed by the Commission in 1996 are even more true today. The Commission's fears were grounded in the fact that only 7 or 8 of the 112 cases they studied involved the use of a computer to establish a BBS, a website, or a similarly threatening means of spreading child pornography. *Id.* at 29. Study indicated that 23% of defendants in 1993, and 28% of defendants in 1995 used a computer. *Id.* at 30. Thus, many defendants to whom the enhancement was applied were not threatening the harm the enhancement was designed to address. *Id*. at 28-30.

How much more true is the over-inclusive effect of the enhancement today? In 2006, 97% of the 1,012 child pornography defendants had used a computer. *See* Bureau Bulletin at page 6. Today, forensic computer technology and monitoring facilitates, not thwarts, the investigation of child pornography offenses. So, if a client today used a computer, but did not widely disseminate the images, did not use them to entice or coerce a child, and did not show them to a child, then their conduct is completely outside the scope of the fear that prompted Congress to require the enhancement, and therefore a variance should be considered.

**C. Comments by the Commission**

In reference to the implementation of the Prevention Act of 1995, the Commission noted: "As directed in the SCACPA, the Commission increased sentences for all pornography guidelines by approximately 25%...In addition, a further 25% was provided for the use of a computer in child pornography offenses." *Id.* at ii. "Based on the data described above, the Commission does not recommend an increase in the base offense level of more than two levels" [referring to the two level

increase mandated for change on November 1, 1996] *Id.* at 9.

The Commission presented three amendments which were under consideration.

First, in an effort to target the most serious, repeat offenders, the Commission indicated it was considering adding the "pattern of activity" enhancement to § 2G2.4. *Id.* at 40.

Second, the Commission considered the need to modify the definition of "distribution." *Id.* The Commission noted that "many cases sentenced under this guideline involve trade clubs or other barter types of exchanges." *Id.* at 10. The Commission sought Congressional input into whether an amendment to include barter forms of distribution should be pursued*.* *Id.* at 40.

Third, returning to an issue from 1991, the Commission noted "there appears to be little difference in the offense seriousness between typical receipt cases and typical possession cases. Indeed, all material that is possessed must at some point have been received (unless it was produced, in which case the defendant would be sentenced under the more severe production guideline)." *Id.* at 11. "There is some indication that judges may be trying to avoid such a disparity" by sentencing receipt under the incorrect Guideline. *Id.* at 11, 41. Given this "unwarranted disparity," the underlying mission to reduce unwarranted disparities, and a Congressional prohibition from 1991 against reducing the offense level for receipt, the Commission indicated that it was being forced to consider consolidating possession into the higher § 2G2.2 Guideline. *Id.* at 11, 41. The Commission indicated consolidation would result in several specific offense characteristics from § 2G2.2 applying to cases of simple possession. *Id.* at 13. There is no mention in the report that the resulting higher sentences would be necessary or likely to affect deterrence, just punishment, or the need to protect society.

## V. Congress Reacts to the Commission's Report

### A. 2000 Amendment

In 1998, Congress reacted to the 1996 Report to Congres by enacting the Protection of Children from Sexual Predators Act of 1998, Pub. L. 105-314. Section 506 directed the Commission to "clarify that the term 'distribution of pornography' applies to the distribution of pornography--(A) for monetary remuneration; or (B) for a nonpecuniary interest." *Id.* Section 507 responded to the Commission's consideration of applying the pattern of abuse enhancement to § 2G2.4 by directing "with respect to any action relating to the Federal Sentencing Guidelines subject to this title, ensure reasonable consistency with other guidelines of the Federal Sentencing Guidelines." *Id.*

On November 1, 2000, these directives became effective via Amendment 592. *See* Amendment 592, U.S.S.G. App. C. The Commission explained its changes to § 2G2.2:

> The amendment addresses the directive in the Act [Protection of Children for Sexual Predators Act of 1998] to clarify that the term "distribution of pornography" applies to the distribution of pornography for both monetary remuneration and a non-pecuniary interest. In response to the directive, the amendment modifies the enhancement in § 2G2.2 (Trafficking

> in Material Involving the Sexual Exploitation of a Minor), relating to the distribution of child pornographic material...the amendment (1) modifies the definition of "distribution" to mean any act, including production, transportation, and possession with intent to distribute, related to the transfer of the material, regardless of whether it was for pecuniary gain; and (2) provides for varying levels of enhancement depending upon the purpose and audience of the distribution. These varying levels are intended to respond to increased congressional concerns, as indicated in the legislative history of the Act, that pedophiles, including those who use the Internet, are using child pornographic and obscene material to desensitize children to sexual activity, to convince children that sexual activity involving children is normal, and to entice children to engage in sexual activity.

The Commission explained its amendment to § 2G2.4 as follows:

> The amendment clarifies the meaning of the term "item" in subsection (b)(2) of § 2G2.4 (Possession of Materials Depicting a Minor Engaged in Sexually Explicit Conduct). That subsection provides a two-level enhancement if the offense involved possession of ten or more items of child pornography. The amendment adopts the holding of all circuits that have addressed the matter that a computer file qualifies as an item for purposes of the enhancement. The amendment also provides for an invited upward departure if the offense involves a large number of visual depictions of child pornography, regardless of the number of "items" involved. This provision invites courts to depart upward in cases in which a particular item, such as a book or a computer file, contains an unusually large number of pornographic images involving children.
>
> In the next amendment cycle, the Commission intends to continue consideration of the directive requiring that the Commission "provide for an appropriate enhancement in any case in which the defendant engaged in a pattern of activity of sexual abuse and exploitation of a minor." In addition, the Commission intends to consider further the general directive in the Act requiring the Commission to ensure "that the sentences, guidelines, and policy statements for offenders convicted of such offenses are appropriately severe and reasonably consistent with the other relevant directives and the relevant existing guidelines. *Id.*

§ 2G2.2
Base Offense Level: 17
Specific Characteristics:
- (b)(1) prepubescent or a minor under 12 years +2
- (b)(2) if distribution
  - A) For pecuniary gain, see 2F1.1 but not less than +5
  - **B) For value but not pecuniary gain +5**
  - **C) To a minor +5**
  - **D) To persuade a minor to engage in sexual conduct +7**
  - **E) Other than for the reasons above** +2
- (b)(3) if material portrays sadistic or masochistic conduct, or other violence, +4
- (b)(4) Pattern of Abuse +5
- (b)(5) transmission of material or notice by computer +2

§ 2G2.4 (Unchanged)

**B. 2001 Amendment**

In 2001 the Commission made changes to § 2F1.1. Accordingly, Section § 2G2.2(b)(2)(A) was amended by striking "§ 2F1.1 (Fraud and Deceit) and inserting "§ 2B1.1 (Theft, Property Destruction, and Fraud)"

§ 2G2.2
Base Offense Level: 17
Specific Characteristics:
(b)(1) prepubescent or a minor under 12 years +2
(b)(2) if distribution
A) For pecuniary gain, see **2B1.1** but not less than +5
B) For value but not pecuniary gain +5
C) To a minor +5
D) To persuade a minor to engage in sexual conduct +7
E) Other than for the reasons above +2
(b)(3) if material portrays sadistic or masochistic conduct, or other violence, +4
(b)(4) Pattern of Abuse +5
(b)(5) transmission of material or notice by computer +2

**VI. Congress Yields Power to the Department of Justice**

**A. The Protect Act**

In 2003, two government attorneys convinced a novice Congressman[9] to insert drastic changes to the child pornography Guidelines into an unrelated, popular bill, without notice to the Sentencing Commission.[10] *See* Skye Phillips, *Protect Downward Departures: Congress and the*

---

[9] Prior to "authoring" the amendment given his name, Representative Feeney had introduced only one piece of legislation during his time in office, a resolution honoring the cheerleaders at the University of Central Florida. *See* Michael S. Gerber, *"Down with Discretion*," Legal Affairs, http://www.legalaffairs.org/printerfriendly.msp?id=547.

[10] Jay Apperson, one of the actual co-authors of this provision, is noteworthy for the frequent legal controversies associated with his work. In 2005, Mr. Apperson was dismissed from government service following a scandal in which he authored an ex parte letter from Representative Sensenbrenner of Wisconsin to (then) Chief Judge Flaum of the 7th Circuit regarding an active case. The letter demanded that Chief Judge Flaum reconsider a pending drug case because the sentence on appeal was too low. *See* Maurice Posley, *Lawmaker Prods Court, Raises Brows*, Chicago Tribune (July 10, 2005). Furthermore, the letter demanded a "prompt response" detailing what actions Chief Judge Flaum would take "to rectify" the sentence. *Id.; see also*

*Executive's Intrusion Into Judicial Independence*, 12 J.L. & Pol'y 947, 976-984 (2004) (hereinafter Phillips) at 983 n. 185, 986. This additional component of the Protect Act, Pub. L. No. 108-21 (2003), modified § 2G2.2 and § 2G2.4, nullified the ability of judges to consider many downward departures for child pornography defendants, and drastically changed the statutory penalties for child pornography offenses. *See* Attachment B for a copy of relevant portions.

The purpose of the Protect Act was to reconcile various bills, establish a nationwide Amber Alert system to be used in cases of child kidnaping, and to address virtual child pornography. *Phillips* at 967-984. As the legislation progressed, Freshman Congressman Tom Feeney proposed an unrelated amendment to the bill that would directly amend various Guidelines and would bar downward departures not sponsored by government attorneys. *Id.; See also United States v. Detwiler*, 338 F.Supp.2d 1166, 1170-71 (D. Or. 2004). The technical amendments to 2G2.2 and 2G2.4 were a minor component of the sweeping changes contained in the amendment and no opportunity for study or research into their affect was possible. Representative Feeney later admitted he was just the "messenger" for the two government officials who authored the provision and ***chose not to notify or consult the Sentencing Commission***. *Phillips*, at 983 n. 185, 986; [emphasis added].

Debate on the amendment was limited to twenty minutes, and there is no indication that the details of the changes to 2G2.2 and 2G2.4 were evaluated. *Id*. at 983. The House later passed the Child Abduction Prevention Act with the Feeney Amendment added. *Id*. at 992-994. Despite objections by the Sentencing Commission, the Chairman of the House Committee on the Judiciary, the Judicial Conference of the United States, and the American Bar Association, that these changes were being made without adequate review and analysis, the Protect Act became law April 30, 2003. *Id*. at 990-992, 991 n.219.

