**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | |
| **ANGEL ANTHONY RIOS,** | **Case No. 26-cr-21 (BAH)** |
| **Defendant.** | |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this Memorandum in Aid of Sentencing in the above-referenced case. For the reasons set forth below, the government recommends a sentence of 80 months of incarceration, followed by 10 years of supervised release.

**FACTUAL AND PROCEDURAL BACKGROUND**

On January 18, 2026, an individual (Witness 1), reported to law enforcement that he received child pornography from an individual on X. Witness 1 advised that, on December 18, 2025, the defendant, Angel Anthony Rios, using X username @aariosdc, sent him a message saying that he was available to help Witness 1 with his, "journey across CA/DC politics and government."

Following an initial messaging interaction, on January 17, 2026, the defendant asked Witness 1 if he was single and the defendant stated that he found Witness 1 attractive. Later, the defendant sent Witness 1 a message (pictured below) indicating that he once had a 16-year-old football player "jerk his cock and show his hole to me on a vid chat."




The defendant also sent a message (pictured below) saying that he and Witness 1 could be an "LGBT+ community leader power couple" during the day and at night a, "goner cock whore child molesters getting high off of teenage dick and ass, drugging boys from the local high schools."




The defendant further stated, "How much do you want to molest little boys, [Witness 1]? They deserve to be raped and used, don't they?"

Shortly afterward, the defendant sent a message to Witness 1 saying, "I have under aged porn on my phone. Want to see it?" the defendant continued, "It's a 3 year old sucking the cock, briefly, of his own father, and the dad ripping his underwear open and playing with his cock."

The defendant then asked Witness 1 (pictured below), "How's it feel knowing you just watched child porn for, I'm assuming, the first time."




Witness 1 asked the suspect how he obtained the video and the defendant stated (pictured below) that he, "Got them live. Managed to talk the dad into doing it for me."[1]




On or about January 20, 2026, law enforcement viewed the contents of Witness 1's phone. Witness 1 previously reported that he had taken a screenshot of the videos that the defendant sent over the X application. The screenshot, which was viewed by law enforcement, depicted an adult male's penis over what appeared to be an approximately toddler-age male. The screenshot also showed that the video was distributed by the defendant to Witness 1 on the X application. A further examination of Witness 1's phone revealed one video depicting the sexual abuse of the same toddler child. The video, which is 22 seconds long, depicted a toddler placing

[1] The toddler and adult depicted in the video distributed by the defendant were subsequently identified by FBI agents. Agents arrested the adult in the video on January 28, 2026. He was indicted in the Middle District of Pennsylvania for production and distribution of child pornography. This matter is pending trial. The search of the Pennsylvania subject's devices as well as the defendant's devices, no messages were found between the defendant and the Pennsylvania subject.

his mouth on an adult male's erect penis repeatedly. Witness 1 stated that the defendant sent the video to him via X.

On January 20, 2026, an undercover officer contacted the defendant via text message and subsequently Snapchat. During the Snapchat conversation, the undercover officer referenced the video depicting the toddler child being sexually abused by an adult male. Rios stated in response that, "kids are here to be used, and I don't mean that ironically."

On January 23, 2026, law enforcement took Rios into custody. Rios waived his *Miranda* rights and stated that he had previously received child pornography, and described the content of the video distributed to Witness 1. A search of Rios' devices did not yield any child pornography images, including the images distributed to Witness 1, however, the messages exchanged with the undercover officer were located on his devices.

On August 14, 2026, the defendant pled guilty to Possession of Child Pornography in violation of 18 U.S.C. § 2252(a)(4)(B).

## DISCUSSION AND RECOMMENDATION

### I. Generally Applicable Legal Principles

In *United States v. Booker*, 125 S. Ct. 738 (2005), the Supreme Court held that the mandatory application of the United States Sentencing Guidelines violates the Sixth Amendment principles articulated in *Blakely v. Washington*, 124 S. Ct. 2531 (2004). As a consequence, the Court invalidated the statutory provision that made the Guidelines mandatory, 18 U.S.C. § 3553(b)(1). *Booker*, 125 S. Ct. at 756.