Numerous members of Congress objected to these changes, and the procedure by which they were introduced, including Senators Ted Kennedy and Patrick Leahy. *Id* at n.215. Senator Leahy explained, "The substance of the Hatch-Sensenbrenner amendment-whether in the form that was voted on in conference, or in the form that was circulated after the conference adjourned-is just as

---

*http://sentencing.typepad.com/sentencing_law_and_policy/2005/07/sentencing_from.html.* Mr. Apperson recently came back to public attention based on allegations that he was inappropriately exempted from normal hiring processes by the United States Attorney for the District of Columbia based on his conservative politics. *See* Carol D. Loenning, "Hiring Process was Bypassed for Prosecutor," Washington Post, (May 8, 2007), http://www.washingtonpost.com/wp-dyn/content/article/2007/05/07/AR2007050701825.html. A strident opponent of judicial discretion, Mr. Apperson has also notoriously suggested that Justice Thurgood Marshall had "no place on the Court," and that the United States needs a "white history month." *See* Carol D. Loenning, "Hiring Process was Bypassed for Prosecutor," Washington Post, (May 8, 2007), http://www.washingtonpost.com/wp-dyn/content/article/2007/05/07/AR2007050701825.html; Michael S. Gerber, *"Down with Discretion*," Legal Affairs, http://www.legalaffairs.org/printerfriendly.msp?id=547.

outrageous as the way in which it was adopted. This amendment modifies in very limited ways the Feeney amendment, which was added to the bill on the House floor after only 20 minutes of debate. This far-reaching proposal will undermine the federal sentencing system and prevent judges from imposing just and responsible sentences." *Id.; See also* 149 Cong. Rec. S5137-01, 5145 (daily ed. Apr. 10, 2003) (statement by Sen. Leahy).

As was later noted by the Federal Public Defender for the Western District of Washington in a letter to Congress, "that the Feeney Amendment received virtually no attention or debate is inexplicable unless one assumes that it was produced at a time and in a way designed to escape detection and debate before its passage." *See* Materials From Interested Groups Opposing Original Feeney Amendment at 15 Fed.Sent.R. 346, 2003 WL 22208850 (Vera Inst.Just.)

Contained in both the original Feeney Amendment and the final version of the Protect Act, was a direct amendment to U.S.S.G. §§ 2G2.2 and 2G2.4, adding up to a five-level increase depending on the number of images possessed. *See Protect Act*, Pub.L. 108-21, § 401(i)(1)(B),(C). The Act also directly amended § 2G2.4 by adding an enhancement for "material that portrays sadistic or masochistic conduct." *Id*. The Act directed the Commission to expand the range of the "pattern of abuse" enhancement to make it encompass single-victim, opportunity offenses commonly associated with the prosecution of Native Americans. *See* U.S. Sentencing Commission, Fifteen Years of Guidelines Sentencing: *An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform* (2004), available at http://www.ussc.gov/15_15year/15year.htm at 73. Finally, the Protect Act also adjusted mandatory minimum sentences and statutory sentencing maximums for child pornography offenses. No research, study, body of experience, or rationale, was provided to justify the arbitrary specific offense enhancement amounts, nor the choice of the triggering quantities for the two to five point enhancement related to the number of images of child pornography. Nor was there any justification provided for § 2G2.4(b)(4)'s new 4-level enhancement.

When the Commission created § 2G2.4 in 1991 (due to Congress making it a federal offense to possess child pornography), it did not include a four-level enhancement for "material that portrays sadistic or masochistic conduct." The history of §§ 2G2.2 and 2G2.4 shows us that this was an intentional act. In 1990, the Commission added the sadistic conduct enhancement to § 2G2.2. *See* U.S.S.G. Appendix C, Amendment 325. However, in drafting and promulgating § 2G2.4, no such enhancement was included. *Compare* U.S.S.G. § 2G2.2 (1991) *with* U.S.S.G. § 2G2.4 (1991). This exclusion should be presumed to be intentional. *See Duncan v. Walker*, 533 U.S. 167, 173 (2001) (if language is included in one section of a statute but excluded in another section of the same Act, it is presumed that the exclusion was done "intentionally and purposely").

The Sentencing Commission's expert analysis did not compel this enhancement in possession cases. In other words, this enhancement was not necessary to fulfill the purposes of sentencing in possession cases. And so long as the Commission's expert-based conclusions controlled, the possession Guideline remained unaltered in this respect. But this all changed with the passage of the PROTECT Act.

Without consulting the Commission or conducting any other research into the necessity of

applying this enhancement to simple possession, Congress directly amended the possession of child pornography Guideline. Inserted into § 2G2.4 was the new subsection (b)(4). *See Pub. L. No.* 108-21, § 401. With this move – and without any explanation or justification – Congress began to sentence the mere possession of child pornography as akin to trafficking of child pornography. It was Congressional actions like this that ultimately compelled the Sentencing Commission's reluctant consolidation of §§ 2G2.2 and 2G2.4. *See* U.S.S.G. Appendix C, Amendment 664

As summarized by one commentator, with the passage of the PROTECT Act:

> Congress directly amended [for the first time] the Federal Sentencing Guidelines by drafting Guideline text. In the past, Congress often . . . issue[d] directions to and requests for study from the Commission, but left it to the Commission to craft specific Guideline text. This time, Congress completely ignored the *expert* role the Sentencing Commission was designed to play, cut the Commission out of the process entirely, and directly wrote Guideline text to its own specifications.

Steven L. Chanenson, *Hoist With Their Own Petard?*, 17 Fed. Sent'g Rep. 20, 23 & nn.54-57 (2004) (emphasis original); *see also Detwiler*, 338 F.Supp.2d at 1171. Of even greater significance, Congress acted in this way without giving either the Judicial Conference or the Sentencing Commission "a fair opportunity to consider and comment" on the direct amendment. *See* Chanenson, 17 Fed. Sent'g Rep. at n.56 (*citing, e.g.* Letter from the Judicial Conference of the United States to Senator Orrin G. Hatch (April 3, 2003), *reprinted at* 15 Fed. Sent'g Rep. 343, 343 (2003)).

As the former United States Attorney for the Eastern District of New York observed:

> "Equally alarming was the process by which these reforms were introduced and considered in Congress. The Feeney Amendment was introduced without input from the federal judiciary, the organized bar, academics, criminal justice experts, probation officers or prison officials. Even the Sentencing Commission itself -- the very body charged by *315 Congress with the responsibility of creating and amending the Guidelines -- was not consulted. Indeed, the statutory process for considering guideline amendments -- one that calls for the Sentencing Commission to consult with numerous interested parties in the criminal justice process -- was ignored.
>
> What is more, the proponents of this legislation sought to minimize the opportunity for debate or opposition. The reforms were appended at the eleventh hour to a politically-popular piece of child abduction legislation that no legislator could easily oppose. The first time that Congress gave serious consideration to the changes was in a House-Senate conference, hastily convened just days before Congress' spring recess. Last-minute revisions to the bill were circulated at 1:00 in the morning on April 9, as a result of a process that Senator Diane Feinstein compared to "rewrit[ing] the criminal code on the back of an envelope." And the only time the full Senate had an opportunity to debate the bill at all was on April 10, the day that it passed.
>
> To be sure, Congress is a political institution, and proponents of legislation generally seek to maximize the prospects for its passage. But this was no pork-barrel legislation. In one

section of a bill, Congress sought to eliminate nine separate guideline departure provisions and legislatively overrule dozens of federal court sentencing decisions, not to mention the leading Supreme Court case construing the Guidelines. Surely, nationwide sentencing reforms of the magnitude contained in this statute deserved far more deliberate consideration than this...

Even more blatant was the rebuke of the Sentencing Commission inherent in this legislation. In enacting this bill, Congress (i) adopted sentencing reforms without consulting the Commission, (ii) ignored the statutorily-prescribed process for creating guideline amendments, (iii) amended the Guidelines directly through legislation, (iv) required that sentencing data be furnished directly to Congress rather than to the Commission, (v) directed the Commission to reduce the frequency of downward departures regardless of the Commission's view of the necessity of such a measure, and (vi) prohibited the Commission from promulgating any new downward departure guidelines for the next two years.
All told, the statute is the most significant effort to marginalize the role of the Sentencing Commission in the federal sentencing process since the Commission was created by Congress nearly 20 years ago."

*See* Alan Vinegrad, *The New Federal Sentencing Law*, 15 Federal Sentencing Reporter 310, 314-315 (June 2003).

**B. 2003 Amendments**

The first changes to § 2G2.2 and § 2G2.4 took effect immediately upon the Act's signature into law. *See* Pub. L. No. 108-21 (2003); *See also* Amendment 649, U.S.S.G. App. C.

§ 2G2.2
Base Offense Level: 17
Specific Characteristics:

(b)(1) prepubescent or a minor under 12 years +2
(b)(2) if distribution
- A) For pecuniary gain, see 2B1.1**,** but not less than +5
- B) For value but not pecuniary gain +5
- C) To a minor +5
- D) To persuade a minor to engage in sexual conduct +7
- E) Other than for the reasons above +2

(b)(3) if material portrays sadistic or masochistic conduct, or other violence, +4
(b)(4) Pattern of Abuse +5
(b)(5) transmission of material or notice by computer +2
**(b)(6) If**
- **A) 10-150 images +2**
- **B) 150-300 +3**
- **C) 300-600 +4**
- **D) 600+ +5**

§ 2G2.4
Base Offense Level: 15
Specific Characteristics:
(b)(1) prepubescent or a minor under 12 years: +2
(b)(2) if 10 or more items: +2
(b)(3) Possession as a result of computer use +2
**(b)(4) if material portrays sadistic of masochistic conduct, or other violence** +4
**(b)(5) If**
**A) 10-150 images +2**
**B) 150-300 +3**
**C) 300-600 +4**
**D) 600+ +5**

On November 1, 2003, a technical change to § 2G2.2(b)(5) was made inserting "', receipt, or distribution" after "transmission." *See* Amendment 663, U.S.S.G. App. C.