In post-*Booker* cases, the Supreme Court has stated that a district court should begin all sentencing proceedings by correctly calculating the applicable guidelines range. *See United States v. Gall*, 552 U.S. 38, 49 (2007) ("As a matter of administration and to secure nationwide

consistency, the Guidelines should be the starting point and the initial benchmark."). After giving both parties an opportunity to argue for an appropriate sentence, the district court should then consider all of the applicable factors set forth in 18 U.S.C. § 3553(a). *Id.* These factors include "the nature and circumstances of the offense and the history and characteristics of the defendant" (18 U.S.C. § 3553(a)(1)); the need for the sentence imposed to reflect the seriousness of the offense, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed correctional treatment (18 U.S.C. § 3553(a)(2)); the kinds of sentences available (18 U.S.C. § 3553(a)(3)); the Sentencing Guidelines and related Sentencing Commission policy statements (18 U.S.C. § 3553(a)(4) and (a)(5)); the need to avoid unwarranted sentencing disparities (18 U.S.C. § 3553(a)(6)); and the need to provide restitution to any victims of the offense (18 U.S.C. § 3553(a)(7)).

## II. <u>Sentencing Guidelines Calculation</u>

The government agrees with the Guidelines calculation set forth in the Presentence Report, estimating a final offense level of 27 and a guidelines range of 70 to 87 months. The defendant received a base offense level of 18 pursuant to United States Sentencing Guidelines (USSG) § 2G2.2(a)(1). The defendant received a two-point enhancement for material depicting a prepubescent minor under USSG § 2G2.2(b)(2). The defendant received a two-point enhancement for knowingly engaging in distribution under USSG § 2G2.2(b)(3)(F). The defendant received a four-point enhancement for material depicting an infant or toddler under USSG § 2G2.2(b)(4). The defendant received a two-point enhancement for use of a computer under USSG § 2G2.2(b)(6). Finally, the defendant received a two-point enhancement for possessing between 10 to 150 images under USSG § 2G2.2(b)(7)(A).

## II. 2021 Sentencing Commission Report

In 2012 and 2021, the U.S. Sentencing Commission published reports to Congress analyzing federal sentences in both production and non-production child pornography offenses. The reports call into question the applicability of several of the enhancements that apply in the instant matter including use of a computer and the number of images. These issues have been before Congress repeatedly, and Congress has declined to change the guidelines. Moreover, in the instant matter, each of these enhancements is and should be considered aggravating factors.

With respect to the use of a computer enhancement, the reason that computers are particularly harmful vectors for disseminating child pornography is because of the wide and "instantaneous transmission," which makes it difficult for law enforcement to detect and prosecute. *United States v. Lebovitz*, 401 F.3d 1263, 1271 (11th Cir. 2005)(quoting H.R. Rep. No. 104-90, at 3-4 (1995), as reprinted in 1995 U.S.C.C.A.N. 759, 760-61). In particular, the defendant could only have committed the instant offense by use of a computer. He did not merely possess images on a device, but instead used the internet to distribute a video depicting the abuse of a toddler to another individual via X. He used a computer and the internet to try to form a common bond with another individual online to discuss his sexual interest in children. Thus, the enhancement for use of a computer should apply. The enhancement for number of images should also apply. This enhancement distinguishes the individual who possesses a single still image from an individual who possesses a video or a larger collection of material. The guideline commentary specifically contemplated this distinction by counting a video as 75 images. The defendant in the instant matter did not distribute a single still image of the abuse of a toddler but rather a 22-second video showing an adult male holding his erect penis while the toddler places his mouth on the penis repeatedly.