Note: For the remainder of 2003, "double counting" was allowed under § 2G2.4 for possessing more than ten items, and for possessing more than ten images. It is difficult to understand why a defendant who possesses eleven printed pictures (eleven items containing one image each) should receive four levels of enhancement, while a defendant who possesses a single computer disk with 149 images (one item containing 149 images) should receive only a two level enhancement. This overlap, and the peculiar double-counting situation it created are indicative of the general lack of study, consideration, and review associated with the modifications of the Protect Act. The double-counting scenario was resolved on November 1, 2004 when Amendment 664 merged § 2G2.4 into § 2G2.2 and dropped the ten item specific offense enhancement. *See* Amendment 664, U.S.S.G. App. C.

**C. 2004 Amendment**

In November 2004, in an effort to reconcile the provisions of the Protect Act, the Sentencing Commission completely reworked §§ 2G2.2 and 2G2.4. *See* Amendment 664, USSG App. C; *See* also Appendix C. The Commission attempted to correct issues such as the double counting scenario described above. *Id.* The Commission also raised the Base Offense Level for trafficking, receipt, and distribution related offenses from 17 to 22. *Id.* Section 2G2.4 was merged into § 2G2.2, and the Base offense Level for possession increased from 15 to 18. *Id.* The Base Offense Level for simple receipt jumped from 17 to 22, with an allowance for a 2 level reduction under certain circumstances.[11] *Id.* The Commission observed, "The Protect Act established five year

[11] The provision allowing "passive" receivers and solicitors of child pornography to qualify for a lesser sentence appears to violate earlier congressional directives that "the Commission shall not promulgate any amendments that, with respect to such cases, would result in sentencing ranges that are lower than those that would have applied under such subsection."

mandatory minimum terms . . . As a result of these new mandatory minimum penalties . . . the Commission increased the base offense level for these offenses . . . The Commission determined that a base offense level of 22 is appropriate for trafficking because, when combined with several specific offense characteristics which are expected to apply in almost every case (e.g. use of a computer, material involving children under 12 years of age, number of images), the mandatory minimum of 60 months' imprisonment will be reached." *See* Amendment 664, USSG App. C.

The decision by the Commission to increase Base Offense Levels may have been politically expedient, but it was contrary to the Commission's established function. Congress created the Sentencing Commission as an independent expert body and placed it in the Judicial Branch. The Supreme Court upheld the promulgation of the Guidelines by the Commission against Separation of Powers challenge, "not without difficulty," based in part on a prediction that the Commission would not be enlisted in the work of the political branches, but instead would bring "judicial experience and expertise" to the "neutral endeavor" of sentencing, "the Judicial Branch's own business." *Mistretta v. United States*, 488 U.S. 361, 407-08 (1989). Justice Scalia disagreed, stating that it was "not about commingling, but about the creation of a new Branch altogether, a sort of junior-varsity Congress." *Id*. at 427 (Scalia, J., dissenting).

As the above explanation for Amendment 664 clearly indicates, the Sentencing Commission increased the Base Offense Levels and re-structured the specific offense characteristics of §2G2.2 with the singular goal of ensuring that the guidelines range matched or exceeded the newly increased mandatory minimums and rules put forth in the Protect Act, rather than with the goal of serving the statutory purposes of sentencing overall. These actions undermine the Supreme Court's analysis in *Mistretta*: "The legitimacy of the Judicial Branch ultimately depends on its reputation for impartiality and nonpartisanship. That reputation may not be borrowed by the political Branches to cloak their work in the neutral colors of judicial action." *Mistretta v. United States*, 488 U.S. 361, 407 (1989).

The Commission acknowledged this problem in its Fifteen Year report in 2004. "Direct congressional control over sentencing policy for sex offenses has increased throughout the guidelines era." *See* U.S. Sentencing Commission, Fifteen Years of Guidelines Sentencing: *An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform* (2004), available at http://www.ussc.gov/15_15year/15year.htm at 72. Regarding the Protect Act's affect on child sex offenses such as child pornography, the Commission noted: "The frequent mandatory minimum legislation and specific directives to the Commission to amend the guidelines make it difficult to gauge the effectiveness of any particular policy change, or to disentangle the influences of the Commission from those of Congress." *Id.* at *73.*

A useful analysis was provided by the Criminal Law Committee of the Judicial Conference in March 2007. The Criminal Law Committee, which believes that the Commission, when deciding

---

Pub. L. No. 108-21 (2003). However, by first raising the Base Offense Level by three levels for all non-possessory offenses, it became possible for the Commission to "give back" two levels to this select group of minor offenders without running afoul of congressional mandates.

whether to amend the guidelines in response to a mandatory minimum, should make an assessment based on its own expert opinion, believes this opinion should be independent of any potentially applicable mandatory minimum. *See* Comments of the Criminal Law Committee of the Judicial Conference (March 16, 2007), http://www.ussc.gov/hearings/03_20_07/walton-testimony.pdf. Afer all, if the resulting guideline, alone or in combination with specific offense characteristics, is lower than the mandatory minimum, § 5G1.1(b) will operate. The Commission could likewise consider in its independent evaluation any information in published reports or hearing records upon which Congress may have relied. *Id*. What it should not do, is "launder" the actions of the political branches by signing the Commission's name to the work.

§2G2.2
**Base Offense Level:**
**(a)(1): 18 if a violation of 18 U.S.C. §1466A(b) or §2252(a)(4) or §2252A(a)(5)**
**(a)(2): 22 otherwise BUT**
**If (a)(2), + conduct was limited to receipt or solicitation, + no intent to traffic or distribute, then -2**
Specific Characteristics:
(b)(1) prepubescent or a minor under 12 years +2
(b)(2) if distribution
A) For pecuniary gain, see 2B1.1**,** but not less than +5
B) For value but not pecuniary gain +5
C) To a minor +5
**D) To a minor to persuade the minor to engage in illegal activity other than E)** +6
**E**) To persuade a minor to engage in sexual conduct +7
F) Other than for the reasons above +2
(b)(3) if material portrays sadistic or masochistic conduct, or other violence, +4
(b)(4) Pattern of Abuse +5
(b)(5) transmission of material or notice by computer +2
**(b)(6) If**

| | |
|---|---|
| **A) 10-150 images** | **+2** |
| **B) 150-300** | **+3** |
| **C) 300-600** | **+4** |
| **D) 600+** | **+5** |

Redacted/Not Merged with 2G2.2: the enhancement for possessing greater than ten items containing visual depictions of the sexual exploitation of a minor. *See* Amendment 664, U.S.S.G. App. C.

## VIII. The Typical Defendant

The flaw with U.S.S.G. § 2G2.2 today is that a common, first-time offender can chart at the statutory maximum, regardless of Acceptance of Responsibility and Criminal History. As noted by the Guidelines Commission, there are "several specific offense characteristics which are expected to apply in almost every case (e.g. use of a computer, material involving children under 12 years of

age, number of images)." *See* Amendment 664, U.S.S.G. App. C "Reason for Amendment", (November 1, 2004). The internet provides the typical means of obtaining child pornography, resulting in a two-level enhancement. *See* U.S.S.G. § 2G2.2(b)(6). Furthermore, as a result of internet swapping, defendants readily obtain 600 images with minimal effort, resulting in a five-level increase. *See* U.S.S.G. § 2G2.2(b)(7)(D). The 2004 Guidelines created an Application Note defining any video-clip as creating 75 images. *See* U.S.S.G. § 2G2.2, App. Note 4(ii). Thus one email containing eight, three-second video clips would also trigger a five-level increase. Undoubtedly, as the Commission recognized, some of these images will contain material involving a prepubescent minor and/or material involving depictions of violence (which may not include "violence" per se, but simply consist of the prepubescent minor engaged in a sex act), thereby requiring an additional six-level increase. *See* U.S.S.G. § 2G2.2(b)(2),(4). Finally, because defendants generally distribute pornography in order to receive pornography in return, most defendants receive a five-level enhancement for distribution of a thing of value. *See* U.S.S.G. § 2G2.2(b)(3)(B). Thus, an individual who swapped a single picture, downloaded a handful of video clips, and engaged in viewing and receiving child pornography for a few hours on one occasion, can quickly obtain an offense level of 40. Even after Acceptance of Responsibility, an individual with no prior criminal history can quickly yield a Guideline Range of 210-262 months, where the statutory maximum caps the sentence at 240 months. *See* U.S.S.G. § 5G1.1(a).

The results are illogical; Congress set the statutory range for first time distributors as five to twenty years. Congress could not have intended for a common first-time offender with no prior criminal history and no history of contact with minors to receive a sentence of 210 to 240 months. An individual with a Criminal History Category of II faces a Guideline range of 235 to 240 months, and any higher Criminal History score mandates the statutory maximum. These result runs contrary not only to Congressional will, but also to a principal Guideline policy - providing harsher penalties to individuals with more significant Criminal History scores while still retaining an incentive for pleas at all Criminal History levels.

Let us examine the results of these Congressionally directed and influenced changes as they apply to two hypothetical, but statistically typical defendants. Quoted statistics are derived from United States Sentencing Commission's "Use of Guidelines and Specific Offense Characteristics: FY 2006" report found at http://www.ussc.gov/gl_freq/06_glinexgline.pdf and *the 2007 Sourcebook*, http://www.ussc.gov/ANNRPT/2007/SBTOC07.htm.

**Defendant #1.**
Convicted of distributing child pornography. Sentenced pursuant § 2G2.2.
Specific Offense Characteristics:

- Possessed a picture depicting a child under the age of 12 (96.2%)
- Used a computer (96.8 % of defendants)
- Possessed one picture involving bondage (63.2%)
- Emailed 5 pictures to another person in expectation of getting 5 pictures back (49.4% of defendants receive some type of distribution enhancement)
- Possessed four short movie clips and ten pictures resulting in a calculated 310 pictures (53.6 % had greater than 300, 85.5% had greater than 10)

Defendant #1 has no criminal history and has never abused or exploited a child.

He pleads guilty in a timely fashion and receives the maximum standard reduction for acceptance of responsibility.

Using the chart provided at Appendix A, we can easily calculate his Guideline Range:

| | |
|---|---|
| April 30, 1987: | 12-18 months |
| November 1, 1991: | 21-27 months |
| November 27, 1991: | 27-33 months |
| November 1, 1996: | 41-51 months |
| November 1, 2000: | 70-87 months |
| April 30, 2003: | 108-135 months |
| November 1, 2004: | 188-235 months |

Percentage increase in the low end of the Guideline Range after Acceptance since 1987: 1,567%.
Actual increase in the low end of the applicable Guideline Range since Congress directly, and repeatedly, began increasing the Guidelines: 167 months.