The video appears to show the adult male treating his conduct as if it were a game to induce the toddler into putting his mouth on the adult male's penis. This horrific and dehumanizing conduct, captured in a video, is an aggravating factor and should serve to enhance the defendant's sentence.

While the Sentencing Commission's reports questioned certain enhancements in the current Guidelines, they also recommend three categories of aggravating factors that courts should consider when imposing sentences in non-production cases: content, community, and conduct. The Commission further explained how these factors should affect a defendant's sentence:

> The presence of aggravating factors from any of these three categories, even without the presence of any aggravating factors from the other two categories, warrants enhanced punishment depending on the degree that aggravating factors from that category are present in a particular case. The presence of aggravating factors from multiple categories generally would warrant a more severe penalty than the presence of aggravating factors from a single category.

U.S. Sent'g Comm'n, Report to Congress: Federal Child Pornography Offenses (2012) at 321 (hereinafter 2012 Report).

*Content*

As outlined in the 2012 Report, this factor directs courts to evaluate the content of an offender's collection and behavior "in terms of volume, the types of sexual conduct depicted in the images, the ages of the victims depicted, and the extent to which an offender has organized, maintained, and protected his collection over time, including through the use of sophisticated technology." 2012 Report at 320.

*Community*

This factor directs the Court to evaluate "the degree of an offender's engagement with other offenders — in particular, in an Internet 'community' devoted to child pornography and child sexual exploitation." 2012 Report at 320. The Commission distinguishes between impersonal file-

sharing exchanges, which involve "anonymous, indiscriminate" open exchange and no two-way communication, versus "personal" distribution in closed groups, involving two-way communication concerning child pornography and child exploitation. *Id.* at 313-14, 324.

*Conduct*

The third factor asks courts to assess whether an offender "has a history of engaging in sexually abusive, exploitative, or predatory conduct in addition to his child pornography offense." 2012 Report at 320. Notably, the Commission recommends that, in addition to criminal offenses, courts consider "non-criminal acts of sexually deviant behavior" because such behavior also indicates sexual dangerousness. *Id.* at. 325.

As described in this sentencing memorandum, the aggravating factors articulated by the sentencing commission would be applicable in the instant matter. When evaluating the defendant's content, the video distributed by the defendant depicted the dehumanizing sexual abuse of a toddler, which is particularly egregious content. As it relates to community, the defendant sought out Witness 1 to discuss his sexual interest in children and distribute child pornography. The defendant then discussed his interests with the undercover officer over text and Snapchat. This indicates that he was seeking out an online community to discuss his sexual interest in children. Finally, as to conduct, the defendant discussed at length his prior conduct involving sexually exploiting minors. He raised the idea of sending Witness 1 child pornography and then sent the video depicting the sexual abuse of the toddler. The defendant made statements to the undercover agent endorsing the sexual abuse of children.

Even if the Court is inclined to not apply enhancements as outlined by the sentencing manual to the defendant's case and instead apply these three aggravators to the defendant's

conduct, the application of these factors should result in the defendant receiving a guideline-compliant sentence.[2]

## IV. Government's Sentencing Recommendation

The government recommends a guidelines compliant sentence of 80 months of incarceration, to be followed by 10 years of supervised release. This sentence aligns with the sentencing factors outlined in 18 U.S.C. § 3553(a) and is sufficient, but not greater than necessary, to reflect the seriousness of the offense, to promote respect for the law, as well as to ensure a balance of justice to all individuals involved, and to provide the defendant with necessary rehabilitation measures.

## V. The § 3553(a) Factors Support a Sentence of 120 Months of Incarceration.

### A. Nature and Circumstances of the Offense

The defendant's conduct is serious. The defendant not only possessed child pornography but also distributed the video he possessed to a stranger on the internet. The defendant sought out Witness 1 and, over the course of approximately one month, cultivated an online relationship with him. The defendant introduced the conversation regarding his sexual interests and inquired about Witness 1's sexual interests. He then turned the conversation to discussing his sexual interest in children and asked Witness 1 if he would like to see a video depicting child pornography. Again, this was something that the defendant introduced to the conversation. The defendant then sent Witness 1 the video depicting the abuse of a toddler to a stranger online. In further conversations with the undercover agent, the defendant reiterated that he is interested in the sexual abuse of children, asserting, "kids are here to be used, and I don't mean that ironically."