If we simply add the extra 10 second movie clips to this collection, defendant #1 charts as follows:

| | |
|---|---|
| April 30, 1987: | 12-18 months |
| November 1, 1991: | 21-27 months |
| November 27, 1991: | 27-33 months |
| November 1, 1996: | 41-51 months |
| November 1, 2000: | 70-87 months |
| April 30, 2003: | **121-151 months** |
| November 1, 2004: | **210-262 months** |

This would result in a 1750% increase, or a 198 month increase over a defendant sentenced for the same conduct on October 30, 1991.

**Defendant #2**
Convicted of possessing child pornography. Sentenced pursuant to § 2G2.2.
Specific Offense Characteristics:
- Possessed a picture depicting a child under the age of 12 (93.5%)
- Used a computer to obtain the image (93.1%)
- Had one disk containing two movie files and 10 pictures, equating to 160 pictures (38% had at least 150 pictures, 63.1% had greater than 10 images)

Defendant #2 has no criminal history and has never abused or exploited a child.
He pleads guilty in a timely fashion and receives the maximum standard reduction for acceptance of responsibility.

Using the chart provided at Appendix A, Defendant #2 receives this Guideline Range:

| | |
|---|---|
| April 30, 1987: | No punishment - not illegal |
| November 1, 1991: | 6-12 months |
| November 27, 1991: | 12-18 months |
| November 1, 1996: | 21-27 months |
| April 30, 2003: | 30-37 months |
| November 1, 2004: | 41-51 months |

Percentage increase in the Total Offense Level after Acceptance since 1991: 683%
Increase in the low end of the applicable Guideline Range since Congress directly, and repeatedly, began increasing the Guidelines: 41 months.

A comparison of defendant #1's case to the Guidelines to two offenses that the normal citizen would likely consider far more egregious demonstrates the absurdity of the system.

First consider the hypothetical of a fifty year-old man who "meets" a thirteen year-old girl on the internet. After the offender discovers that the girl lives on a nearby military post, and that her father is away at training, he uses his superior worldliness to create a complex relationship with the child. Ultimately, he persuades her to meet at a park on the base. Over the course of several months, until they are discovered, they regularly meet for sex. This violation of 8 U.S.C. § 2243 is subject to Guideline 2A3.2. Applying a Base Offense Level of 18, a four-level enhancement for unduly influencing a child (b)(2), and a two-level enhancement for use of a computer (b)(3), the Total Offense Level is 24. After Acceptance, the Guideline range for this Category I offender would be 37-46 months.

Next, consider the same hypothetical fifty year-old man who intentionally seeks out and contacts a twelve year-old girl over the internet (a violation of 18 U.S.C. § 2422(b)). Using his age and experience, he gradually convinces her that sex with a fifty year-old man is desirable. Over several months, the offender creates a relationship of "trust." He then persuades the child to meet. The offender crosses state lines and rendezvous with the child, whereupon the two engage in repeated sex. U.S.S.G. § 2G1.3(a)(3) establishes a base offense level of 28 for the offense. After a two-level enhancement for unduly influencing the child under U.S.S.G. §2G1.3(b)(2), a two-level enhancement for use of the computer (b)(3), and a two-level enhancement for commission of a sex act (b)(4), the final offense level would be 34. After Acceptance, the Guideline range for this Category I offender would be 108-135 months.

That the Guidelines would mete out the most severe punishment for the least egregious of these three offenses requires some correction. Defendant #1's Guideline range is 567% higher for trading pornography than for the man who coerces a lonely military child into sex. Defendant #1 faces a Guideline range 194% higher than the man who planned a months-long campaign to cross state boundaries and engage in repeated sex with a twelve year-old. *Id*. at 1279. Such results either means that the entire Guideline system is bunk, or it is an indication that the stacked enhancements resulting from the Protect Act produce sentences that are greater than necessary to satisfy sentencing purposes.

Courts of appeals may accord a presumption of reasonableness to a within guideline

sentence based on the general assumption that the guidelines are the product of careful study based on extensive empirical evidence, *Rita*, 127 S. Ct. at 2464, but "not all of the Guidelines are tied to this empirical evidence." *Gall*, 1287 S. Ct. at 594 n.2. Where, as here, we can demonstrate that the Guidelines were dramatically skewed upwards by the efforts of two government attorneys, who used a novice Congressman to backdoor changes into a major bill, over the objection of the Sentencing Commission, which specifically stated that no careful study or review had been allowed, then the assumption of careful study becomes unfounded, and the resulting Guideline is worthy of little respect.

**IX. Additional Factors To Consider**

It is important to recognize that the latest version of the Guideline could not take into account new tools and empirical data implemented after the latest version of 2G2.2 was designed. Since 2004, both the Bureau of Prisons and the Courts have acquired additional tools for monitoring offenders and protecting society. Additionally, new studies focused purely on child pornography defendants have empirically demonstrated that many child pornographers are less dangerous than previously believed.

First, lifetime supervised release, with the availability of a lifetime sentence after revocation, provides a greatly expanded system of monitoring and forcing compliance on these offenders. The provision for lifetime supervised release was added to the 2004 verison of 18 U.S.C. § 3583(k); Subsec. (k). Pub.L. 108-21, § 101(3). The power of the judge to impose necessary treatment, search, or safety restrictions was greatly expanded in 2006 as part of the Sex Offender Registration and Notification Act (also known as the Adam Walsh Child Protection and Safety Act of 2006) of Public Law 248-109. This act expanded standard conditions of supervised release to include mandatory registration of all sex offenders, broadened the court's standard search authority, and instituted greater mandatory punishments for a violation of the conditions of supervised release. *See* 18 U.S.C. § 3583(d)(3); Pub.L. 109-248, §§ 141(e)(1), (e)(2), 210(b). Anecdotal evidence suggests that local probation offices responded to this legislation by developing a greatly expanded package of "special conditions of supervised release " designed to provide targeted treatment, electronic monitoring, sharply limit or prohibit access to minors and access to computerized devices, etc. These tools collectively allow the court to more closely supervise offenders, deter future offenses, and safeguard the public.

Second, the system now has a vehicle for identifying and removing dangerous offenders from society. 18 U.S.C. § 4248 now provides means to indefinitely commit sexually dangerous offenders. *See* 18 U.S.C. § 4248, added by Pub. L. 109-248, Title III, § 302(4), July 27, 2006; 120 Stat. 620. The Bureau of Prison, over the course of an offender's confinement and treatment, is able to identify and refer dangerous individuals for commitment. This system, if used properly, may benefit society and defendants (in general) both. Rather than initially issue an extended sentence for fear that a child pornography defendant might prove dangerous, the court can sentence the defendant for the harm they actually committed. Treatment providers and case workers can then make assessments based on long periods of observation about which clients should be referred for the strictest conditions on liberty, or even be referred for indefinite commitment. The court ultimately is empowered to exercise judgement in those cases where the personal history during

incarceration and treatment merits prolonged conditions or detention. For most defendants however, that should not prove necessary.

Third, empirical testing disproves the fear that the typical child pornography defendant will go on to molest children. Michael Seto, a prominent expert in the field explains the impetus for his studies as follows:

> There is increasingly strong rhetoric about the dangers of the internet, including claims of a large and profitable child pornography industry... and vast online networks of pedophiles, child pornography offenders, and sex offenders against children. There is little research however, to support the rhetoric or to guide major policy and legal changes that are taking place as a result...
>
> There is a major gap between scientific understanding of these topics and the practices and policies that have been developed in response to the problem...much of what laypeople and professionals believe about pedophiles and sexual offending against children...is not supported by empirical evidence.
>
> Michael Seto, *Pedophilia and Sexual Offending Against Children: Theory, Assessment, and Intervention,* American Psychological Association, 2008 at xi, xii.

In 2005[12] Mr. Seto and his colleagues engaged in a detailed examination of documented child pornographers. The goal was to determine what factors predict the likelihood that child pornography offenders would later commit a contact sexual offense. *See* Michael C. Seto and Angela W Eke, *The Criminal Histories and Later Offending of Child Pornography Offenders*, Sexual Abuse: Journal of Research and Treatment, Vol. 17, No.2, April 2005. The study followed 201 child pornography offenders for a period of years after their release from prison. The greatest indicators of risk to re-offend or to commit a contact sexual offense were prior history of contact offenses, and prior criminal history. Seto and Eke concluded:

"Possession of child pornography is a valid indicator of pedophilia..."

But,

"Only one of the offenders with only child pornography offenses committed a contact sexual offense in the follow-up period...our finding does contradict the assumption that all child pornography offenders are at very high risk to commit contact sexual offenses involving children." *Id.* at 202, 208. The valid indicators for later commission of a contact offenses were prior criminal history, and prior instances of contact sexual abuse. *Id.*

---

[12] Mr. Seto recently completed an expanded follow-up study that validated the 2005 conclusions. This study, which was presented in October 2008 at the national Association for the Treatment of Sexual Abusers conference in Atlanta has not yet been published.

Many members of the public would undoubtedly struggle with these findings. Many child pornography defendants state that they never thought that looking at pictures over the internet would hurt anyone, and that they would never actually participate in the molestation of children. To many in the public, this statement is ridiculous. To many citizens, pedophile equals molester. The fact that the terms are used interchangeably in many news stories contributes to this perception. How then can the average person appreciate the distinction?

For those with teenage children, or those who know young adults, the genre of movies typified by films such as *Hostel*, or *Saw*[13] may provide a useful analogy. These highly disturbing films focus on the vicarious "thrill" derived by watching kidnaped adults suffer the realization of imminent torture and death. These Hollywood movies are essentially "snuff" movies without the accompanying sex. The films are presumably fake, but they appear very real, and are enormously popular with young adults[14]. If fans look at similar "clips," on-line, there would be no way of knowing for sure whether the images were produced fakes (from Hollywood), or actual torture movies.

This analogy provides useful perspective. The analogy is imperfect of course, in that child pornography images tend to be real, and thus document the actual, illegal maltreatment of children, not a Hollywood simulation. On the other hand, to the viewers, the emotional experience of watching a woman's face blow-torched apart in one of the Hostel films is of an equally "real" feeling event. For a large portion of both sets of viewers, there may exist a sense that their watching films and photos is a harmless fantasy indulgence that does not contribute to actual acts of violence.