[2] The government believes that the sentencing factors do apply and should be applied. However, the government provides an alternative argument in an abundance of caution due to differing views among judges about which enhancements should apply in child pornography trafficking cases.

The real-world impacts of trafficking in child pornography are severe. First, it perpetuates an immense psychological toll on the child depicted in the video. The fact that his abuse was not only captured on video but subsequently disseminated online to a stranger inflicts significant harm on the child.

Second, possession and distribution of CSAM perpetuate a market and demand for CSAM to be produced. The defendant's efforts to disseminate child pornography to a stranger online only feeds into the existing market for child sexual abuse material and contributes to the demand for the creation of more child pornography.

The nature and circumstances of the defendant's conduct warrants a guidelines sentence of 80 months incarceration.

**B. History and Characteristics of the Defendant**

The defendant has a limited criminal history, and no criminal history involving the sexual abuse of children. His lack of criminal history, however, only shows that he is capable of evading law enforcement detection. The defendant obtained the video that he distributed without being detected by law enforcement agents. It was only after Witness 1 reported the defendant's conduct to law enforcement that the investigation into this matter began. Therefore, this factor should not weigh in favor of sentence below the sentencing guidelines.

The evaluation submitted by the defendant by Dr. Erickson concludes that the defendant's conduct is likely not the result of a preferential pedophilic propensity, and rather the result of other difficulties in the defendant's life. This does not comport with the facts of the case. The defendant, in the midst of a sexual conversation with Witness 1, brings up for the first time his sexual interest in children. Witness 1 did not raise this issue or indicate he would continue talking to the defendant if they discussed the sexual abuse of children. This was an issue raised entirely by the defendant

and the distribution of the video of the toddler was an act he suggested to Witness 1. The defendant, by his admission, obtained this content two years ago and apparently kept it in his possession throughout that time. The fact that he sought this material out two years ago and subsequently had this discussion with Witness 1 indicates that his behavior was not the result of struggles in his life and rather the result of a years-long sexual interest in children.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and Provide Just Punishment for the Offense

The government's recommended sentence in this case would promote respect for the law and provide just punishment for the defendant's offenses. 18 U.S.C. § 3553(a)(2)(A). As the Eleventh Circuit explained in *United States v. Irey*, 612 F.3d 1160, 1206 (11th Cir. 2010):

> This purpose--essentially the "just des[s]erts" concept--should be reflected clearly in all sentences; it is another way of saying that the sentence should reflect the gravity of the defendant's conduct. From the public's standpoint, the sentence should be of a type and length that will adequately reflect, among other things, the harm done or threatened by the offense, and the public interest in preventing a recurrence of the offense.

Child pornography offenses are extremely serious because they result in perpetual harm to the most vulnerable victims, while simultaneously validating and normalizing the sexual exploitation of children. Courts across the country have recognized this:

> There can be no keener revelation of a society's soul than the way in which it treats its children. Given the current statistics surrounding child pornography, we are living in a country that is losing its soul.
>
> Child pornography is a vile, heinous crime. Mention the term to your average American and he responds with immediate disgust and a sense of unease. However, once it enters the legal system, child pornography undergoes sterilization. The sterilization goes far beyond properly removing emotion from sentencing decisions. Images are described in the most clinical sense. Victims all too often remain

> nameless. The only emotions on display are those of the defendants, sorry that their actions were discovered by law enforcement.