Has the latest generation suddenly spawned millions of young adults who intend to eventually kidnap and torture others for pleasure then? Making frequent trips to the cinema to view the latest installment of these films, or even worse buying them on DVD, is certainly a valid indicator that the watcher derives excitement from seeing others (apparently) tortured. However, most viewers would probably be horrified at the prospect of actually engaging in the conduct they find exciting when it is watched in the context of a movie theater or in their home den. This vast majority draws a line between the fantasy of the media, and the "reality" of actually committing a torture act. Internal moral controls, fear of external punishment, etc. likely deter all but a handful of the remainder (those who might otherwise actually pursue their interest). This leaves the dangerous

---

[13] Hostel is movie depicting the kidnaping and graphic torture deaths of young travelers at the hands of rich "tourists" who pay for the privilege of torturing chained victims to death. Saw features two men kidnaped and chained together to a corpse. Two hacksaws are located within easy reach. Each man discovers a tape instructing him to kill the other (And presumably saw off their own foot in order to escape). *See* http://en.wikipedia.org/wiki/Hostel_(film); http://en.wikipedia.org/wiki/Saw_(film).

[14] Hostel, a 2005 Lion's Gate film, grossed 80.5 million at the box office and sparked a 2007 sequel. Saw, a 2004 Lion's Gate film, grossed 103 million at the box office, and sparked five sequels. *See* http://www.boxofficemojo.com/movies/?id=hostel.htm; http://www.boxofficemojo.com/movies/?id=saw.htm.

handful. The risk is that films such as Saw or Hostel excite this handful of dangerous fans by inflaming their intentions to engage in such frightful behavior, and by arguably normalizing their fantasies. For these reasons, viewers who pay money to watch the latest Hostel or Saw movie may be contributing to the eventual kidnap and torture of someone real by contributing to the industry that normalizes and produces images.

When we try to identify the imminent dangers in our society, instances of viewing Hostel or Saw are insufficient to distinguish the casual, excited viewer of Saw VI from the quiet man down the street named Jeffrey Dahmer. It is common knowledge that past criminal history (kidnaps, assaults, etc), and past contact behavior (torturing cats, skinning squirrels, etc.) are much stronger indicators of likely later abusive patterns. Mr. Seto's study demonstrates that the same variables apply in child pornography cases.

The frequent theme at the sentencing of child pornography defendants is the worry (stated or unstated) that the defendant will molest children later in life. Mr. Seto's study demonstrates that for child pornography defendants, past criminality and past sexual contacts are reliable ways to separate "fantasy" pedophiles from intentional contact offenders. Mr. Seto's study also demonstrates that in the absence of these factors, the likelihood of a later contact offense is far, far, less likely.

**X. The implications of Gall and Kimbrough for Child Pornography Cases**[15]

Thankfully, recent changes in the law allow us to argue this position to the courts.

The Guidelines, "formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence." *Kimbrough*, 128 S. Ct. at 564; *see also Gall*, 128 S. Ct. at 602 (same). "The statute, as modified by *Booker*, contains an overarching provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary,' to achieve the goals of sentencing." *Kimbrough*, 128 S. Ct. at 570.

Because the "Guidelines are not the only consideration," the judge, "after giving both parties an opportunity to argue for whatever sentence they deem appropriate," "should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party." *Id*. The judge must independently evaluate the appropriate sentence in light of the Section 3553(a) purposes and factors, and must consider arguments that the guidelines should not apply on general policy grounds, case-specific grounds (including guideline-sanctioned departures), or "regardless." *Rita*, 127 S. Ct. at 2463, 2465, 2467-68. In doing so, the judge "may not presume that the Guidelines range is reasonable." *Gall*, 128 S. Ct. at 596-97; *see also Rita*, 127 S. Ct. at 2465 (same).

Of great importance is the fact that district court judges must now consider and respond to nonfrivolous arguments that the guideline sentence itself reflects an unsound judgment because it

[15] Large passages in this section are excerpted, with permission of the author, directly from Amy Baron-Evans, *"Rita, Gall and Kimbrough:A Chance for Real Sentencing Improvements."; See also http://www.fd.org/pdf_lib/2G2.2%20Reply%20to%20Govt.pdf.*

fails properly to reflect § 3553(a) considerations, does not treat defendant characteristics in the proper way, or a different sentence is appropriate regardless. *Rita*, 127 S. Ct. at 2465, 2468. District courts are no longer required, or permitted, to simply defer to Commission policies. *Id.* Courts of appeals may not "grant greater factfinding leeway to [the Commission] than to [the] district judge." *Id.* at 2463. Even the government has "acknowledge[d] that . . . 'courts may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines.'"[16] *Kimbrough*, 128 S. Ct. at 570.

Thus, judges may vary from the child pornography guidelines because of the individual circumstances of the case, *United States v. Pauley*, 511 F.3d 468 (4th Cir. 2007), and/or because the Guidelines are not the product of empirical data, national experience, or independent expertise and thus do not satisfy § 3553(a)'s objectives, or both. *See United States v. Baird*, slip op., 2008 WL 151258 (D. Neb. Jan. 11, 2008). As the Fourth Circuit observed while upholding an individual circumstances variance from 78-97 months down to 24 months:

> "In the wake of Gall, the Government's principal argument is that the district court failed to take into account the seriousness with which Congress views sexual crimes involving children. The district court's statement of reasons, however, expressly acknowledged the seriousness of the offense charged in computing the sentence. See J.A. at 96 (explaining that Congress considered Smith's crime 'a very serious offense' and that the district court 'was treating it as such'). In addition, the district court noted during the sentencing hearing that 'Congress has indicated its abhorrence of the offense or offenses relating to child pornography.' (J.A. at 92)." *United States v. Smith*, slip op., 2008 WL 1816564 (4th Cir. Apr. 23, 2008).

Helpful language may also be found from recent case law dealing with the seemingly settled issue of variances based on fast-track disparities. The First Circuit recently abrogated a ban on the consideration of fast-track disparities in sentencing, noting:

> "While the *Kimbrough* Court acknowledged that a sentencing court can be constrained by express congressional directives, such as statutory mandatory maximum and minimum prison terms, 128 S. Ct. at 571-72, the PROTECT Act — as the Fifth Circuit would have to concede — contains no such express imperative. The Act, by its terms, neither forbids nor discourages the use of a particular sentencing rationale, and it says nothing about a district court's discretion to deviate from the guidelines." *U.S. v. Rodriguez*, __F.3d __, 2008 WL 2265898 (1st Cir. June 4, 2008)

As district court judges become comfortable in the knowledge that the appellate courts will respect their reasoned discretion, these opportunities for effective advocacy will grow. Indeed, in the right circumstances, a detailed record may encourage, and support, exceptional downward variances. *See United States v. Rowan II*, slip op., 2008 WL 2332527 (C.A.5 June 9,

---

[16] *See also* Tr. of Oral Argument at 50, *Rita v. United States* (U.S. argued Feb. 20, 2007); Tr. of Oral Argument at 32-33, *Claiborne v. United States* (U.S. argued Feb. 20, 2007).

2008)(abrogating prior circuit precedent to affirm a variance from 47-56 months downwards to supervised release for possession of child pornography).

This article has demonstrated a number of policy problems with the child pornography guidelines that can be easily put into the record. First, the guidelines have been repeatedly raised despite evidence and recommendations by the Commission to the contrary. Second, repeated Congressional directives were targeted to deter mass producers, repeat abusers, and mass distributors, but this group makes up less than 5% of the defendants effected by the changes. Third, the two point enhancement for use of a computer is applied to nearly every defendant, but the rationale for creating and continuing the enhancement is rarely present. Fourth, the latest, and most dramatic changes to the Guidelines result not from study by the Commission, nor debate in Congress, but instead by the actions of two unknown authors within the Department of Justice.

In a decisive rejection of mindless uniformity, the Court has recognized that unwarranted uniformity is every bit as objectionable as unwarranted disparity: "[I]t is perfectly clear that the District Judge . . . also considered the need to avoid unwarranted *similarities* among other co-conspirators who were not similarly situated." *Id*. at 600 (emphasis in original). Thus, the judge "must make an individualized assessment based on the facts presented," and "must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing." *Gall*, 128 S. Ct. at 597. *Kimbrough,* for example, was an "unremarkable" "mine-run" case in which the guideline itself reflects unsound judgment in that it fails properly to reflect § 3553(a) considerations. 128 S. Ct. at 575. There, the Court upheld a below-guideline sentence in an ordinary crack trafficking case because the crack guidelines (like all of the drug guidelines) were not based on past practice at their inception, and reflect unsound judgment in light of the purposes of sentencing and the need to avoid unwarranted disparities. The Court said: "In the main," the Commission used an "empirical approach based on data about past practices, including 10,000 presentence investigation reports," but it "did not use this empirical approach in developing the Guidelines sentences for drug-trafficking offenses." *Id*. at 567. When a guideline is not the product of "empirical data and national experience," it is not an abuse of discretion to conclude that it "yields a sentence 'greater than necessary' to achieve §3553(a)'s purposes, even in a mine-run case." *Id*. at 575.

In *Kimbrough*, "the District Court properly homed in on the particular circumstances of Kimbrough's case and accorded weight to the Sentencing Commission's consistent and emphatic position that the crack/powder disparity is at odds with § 3553(a)." 128 S. Ct. at 576. The Court did not mean that the district court properly relied on something "unique" about Mr. Kimbrough or his offense because it made quite clear that this was an "unremarkable" "mine-run" case. What it meant was that the facts of the case fit what is wrong with the crack cocaine guidelines. Thus, a defense attorney who argues for a below-guideline sentence is not seeking a "categorical" rejection of a guideline in all possible cases, but a rejection of the guideline in the particular case because the facts fit the policy problems of the guideline.

Although some guidelines may be entitled to respect, this does not pertain to guidelines, like the child pornography guidelines, that "do not exemplify the Commission's exercise of its characteristic institutional role." *Kimbrough*, 128 S. Ct. at 575. Where, as here, the Commission is

merely parroting the directives of Congress, which in turn admits that it was merely enacting an undebated item written by federal prosecutors, then little respect is due.