*United States v. Cunningham*, 680 F.Supp.2d 844, 847 (N.D. Ohio, 2010), *affirmed* 669 F.3d 723 (6th Cir. 2012).[3]

When enacting mandatory minimum penalties for those who produce and traffic in the sexual abuse and exploitation of children, Congress similarly described the evil of child pornography:

> [W]here children are used in its production, child pornography permanently records the victim's abuse, and its continued existence causes the child victims of sexual abuse continuing harm by haunting those children in future years . . . [The] existence of and traffic in child pornographic images creates the potential for many types of harm in the community and presents a clear and present danger to all children . . . it inflames the desires of . . . pedophiles . . . who prey on children, thereby increasing the creation of and distribution of child pornography and the sexual abuse and exploitation of actual children who are victimized as a result of the existence and use of these materials.

Child Pornography Prevention Act of 1996, Pub.L. No. 104-208, § 121, 110 Stat. 3009, 3009-27 (1996).

The gravity of trafficking in child sexual abuse material cannot be overstated. As the Supreme Court recognized in *New York v. Ferber*, 458 U.S. 747, 759 (1982), "the distribution of photographs and films depicting sexual activity by juveniles is intrinsically related to the sexual

---

[3] *See also In re Amy Unknown*, 636 F.3d 190, 201 n.12 (5th Cir. 2011) (*citing United States v. Norris*, 159 F.3d 926 (5th Cir. 1998) (describing how the distribution of child pornography creates a marketplace for images of children, perpetuating abuse); *United States v. Yuknavich*, 419 F.3d 1302, 1310 (11th Cir. 2005); *United States v. Grosenheider*, 200 F.3d 321, 332-34 (5th Cir. 2000).

abuse of children in at least two ways. First, the materials produced are a permanent record of the children's participation and the harm to the child is exacerbated by their circulation. Second, the distribution network for child pornography must be closed if the production of material which requires the sexual exploitation of children is to be effectively controlled."

Traffickers of child pornography, like the defendant, create a market and demand for materials depicting the sexual abuse and exploitation of real children. They contribute to the cycle of abuse and are in part responsible for the harm suffered by the children used to produce the materials in their collections. *See United States v. Goff,* 501 F.3d 250, 259-260 (3d Cir. 2007) ("Children are exploited, molested, and raped for the prurient pleasure of [defendant] and others who support suppliers of child pornography"). In *United States v. Goldberg,* the Seventh Circuit stated:

> The district judge was influenced by the erroneous belief that a sentence affects only the life of the criminal and not the lives of his victims. Young children were raped in order to enable the production of the pornography that the defendant both downloaded and uploaded-both consumed himself and disseminated to others. The greater the customer demand for child pornography, the more that will be produced. [Citations omitted].

491 F.3d 668, 672 (7th Cir. 2007). In other words, even if consumers of child pornography do not themselves molest children, their actions directly contribute to the abuse of children. Significant incarceration is necessary to promote respect for the law, ensure just punishment, and to reflect the seriousness of the defendant's offenses.

The government's proposed sentence would provide just punishment for these offenses, promote respect for child sexual abuse and exploitation laws, and reflect the seriousness of the defendant's offense and offenses against minor victims in general.

The defendant was a participant in and contributor to that market. He obtained child pornography, sought out another individual to discuss his sexual interest in children, and distributed child pornography to that person.

The U.S. Sentencing Commission has recognized that these offenses inflict what it described as "substantial and indelible harm" on the children who are victimized. United States Sentencing Commission, *Report to the Congress: Federal Child Pornography Offenses* (Dec. 2012). That harm is not limited to the moment of production. Research consistently shows that victims suffer ongoing psychological injury each time their images are redistributed and viewed. This is harm that endures into adulthood and victims describe it as a form of perpetual re-victimization. As the Chair of the Victims Advisory Group to the United States Sentencing Commission stated, "the proliferation of child abuse images increases the risk of future victimization and harms the victims who are the subject of those images" because "repeated exposure to those images normalizes the sexual assault of children, promoting cognitive distortions." *Id.*, App. D (statement of Chair, Victims Advisory Group).