In *Rita*, the basis for the non-binding- with-no-independent-legal-effect presumption was that it was "fair to assume" that the guidelines "reflect a rough approximation" of sentences that "might achieve 3553(a) objectives" because the original Commission (instead of basing the Guidelines on the purposes of sentencing as Congress directed, *see* 28 U.S.C. § 991(b)(1)(A)) used an "empirical approach" based on "past practice," and the Guidelines "*can*" evolve in response to non-guideline sentencing decisions and consultation with the criminal justice community. *Rita*, 127 S. Ct. at 2464-65 (emphasis supplied). But this is simply untrue when the Commission has not exercised its capacity to develop guidelines based on empirical data, national experience, and independent expertise. *Kimbrough*, 128 S. Ct. at 575.

After *Gall* and *Kimbrough*, the fact that a guideline (or amendment to a guideline) was spawned by congressional action is a red flag for lack of empirical basis, raising the question whether the guideline reflects unsound judgment. *See Gall*, 128 S. Ct. at 594 n.2 ("For example, the Sentencing Commission departed from the empirical approach when setting the Guidelines range for drug offenses, and chose instead to key the Guidelines to the statutory mandatory minimum sentences that Congress established for such crimes."); *Kimbrough*, 128 S. Ct. at 575 ("The crack cocaine Guidelines . . . do not exemplify the Commission's exercise of its characteristic institutional role. In formulating Guidelines ranges for crack cocaine offenses, as we earlier noted, the Commission looked to the mandatory minimum sentences set in the 1986 Act, and did not take account of 'empirical data and national experience.'"); *id*. at 569 n.10 ("The amended Guidelines still produce sentencing ranges keyed to the mandatory minimums in the 1986 Act.").

The Court affirmatively recognizes that Congress makes mistakes, and that when the Commission blindly follows or exacerbates a congressional mistake with guidelines that are not based on empirical evidence or experience, and that are contrary to sentencing purposes and/or create unwarranted disparities or unwarranted similarities, the courts are free to reject such guidelines. *Kimbrough*, 128 S. Ct. at 567-68, 569 n.2, 571-72, 574-75; *Gall*, 128 S. Ct. at 594 & n.2.

The Commission has acknowledged that the goals of sentencing reform have not been fully achieved because, "[i]n some cases, the results of research and collaboration have been overridden or ignored . . . through enactment of mandatory minimums or specific directives to the Commission." *See* U.S. Sentencing Commission, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform* at vii (2004). Indeed, "frequent mandatory minimum legislation and specific directives to the Commission to amend the [sex offense] guidelines make it difficult to gauge the effectiveness of any particular policy change, or to disentangle the influences of the Commission from those of Congress." *Id*. at 73. The term "directives" may convey the impression of express instructions to amend the guidelines in particular ways, but many of the guidelines were created or amended as a reflexive response to a new or increased mandatory minimum, an increased statutory maximum, an instruction to study some aspect of sentencing or to change penalties if appropriate, or behind-the-scenes discussions not in the public record at all. In some instances, the Commission exceeded an

express congressional directive, or took other action that appears to contravene congressional intent.

It is important to recognize that a Guideline which follows to the letter a congressional directive stated in "express terms" is not immune from scrutiny by the sentencing judge as a potentially unsound judgment. Even the government acknowledges as much. *See* Brief of the United States at 29, *Kimbrough v. United States* ("As long as Congress expresses its will wholly through the Guidelines system, the policies in the Guidelines will best be understood as advisory under *Booker* and subject to the general principles of sentencing in section 3553(a)."); Letter stating the government's position on the career offender guideline, docketed March 17, 2008 in *United States v. Funk*, No. 05-3708, 3709 (6th Cir.) ("position of the United States" is that "*Kimbrough*'s reference to [§ 994(h)] reflected the conclusion that Congress intended the Guidelines to reflect the policy stated in Section 994(h), not that the guideline implementing that policy binds federal courts.") (emphasis in original), available on the Sentencing Resource Page of www.fd.org.

Congress has the exclusive right and responsibility to legislate statutory minimums and maximums,[17] and those outer limits trump any inconsistent guideline range, as is obvious, and as USSG § 5G1.1 says. But when Congress uses the Commission as a conduit for a specific sentence or sentencing increase, the resulting guideline is but one factor to be considered under § 3553(a), and is subject to the same critical analysis as other guidelines, as the courts have found in both career offender and child pornography cases. *See United States v. Martin*, 520 F.3d 87, 88-96 (1st Cir. 2008) (courts have broad discretion to sentence below career offender guideline under *Gall* and *Kimbrough*); *United States v. Sanchez*, 517 F.3d 651, 662-65 (2d Cir. 2008) (Section 994(h) is a directive to the Commission, not the courts); *United States v. Marshall*, slip op., 2008 WL 55989 **7-8 (7th Cir. Jan. 4, 2008) ("We must reexamine our case law" holding "that courts are not authorized to find that the guidelines themselves, or the statutes upon which they are based, are unreasonable . . . in light of the Supreme Court's recent decision in *Kimbrough*."); *United States v. Malone*, 2008 U.S. Dist. LEXIS 13648 (E.D. Mich. Feb. 22, 2008) (imposing below guideline sentence based on Commission's reports finding career offender guideline unsound); *United States v. Baird*, slip op., 2008 WL 151258 *7 (D. Neb. 2008) ("Because . . . the Guidelines for child [pornography] offenses, like the drug-trafficking Guidelines, were not developed under the empirical approach, but . . . in response to statutory directives. . . . the court affords them less deference than it would to empirically-grounded guidelines."). If it were otherwise, the Separation of Powers problem that most troubled the Court in *Mistretta* would arise. *See Mistretta*, 488 U.S. at 407.

The fact that 33% of FY 2007 child pornography defendants were sentenced below the Guidelines is encouraging. *See 2007 Sourcebook*; http://www.ussc.gov/ANNRPT/2007/SBTOC07.htm at Table 28. It is also indicative of the fact

[17] See *United States* v. *Evans*, 333 U.S. 483, 486 (1948) (observing that "as concerns the federal powers, defining crimes and fixing penalties are legislative, not judicial, functions"); *Ex parte United States*, 242 U.S. 27, 41-42 (1916) (stating that "the authority to define and fix the punishment for crime is legislative," while the "right . . . to impose the punishment provided by law, is judicial"); *United States* v. *Wiltberger*, 18 U.S. (1 Wheat) 76, 95 (1820) ("It is the legislature, not the Court, which is to define a crime, and ordain its punishment."); *United States* v. *Hudson*, 11 U.S. (1 Cranch) 32, 34 (1812) ("The legislative authority of the Union must first make an act a crime, affix a punishment to it, and declare the Court that shall have jurisdiction of the offence.").

that the courts recognize the flawed character of the child pornography sentencing scheme. This flaw exists, and severely impacts our clients, regardless of whether our clients were special or "extraordinary." Following *Rita*, *Gall*, and *Kimbrough*, the Courts are now in an even better position to ameliorate this problem.

As one district court judge recently observed:

> [F]or policy reasons, and because statutory mandatory minima dictated many terms of the Guidelines, the Commission departed from past practices in setting offense levels for such crimes as . . . child crimes and sexual offenses. Consequently, the Guideline ranges of imprisonment for those crimes are a *less reliable appraisal of a fair sentence*. In cases involving application of Guidelines that do not exemplify the Commission's exercise of its characteristic institutional role — basing its determinations on "'empirical data and national experience, guided by a professional staff with appropriate expertise'", — it is not an abuse of discretion for a district court to conclude when sentencing a particular defendant that application of the guideline will yield a sentence "greater than necessary" to achieve the purposes set out in § 3553(a).

*United States v. Bennett*, 8:07CR235 (D. Neb. May 30, 2008) (Sentencing Memorandum)available at http://sentencing.typepad.com/sentencing_law_and_policy/files/bennett_sentencing_opinion.pdf

## XI. Conclusion

Child pornography is a pernicious evil. However, the hysteria associated with public events such as the Dateline "To Catch a Predator" series is not a sound basis for sentencing. Since 1991, the punishment for these offenses has been dramatically and irrationally increased, to the point where today rapists, murderers, and molesters receive lesser sentences than would a man who swaps a few, thirty-year old, pictures of child pornography that were produced before the defendant was even born. Recent changes to the sentencing system, and an increased familiarity with the underlying presumptions of § 2G2.2 should persuade and embolden the courts to conclude that unless a defendant was a repeat offender, or a mass distributor, the Guidelines yield a sentence 'greater than necessary' to achieve §3553(a)'s purposes.