The government's recommended sentence would reflect the true gravity of this conduct, promote respect for the laws enacted to protect children from this cycle of abuse, and ensure just punishment for an offense whose victims continue to suffer its consequences indefinitely.

**D. Adequate Deterrence and Protection of the Public**

CSAM trafficking offenses create a public safety risk for two reasons: 1) the overlap between individuals who engage in online trafficking of CSAM and individuals who engage in hands-on child sexual abuse and 2) the difficulty of detecting these crimes and monitoring compliance with conditions of release. Because of underreporting, it is difficult to obtain accurate statistics regarding the number of individuals who have committed CSAM trafficking offenses and

also committed hands-on abuse. A 2012 report released by the United States Sentencing Commission showed that approximately one in three non-production CSAM offenders had engaged in one or more types of criminal sexually dangerous behavior in addition to the charged CSAM offense. The Commission defined "criminal sexually dangerous behavior" as actual or attempted contact sex offenses, non-contact sex offenses, and prior non-production child pornography offenses. U.S. Sent'g Comm'n, Report to the Congress: Federal Child Pornography Offenses, 314-315 (2012); https://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/sex-offense-topics/201212-federal-child-pornography-offenses/Full_Report_to_Congress.pdf. One significant study on this topic conducted by M.C. Seto, et al. conducted two meta-analyses to estimate the extent of hands-on sexual offending among individuals who sexually offended online. The study looked at 4464 men who committed online sexual offenses which were mostly CSAM trafficking. The findings of the study revealed that 12% of the 4464 men had a history of hands-on offenses based strictly on official records including arrests and convictions. However, the study also interviewed a sub-sample of 523 men involved in CSAM trafficking offenses. One in two men within that subgroup, a total of 55%, admitted to perpetrating offline contact sexual offenses against minors. M.C. Seto, R.K. Hanson & K.M. Babchishin, *Contact Sexual Offending by Men with Online Sexual Offenses*, 23.1 Sexual Abuse: A Journal of Research and Treatment 124-45 (2011).

Another study conducted by Matthew DeLisi studied 216 federal offenders who were on supervised release between 2016 and 2020. Of the 216 group members, 109 had previously been charged with a sexual contact offense and 107 had been charged with non-contact CSAM offenses and had no prior arrests for contact offenses. 59% of the individuals convicted of CSAM offenses admitted to a prior contact sex offense for which they had never been charged. Dury A. J., Elbert

M. J., & DeLisi M., *The Dark Figure of Sexual Offending: A Replication and Extension*, 38.6 Behavioral Sciences & the Law 559-570 (2020).

This data is consistent with cases in this district where defendants who engage in CSAM trafficking offenses also engage in hands-on abuse. *United States v. Allen Love*, 07-cr-27 (RBW) (in 2007, the defendant was sentenced for transportation of child pornography for distributing CSAM to an undercover agent and subsequently violated supervised release in 2024 for contacting minors to meet them for sex); *United States v. Charles Hilton*, 24-cr-554 (ACR) (defendant, who was previously convicted of endangering the welfare of a child, was sentenced in 2025 for uploading CSAM of a minor child he abused in addition to large quantities of CSAM he found on the internet); *United States v. Linwood Barnhill*, 25-cr-149 (JMC) (defendant, who was previously convicted of possession of child pornography and pandering, was sentenced in 2026 for sex trafficking minors). Because of the link between CSAM offenders and offenders who engage in hands-on abuse, there is a serious risk of danger posed by CSAM offenders to children in the real world. A significant sentence is therefore warranted in this case to ensure the community is protected from the danger posed by the defendant.