# Appendix A
# Guideline Changes Chart 1987 to Present

| Date | 13-Apr-87 | 1-Nov-91 | 27-Nov-91 | 1-Nov-96 | 1-Nov-00 | 1-Nov-01 | 30-Jan-03 | 30-Apr-03 | 1-Nov-04 |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| **Simple Possession (Base Offense Level)** | | **10** | **13** | **15** | 15 | 15 | 15 | 15 | **18** |
| <12 years or prepubescent | | **+2** | +2 | +2 | +2 | +2 | +2 | +2 | |
| >10 items containing images | | | **+2** | +2 | +2 | +2 | +2 | **(see below)** | (see below) |
| # of images | | | | | | | | **+2 to 5** | +2 to +5 |
| use of a computer | | | | +2 | +2 | +2 | +2 | +2 | +2 |
| sadistic or masochistic | | | | | | | | **+4** | +4 |
| Max | | **12** | **17** | **21** | 21 | 21 | 21 | **28** | **31** |
| Max Guideline Range w/o Acceptance, CH I | | **10-16 months** | **24-30 months** | **37-46 mnths** | 37-46 months | 37-46 months | 37-46 months | **78-97 months** | **108-135 months*** |
| Max Guideline Range w/ Acceptance, CH I | | **6-12 months** | **15-21 months** | **27-33 mnths** | 27-33 months | 27-33 months | 27-33 months | **51-63 months** | **78-97 months** |
| Statutory Range | | **NMT 5 yrs** | NMT 5 yrs | NMT 5 yrs | NMT 5 yrs | NMT 5 yrs | NMT 5 yrs | **NMT 10 yrs** | NMT 10 |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| **Distribution (Base Offense Level)** | 13 | 13 | **15** | **17** | 17 | 17 | 17 | 17 | **22** |
| Receipt w/ intent to traffick/distro (Base) | 13 | 13 | **15** | **17** | 17 | 17 | 17 | 17 | **22** |
| Receipt w/o intent to traffick/distro (Base) | 13 | **10** | **15** | **17** | 17 | 17 | 17 | 17 | **20** |
| Possession w/ intent to traffick/distro (Base) | 13 | 13 | **15** | **17** | 17 | 17 | 17 | 17 | **18** |
| Distribution for $$ | +5 to +11 (2F1.1) | +5 to +x | +5 to +x | +5 to + 18 | +5 to + 18 (2F1.1) | **+5 to +26 (2B1.1)** | **+5 to +30** | +5 to +30 | +5 to +30 |
| Disribution for other reason thatn $$ | | | | | **+2 to +7** | +2 to +7 | +2 to +7 | +2 to +7 | +2 to +7 |
| <12 years | +2 | +2 | | | | | | | |
| <12 years or prepubescent | | | **+2** | +2 | +2 | +2 | +2 | +2 | +2 |
| sadistic or masochistic | | **+4** | +4 | +4 | +4 | +4 | +4 | +4 | +4 |
| pattern of abuse or exploitation | | | **+5** | +5 | +5 | +5 | +5 | +5 | +5 |
| use of a computer | | | | **+2** | +2 | +2 | +2 | +2 | +2 |
| # of images | | | | | | | | **+2 to +5** | +2 to +5 |
| Max | **20+** | **24+** | **31+** | **35+** | 35+ | **37+** | 37+ | **42+** | **47+** |
| Max Guideline Range w/o Acceptance, CH I | **33-41** | **51-63** | **108-135** | **168-210**** | 168-210** | **210-262**** | 210-262** | **360-Life***** | **Life***** |
| Max Guideline Range w/ Acceptance, CH I | **24-30** | **37-46** | **78-97** | **121-151** | 121-151 | **151-188**** | 151-188** | **262-327***** | **Life***** |
| Statutory Range | NMT 15 | NMT 15 | NMT 15 | NMT 15 | NMT 15 | NMT 15 | NMT 15 | **NLT 5, NMT 20** | NLT 5, NMT 20 |

* Exceeds statutory max of 120 months for 1st time offender

** Exceeds statutory max of 180 months for 1st time offender

*** Exceeds statutory max of 240 months for 1st time offender

Bold, Red type indicates a change from the previous year.

## Guideline Changes Chart 1987 to Present

(Page 2)

Distribution Offenses:

| | |
|---|---|
| Base Offense Level: | 13 (Committee) |
| | 15 (by law in 1991) |
| | 17 (by law in 1996) |
| | 22 (to comport with new mandatory minimum in 2003) |

Receipt Offenses:

| | |
|---|---|
| Base Offense Level: | 10 (Committee) |
| | 13 (by law in 1991) |
| | 15 (by law in 1991) |
| | 20/22 (to comport with new mandatory minimums in 2003) |

Simple Possession:

| | |
|---|---|
| Base Offense Level | 10 (Committee) |
| | 13 (by law in 1991) |
| | 18 (to comport with new mandatory minimums in 2003) |

| | |
|---|---|
| +2 for a victim <12 | Committee |
| sadistic/masochistic | Committee |
| Pattern of Abuse | Committee |
| Distribution | Committee |

| | |
|---|---|
| +2 computer | by law / Congress |
| # of pictures | by law / written by the DOJ |

## Appendix B:
## Letter from the Commission opposing increased penalties

U.S. SENTENCING COMMISSION
Washington, DC, August 7, 1991.
Hon. EDWARD R. ROYBAL,
Chairman, Subcommittee on Treasury, Postal Service, and General Government,
Capitol, Washington, DC.

DEAR CONGRESSMAN ROYBAL: I am writing in reference to Senate Amendment No. 780 to the FY 1992 Treasury, Postal Service Appropriations Bill that directs the United States Sentencing Commission to amend the sentencing guidelines pertaining to child pornography offenses.

Regrettably, the debate in the Senate mischaracterized the Commission's recent actions as having reduced the guideline penalties for trafficking in child pornography. This is not correct. In point of fact, the Commission amendments assure that defendants who peddle child pornography will be sentenced as traffickers even if they successfully negotiate a plea to the lesser offense of simple possession of child pornography. The Commission has always regarded child pornography offenses as serious, as indicated by the fact that the guidelines do not permit straight probation for the least serious forms of this conduct and require a substantial term of imprisonment for the more serious forms.

The Commission's 1991 amendments to the child pornography guideline were principally motivate by the creation of a new offense in the 1990 crime bill (codified at 18 U.S.C. s 2252(a)(4)) that punishes by imprisonment up to five years the knowing possession of three or more items of child pornography. Prior to the 1990 crime bill, 18 U.S.C. s 2252 provided up to ten years imprisonment upon a first offense conviction for a wide range of conduct varying in seriousness from the simple receipt through the mail of one item of child pornography to for-profit trafficking in large volumes of such material. Convictions for such conduct were sentenced under guideline § 2G2.2, which provided a base offense level of 13, increased by 2 levels (about 25 percent) if the material involved a prepubescent minor or minor under age 12, and further increased by at least 5 levels if the offense involved for-profit distribution.

In response to the 1990 crime bill amendment, the Commission created a new guideline, § 2G2.4, and assigned to it a base offense level of 10, increased to 12 if the pornographic material involved a prepubescent minor or minor under age 12. The base offense level of 10 was the highest of the alternatives proposed for public comment 1 and is roughly 50 percent greater than the base offense level for simple receipt or possession (in federal jurisdiction) of one item of adult obscene matter. The sentencing significance of this is that a first offender who violates 18 U.S.C. s 2252(a)(4) by possessing three items depicting a prepubescent child and who manifests remorse will be subject to a guideline range of 6-12 months imprisonment. A sentence of probation is only permitted in such circumstances if the defendant, as a condition of probation, loses his liberty for at least six months in jail, community confinement, or home detention.

In constructing the new guideline, the Commission made several other significant decision. First, the Commission provided that if the actual offense conduct involves trafficking in child pornography, the trafficking guideline, with its more severe penalties, will apply, although the defendant may only be convicted of simple child pornography

possession. Similarly, if the actual offense conduct involves production of child pornography, the still more severe penalties of guideline 2G2.1 (Sexually Exploiting a Minor by Production of Sexually Explicit Visual or Printed Material . . .) will apply. The purpose of these "cross references" is to ensure that defendants will be punished commensurate with the seriousness of their real offense conduct, even if a plea bargain allows a plea to a possession charge. Furthermore, for those cases in which the defendant possesses a large quantity of prohibited material, but the government is unable to prove trafficking (in order to trigger the cross reference to the trafficking guideline), commentary to the new guideline recommends an above-guideline sentence.

Secondly, in keeping with the overarching congressional mandate to ensure that defendants who commit similar offense conduct are treated similarly under the guidelines, the Commission determined that the new guideline should encompass other conduct of comparable seriousness to the new statutorily-created offense (simple possession of child pornography) that was formerly sentenced under s § 2G2.2, including simple receipt. Recognizing that receipt is a logical predicate to possession, the Commission concluded that the guideline sentence in such cases should not turn on the timing or nature of law enforcement intervention, but rather on the gravity of the underlying conduct. In this regard, the Commission's rationalization of the offense conduct according to its severity parallels the manner in which illegal drug (or firearms) receipt and possession are treated similarly under the guidelines, while drug (or firearms) distribution or trafficking are treated more severely. Senate Amendment No. 780, unfortunately, would negate the Commission's carefully structured efforts to treat similar conduct similarly and to provide proportionality among different grades of seriousness of these offenses. Instead, it would require the Commission to rewrite the guidelines for these offenses in a manner that will reintroduce sentencing disparity among similar defendants and render the guidelines susceptible to plea bargaining manipulation.

For example, the Senate Amendment mandates the same base penalty for a defendant who, in response to a postal sting solicitation, orders one prohibited magazine as it does for an active "smut peddler." At the same time, the amendment would require the Commission to provide sentences that are 25 percent more severe if the defendant transports one prohibited magazine across state lines than if he is apprehended with nine child pornography movies in his home. Furthermore, through skillful plea bargaining, large-scale traffickers may be able to circumvent the nominally more sever penalties mandated by the Senate amendment by negotiating a plea to simple possession. One primary reason Congress created the Sentencing Commission was to devise guidelines that avoid these unwarranted variations in sentencing for similar conduct. Amendment No. 780 will reintroduce the very problems the guidelines now prevent.

The Commission fully concurs in the need to provide appropriately sever penalties for these offenses that involve the sexual exploitation of young victims. The Commission's guidelines, taking into account proposed amendments we recently sent to the Congress for its review, continue to require substantially tougher penalties than typically were imposed under pre-guidelines practice. In fact a number of judges had written the Commission to express the view that the offense level for the lest serious forms of conduct under s § 2G2.2 was too severe and that the Commission had failed to consider mitigating factors that warranted a lower sentence. Empirical data on non-distribution cases sentenced under s § 2G2.2 during fiscal year 1990 suggest many judges share this view of sentence severity. Data indicates that 34 of 88 such cases were sentenced below the appropriate guideline range. This 38 percent below-guideline sentencing rate is more than two and one-half times the 14.4 percent downward departure rate for all guidelines in the same period. Moreover, there are indications that many prosecutors may share the judges' views, based on the fact that apparently only three such downward departure sentences have been appealed. By ordering the Commission to raise penalties even higher for the least serious cases (i.e., simple possession and receipt), Senate Amendment No. 780 may aggravate this below-guideline sentencing rate and heighten sentencing disparity.

As I stated in recent testimony submitted to the Senate Judiciary Committee in connection with the 1991 crime bill, the Commission welcomes the opportunity to work with Congress to ensure that the guidelines are achieving the objectives Congress sees fit to establish, and we will implement any new congressional directives as promptly as the law permits. At the same time, we believe it is important for Congress to recognize that the Commission is now in a position to provide, to an extent unparalleled by previous sources, detailed data on actual sentencing practices under the guidelines-information that we hope Congress will consider in its decision on sentencing policy.

If the conferees determine that a directive to the Commission is needed in this area, I recommend consideration of the attached substitute provision. This directive, with its more flexible language, is patterned after similar directives in the Commission's original statute and several subsequent crime bills. It expresses the clear Congressional will that the Commission provide appropriately severe penalties in this area without hamstringing the ability of the Commission to take into account variations in the actual offense conduct and significant offender characteristics. Given reasonable flexibility, I am confident the Commission can accomplish the desired aim without creating anomalous results or compromising the core principles of the Sentencing Reform Act.