Moreover, there have been cases in this District which demonstrate the difficulty in detecting these offenses. In *United States v. Bayo Bakare*, 23-cr-385 (TNM), the defendant was on supervised release following a conviction for Distribution of Child Pornography. The United States Marshal Service conducted a compliance check at Bakare's residence and recovered a phone that he was not authorized to have. The phone contained multiple images of child pornography. But for the compliance check conducted by law enforcement agents, Bakare's conduct would have gone undetected.

A significant sentence is necessary to achieve adequate deterrence, both specific and general. 18 U.S.C. § 3553(a)(2)(B). With respect to specific deterrence, the defendant's conduct represents an escalation from obtaining child pornography online to seeking out another individual to discuss CSAM and distributing CSAM to them.

Additionally, the Supreme Court has long recognized that penalizing those who traffic in child pornography reduces the demand that sustains its production, and that reducing demand is one of the most effective tools for reducing the number of children subjected to abuse. *Osborne v. Ohio*, 495 U.S. 103, 109-10 (1990). A sentence that does not meaningfully punish trafficking of CSAM, particularly in light of the escalation to potential hands-on abuse, signals to the many participants in that market that such conduct carries acceptable risks, encouraging others to engage in or continue similar behavior. General deterrence is particularly important in CSAM cases, where conduct can go undetected for long periods of time, particularly with sophisticated actors like Mr. Day, who used encrypted tools to hide their illegal actions.

A sentence of 80 months is necessary and appropriate to deter both this defendant and others who engage in, or contemplate engaging in, the organized trafficking of CSAM.

**E. Kinds of Sentences Available and the Need to Avoid Unwarranted Sentencing Disparities**

Section 3553(a)(6) requires courts to consider the need to avoid unwarranted sentencing disparities among defendants "with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). However, it "does not require the district court to avoid sentencing disparities . . . between [] defendants who might not be similarly situated." *United States v. Mattea*, 895 F.3d 762, 768 (D.C. Cir. 2018) (quoting *United States v. Guillermo Balleza*, 613 F.3d 432, 435 (5th Cir. 2010)).

Here, the U.S. Sentencing Commission's Judicial Sentencing Information shows that the average sentence length for individuals sentenced under U.S.S.G. § 2G2.2 with a final offense level of 27 and Criminal History Category I was 60 months during Fiscal Years 2021–2025. The median sentence length was 60 months.

U.S.S.G. § 2G2.2 covers a wide range of behavior, including possession, receipt, transportation, and distribution of child pornography, among other conduct. The Defendant pled guilty to possession of CSAM, and his actions were not those of a passive participant or mere bystander. The Defendant's actions place him as one of the more serious actors in the wide range of behavior contemplated by U.S.S.G. § 2G2.2.

A sentence of 80 months appropriately accounts for the entire context of the defendant's conduct while avoiding unwarranted disparity with similarly situated defendants.

**F. Restitution**

In child pornography cases, restitution is mandatory to any person "harmed as a result of" a defendant's crime. See 18 U.S.C. § 2259(a), (c); see also *United States v. Monzel*, 930 F.3d 470, 476 (D.C. Cir. 2019); *United States v. Hite*, 113 F. Supp. 3d 91, 94 (D.D.C. 2015) ("Pursuant to 18 U.S.C. § 2259, the victims of certain federal crimes, including possession of child pornography, are entitled to mandatory restitution."). Restitution includes "the full amount of the victim's losses," which may include any costs incurred by the victim for:

> (A) Medical services relating to physical, psychiatric, or psychological care;
> (B) Physical and occupational therapy or rehabilitation;
> (C) Necessary transportation, temporary housing, and childcare expenses;
> (D) Lost income;
> (E) Attorneys' fees, as well as other costs incurred; and
> (F) Any other losses suffered by the victim as a proximate result of the offense.