Thank you for your consideration in this matter.

With highest regards and best wishes, I am,

Sincerely,

WILLIAM W. WILKINS, JR.,
Chairman.

**Appendix C:**
**Select Portions of Amendment 664**

"Background: Section 401(i)(1)(C) of Public Law 108-21 directly amended subsection (b) to add subdivision (7), effective April 30, 2003.".

Reason for Amendment: This amendment implements the directives to the Commission regarding child pornography and sexual abuse offenses in the Prosecutorial Remedies and Other Tools to end the Exploitation of Children Today Act of 2003, (the "PROTECT Act"), Pub. L. 108-21. This amendment makes changes to Chapter Two, Part A (Criminal Sexual Abuse), Chapter Two, Part G (Offenses Involving Commercial Sex Acts, Sexual Exploitation of Minors, and Obscenity), §§ 3D1.2 (Groups of Closely Related Counts), 5B1.3 (Conditions of Probation), 5D1.2 (Term of Supervised Release), and 5D1.3 (Conditions of Supervised Release), and Appendix A (Statutory Index).

First, the amendment consolidates §§ 2G2.2 (Trafficking in Material Involving the Sexual Exploitation of a Minor; Receiving, Transporting, Shipping, or Advertising Material Involving the Sexual Exploitation of a Minor; Possessing Material Involving the Sexual Exploitation of a Minor with Intent to Traffic), and 2G2.4 (Possession of Materials Depicting a Minor Engaged in Sexually Explicit Conduct), into one guideline, § 2G2.2 (Trafficking in Material Involving the Sexual Exploitation of a Minor; Receiving, Transporting, Shipping, or Advertising Material Involving the Sexual Exploitation of a Minor; Possessing Material Involving the Sexual Exploitation of a Minor with Intent to Traffic; Possession of Materials Depicting a Minor Engaged in Sexually Explicit Conduct). Consolidation addresses concerns raised by judges, probation officers, prosecutors, and defense attorneys regarding difficulties in determining the appropriate guideline (§ 2G2.2 or § 2G2.4) for cases involving convictions of 18 U.S.C. § 2252 or § 2252A. Furthermore, as a result of amendments directed by the PROTECT Act, these guidelines have a number of similar specific offense characteristics.

Section 103 of the PROTECT Act established five-year mandatory minimum terms of imprisonment for offenses related to trafficking and receipt of child pornography under 18 U.S.C. §§ 2252(a)(1)-(3) and 2252A(a)(1), (2), (3), (4) and (6). This section also increased the statutory maximum terms of imprisonment for these offenses from 15 years to 20 years. Furthermore, the PROTECT Act increased the statutory maximum penalty for possession offenses from five to ten years. As a result of these new mandatory minimum penalties and the increases in the statutory maxima for these offenses, the Commission increased the base offense level for these offenses.

The amendment provides two alternative base offense levels depending upon the statute of conviction. The base offense level is set at level 18 for a defendant convicted of the possession of child pornography under 18 U.S.C. § 2252(a)(4), 18 U.S.C. § 2252A(a)(5), or 18 U.S.C. § 1466A(b), and at level 22 for a defendant convicted of any other offense referenced to this guideline, primarily trafficking and receipt of child pornography. The Commission determined that a base offense level of level 22 is appropriate for trafficking offenses because, when combined with several specific offense characteristics which are expected to apply in almost every case (e.g., use of a computer, material involving children under 12 years of age, number of images), the mandatory minimum of 60 months' imprisonment will be reached or exceeded in almost every case by the Chapter Two calculations. The Commission increased the base offense level for possession offenses from level 15 to level 18 because of the increase in the statutory maximum term of imprisonment from 5 to 10 years, and to maintain proportionality with receipt and trafficking offenses. The amendment also provides a two-level decrease at § 2G2.2(b)(1) for a

defendant whose base offense level is level 22, whose conduct was limited to the receipt or solicitation of material involving the sexual exploitation of a minor, and whose conduct did not involve an intent to traffic in or distribute the material. Thus, individuals convicted of receipt of child pornography with no intent to traffic or distribute the material essentially will have an adjusted offense level of level 20, as opposed to an offense level of level 22, for receipt with intent to traffic, prior to application of any other specific offense characteristics. The Commission's review of these cases indicated the conduct involved in such "simple receipt" cases in most instances was indistinguishable from "simple possession" cases. The statutory penalties for "simple receipt" cases, however, are the same as the statutory penalties for trafficking cases. Reconciling these competing concerns, the Commission determined that a two-level reduction from the base offense level of level 22 is warranted, if the defendant establishes that there was no intent to distribute the material.

The amendment also provides a new, six-level enhancement at § 2G2.2(b)(3)(D) for offenses that involve distribution to a minor with intent to persuade, induce, entice, or coerce the minor to engage in any illegal activity, other than sexual activity.

The amendment also makes a number of changes to the commentary at § 2G2.2, as follows. The amendment adds several definitions, including definitions of "computer," "image," and "interactive computer service," to provide greater guidance for these terms and uniformity in application of the guideline. The amendment also broadens the "use of a computer" enhancement at § 2G2.2(b)(5) in two ways. First, the amendment expands the enhancement to include an "interactive computer service" (e.g., Internet access devices), as defined in 47 U.S.C. § 230(f)(2). The Commission concluded that the term "computer" did not capture all types of Internet devices. Thus, the amendment expands the definition of "computer" to include other devices that involve interactive computer services (e.g., Web-Tv). In addition, the amendment broadens the enhancement by explicitly providing that the enhancement applies to offenses in which the computer or interactive computer service was used to obtain possession of child pornographic material. Prior to this amendment, the enhancement only applied if the computer was used for the transmission, receipt or distribution of the material.

The PROTECT Act directly amended §§ 2G2.2 and 2G2.4 to create a specific offense characteristic related to the number of child pornography images. That specific offense characteristic provides a graduated enhancement of two to five levels, depending on the number of images. However, the congressional amendment did not provide a definition of "image," which raised questions regarding how to apply the specific offense characteristic. This amendment defines the term "image" and provides an instruction regarding how to apply the specific offense characteristic to videotapes. Application Note 4 states that an "image" means any visual depiction described in 18 U.S.C. § 2256(5) and (8) and instructs that each photograph, picture, computer or computer-generated image, or any similar visual depiction shall be considered one image. Furthermore, the application note provides that each video, video-clip, movie, or similar recording shall be considered to have 75 images for purposes of the specific offense characteristic. Application Note 4 also provides two possible grounds for an upward departure (if the number of images substantially under-represents the number of minors or if the length of the videotape or recording is substantially more than five minutes). Because the image specific offense characteristic created directly by Congress in the PROTECT Act essentially supercedes an earlier directive regarding a specific offense characteristic relating to the number of items (see Pub. L. 102-141 and Amendment 436), the Commission deleted the specific offense characteristic for possessing ten or more child pornographic items (formerly § 2G2.4(b)(3)). This deletion avoids potential litigation regarding issues of "double counting" if both specific offense characteristics were retained in the guideline.

In response to the increase in the use of undercover officers in child pornography investigations, the amendment expands the definition of “minor.” “Minor” is defined as (1) an individual who had not attained the age of 18 years; (2) an individual, whether fictitious or not, who a law enforcement officer represented to a participant (A) had not attained the age of 18 years, and (B) could be provided to a participant for the purposes of engaging in sexually explicit conduct; or (3) an undercover law enforcement officer who represented to a participant that the officer had not attained the age of 18 years.

The amendment also makes clear that distribution includes advertising and posting material involving the sexual exploitation of a minor on a website for public viewing but does not include soliciting such material. In response to a circuit conflict, the amendment adds an application note to make clear that the specific offense characteristic for material portraying sadistic or masochistic conduct applies regardless of whether the defendant specifically intended to possess, receive, or distribute such material. The circuit courts have disagreed regarding whether a defendant must have specifically intended to receive the sadistic or masochistic images. Some circuit courts have required that the defendant must have intended to receive these images. See United States v. Kimbrough, 69 F.3d 723 (5th Cir. 1995); United States v. Tucker, 136 F.3d 763 (11th Cir. 1998). The Seventh Circuit has held that this specific offense characteristic is applied based on a strict liability standard, and that no proof of intent is necessary. See United States v. Richardson, 238 F.3d 837 (7th Cir. 2001). The Commission followed the Seventh Circuit's holding that the enhancement applies regardless of whether the defendant specifically intended to possess, receive, or distribute such material.

Second, section 103 of the PROTECT Act increased the mandatory minimum term of imprisonment from 10 to 15 years for offenses related to the production of child pornography under 18 U.S.C. § 2251. In response, the amendment increases the base offense level at § 2G2.1 (Sexually Exploiting a Minor by Production of Sexually Explicit Visual or Printed Material; Custodian Permitting Minor to Engage in Sexually Explicit Conduct; Advertisement for Minors to Engage in Production) from level 27 to level 32. A base offense level of level 32 is appropriate for production offenses because, combined with the application of several specific offense characteristics that are expected to apply in almost all production cases (e.g., age of the victim), this base offense level will ensure that the 15 year mandatory minimum (180 months) will be met in by the Chapter Two calculations almost every case.

The amendment adds three new specific offense characteristics that are associated with the production of child pornography. The amendment provides, at § 2G2.1(b)(2), a two-level increase if the offense involved the commission of a sex act or sexual contact, or a four-level increase if the offense involved a sex act and conduct described in 18 U.S.C. § 2241(a) or (b) (i.e., the use of force was involved). The Commission concluded that this type of conduct is more serious than the production of a picture without a sex act or the use of force, and therefore, a two-or four-level increase is appropriate. The amendment also adds a two-level increase if the production offense also involved distribution. The Commission concluded that because traffickers sentenced at § 2G2.2 receive an increase for distributing images of child pornography, an individual who produces and distributes the image(s) also should be punished for distributing the item. Lastly, the amendment adds a new, four-level increase if the offense involved material portraying sadistic or masochistic conduct. Similar to the distribution specific offense characteristic, the Commission concluded that, because § 2G2.2 contains a four-level increase for possessing, receiving or trafficking these images, the producers of such images also should receive comparable additional punishment.