18 U.S.C. § 2259(a), (b)(3); *see also United States v. Hite*, 113 F. Supp. 3d 91, 94 (D.D.C. 2015).

Possession of Child Pornography is a child pornography trafficking offense, as defined in 18 U.S.C. § 2259(c)(3). Therefore, the Court shall determine the full amount of the victim's losses and shall order restitution in an amount that reflects the Defendant's relative role in the causal process that underlies the victim's losses, but which is not less than $3,000. 18 U.S.C. § 2259(b)(2).

In *Paroline v. United States*, 134 S. Ct. 1740 (2014), the United States Supreme Court faced a circuit split over the interpretation of 18 U.S.C. § 2259, specifically over "how to determine the amount of restitution a possessor of child pornography must pay to the victim whose childhood abuse appears in the pornographic materials possessed." *Paroline*, 134 S. Ct. at 1716. In *Paroline*, the defendant possessed two images of the victim who was seeking restitution. The Court's answer to this question involved three steps.

First, *Paroline* held that, because the statute defined a "victim" as someone "harmed as a result" of the offense, restitution under § 2259 was proper "only to the extent the defendant's offense proximately caused a victim's losses." *Id*. at 1722.

Second, the Court held that "proximate cause" under § 2259 did not require strict but-for causation. *Id*. at 1726-27. The Court recognized that in most child pornography possession cases, a victim's losses resulted from harm caused by the trafficking of his or her images by numerous "geographically and temporally distant offenders acting independently, and with whom the defendant had no contact." *Id.* at 1727. As a result, the Court held that:

> In this special context, where it can be shown that a defendant possessed a victim's images and that a victim had outstanding losses caused by the continuing traffic in those images but where it is impossible to trace a particular amount of those losses to the individual defendant by recourse to a more traditional causal inquiry, a court applying § 2259 should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses.

*Id*. at 1725. The Court made clear that, where the victim's losses are "the product of the acts of thousands of offenders," a restitution order should not be "too severe" but must not be merely "a token or nominal amount." *Id.* That is, in part, because a restitution order under § 2259 serves "twin goals," the first being to "help[] the victim achieve eventual restitution for all her child-pornography losses" and second to "impress[] upon offenders the fact that child pornography crimes, even simple possession, affect real victims." *Id.*

Third, the Court provided sentencing courts with the guidance regarding how to determine the proper amount of restitution under this standard. The Court noted that a sentencing court's goal should be to assess "the significance of the individual defendant's conduct in light of the broader causal process that produced the victim's losses," taking into account any "available evidence." *Id*. at 1727-28. The Court emphasized that there is no "precise mathematical inquiry" governing this determination and that district courts must exercise "discretion and sound judgment" in fashioning restitution awards. *Id*. at 1728. The Court suggested several factors to be considered, including: (1) the number of defendants convicted of possessing the victim's images; (2) the number of future offenders likely to be caught and convicted; (3) whether the defendant had any role in the initial production of the images; (4) whether the defendant reproduced or distributed the images; (5) how many images the defendant possessed; and (6) "other facts relevant to the defendant's relative causal role." *Id*. "These factors need not be converted into a rigid formula, especially if doing so would result in trivial restitution orders. They should rather serve as rough guideposts for determining an amount that fits the offense." *Id*. Congress has since amended Section 2259 to both codify *Paroline*'s basic approach and to set a restitution floor of $3,000. *See* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299, 132 Stat. 4383 (2018).

The Government has made efforts to contact the victim's family regarding restitution, however they have not responded. The government will continue to make efforts to make contact with the family.

## CONCLUSION

For the foregoing reasons, the government respectfully recommends that the defendant be sentenced to a term of incarceration of 80 months, followed by 10 years of supervised release. Such a sentence contemplates not only the relevant guidelines range set forth for this offense, but also adequately reflects the factors as outlined in 18 U.S.C. § 3553(a).

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

*/s/ Janani Iyengar*

Janani Iyengar
NY State Bar No. 5225990
Assistant United States Attorney
601 D St NW
Washington, DC 20530
(202) 252-7760
Janani.iyengar@usdoj.gov